1  Law Offices of George S. Burns
2  George S. Burns (Bar No. 124507)
   4100 MacArthur Boulevard, Suite 305
3  Newport Beach, CA 92660
   Telephone: (949) 263-6777
4  Facsimile:  (949) 263-6780

5  Attorneys for Plaintiff
   Advanced Materials Group, Inc., a Nevada corporation

6

7

8              UNITED STATES DISTRICT COURT

9     CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11 | Advanced Materials Group, Inc., a     | CASE NO.  SACV 08-43 JVS
      Nevada corporation                     (RNBx)
12

13                                           Assigned for all purposes to
                                             Honorable James Selna
                     Plaintiff,
14

15 | vs.                                    | **TRIAL TESTIMONY OF ED
                                             SYBESMA**

16 | Foamtec (Singapore) Pte. Ltd., a        Date:   March 16, 2009
      private limited company incorporated   Time:   8:30 a.m.
17   in Singapore; Foamex Asia Ltd., a       Dept.:  11:00 a.m.
      private limited company incorporated
18   in the Kingdom of Thailand and
      DOES 1 through 10, inclusive           Complaint Filed:  December 11,
19                                           2007
                     Defendants.
20 |                                        | Trial Date: March 31, 2009

21

22

23

24

25

26

27

28

Declaration of Ed Sybesma

1

2

## DECLARATION OF ED SYBESMA

3      I Ed Sybesma, declare as follows:

4

5      1.      I am an attorney licensed to practice in California.  If called as a

6 witness at the trial of this matter, I could and would give the following

7 testimony.

8

9      2.      I have acted as counsel to the plaintiff in this matter on various

10 matters, including the negotiation and drafting of the "Addendum", a true

11 and correct copy of which is attached as exhibit 1.  In negotiating the

12 agreement, I corresponded with Foamtec representatives including Mr.

13 S.L. Foong, whom I understood to be a senior Foamtec manager.

14

15      3.      The negotiation, drafting and execution of this Addendum took

16 place in May - June, 2003.  As of that time, I had reviewed and was familiar

17 with the series of agreements that had been entered into in 1998 by the

18 predecessor companies of AMG and Foametec, respectively.  I understood

19 that the general object of those agreements was the manufacture and sale

20 of specialty foam for use in Hewlett Packard ("HP") printers.

21

22      4.      In that context, I understood that the parties' intent for the

23 Addendum included to memorialize an agency relationship whereby

24 Foamtec would directly bill the customer for sales of the finished product,

25 and would provide accountings of same to AMG as its agent.  That was my

26 intention when I drafted the following provisions of the Addendum, a true

27 and correct copy of which is attached as exhibit 1.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

16.1  Section 2.1 of the Manufacturing Agreement is amended to read as follows:

2.1.  Purposes.  The purposes for which this Agreement were originally entered into were for AMFS to acquire raw materials from Foamex USA, and to sell such raw materials to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished foam products to AMFS, which will then sell such products to Hewlett-Packard, and to certain other approved customers and products, such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis.

Following the Addendum Effective Date, subject to the provisions of Section 3.2(d) of the Manufacturing Agreement, the purposes for which this Business Agreement is entered into (the "Business") shall be to manufacture and sell to Hewlett-Packard Company, a Delaware corporation, including its Affiliates and its successors and assigns (collectively, "Hewlett-

2

Packard"), finished foam products (the
"products"), with all manufacturing
sales, delivery, billing, and collection of
and for the Products to be effected by
Foamex as agent for the Business.

5.    The original Manufacturing Agreement (a copy of which is attached hereto as exhibit 2) did not specifically describe which product lines, or which customers, would be covered under its provisions (such as with a schedule of customer names or part numbers). During 2003, I generally understood that Hewlett Packard used approved subcontractors to manufacture and assemble the various components of the printers.

6.    On June 6, 2003, I received the e mail from Mr. Foong, a true and correct copy of which is attached as exhibit 3, as part of our negotiation of the Addendum in which he discussed Foamtec's understanding of the intended scope of this agreement, (the "Business", as it was called in the original Manufacturing Agreement). As he wrote:

1.4:   The "Business" of both of us means 'the entire
supply chain of the Products to HP Singapore
("HPS") and Malaysia ("HPM"), and their
contract manufacturers, wherever located in
Asia but linked back to the two agreed
territories'. Where does new area, "HPAsia",
come in?

Declaration of Ed Sybesma

1      7.      Mr. Foong's statement agreed with what I understood was the
2 parties' intent–that the sales under this agreement would not just be to HP
3 directly, but would also include sales to any other company involved in that
4 supply chain, such as HP's approved subcontractors.

5

6      8.      The above-quoted portion of the Addendum therefore refers to
7 sales to "Hewlett-Packard company, a Delaware corporation, including its
8 Affiliates and its successors and assigns (collectively, 'Hewlett-Packard')."
9 When I used the term "Affiliates" in the addendum, that was taken from the
10 original Manufacturing Agreement (exhibit 2 hereto) which at p.1 defines an
11 "Affiliate" as (emphasis added):

12

13            An "Affiliate", when used with respect to a
14            specified Person, shall mean (i) any other Person
15            directly or indirectly controlling, controlled by, or
16            under common control with, such specified Person,
17            (ii) any officer, director, partner (including any
18            officer or director of AMFS or Foamtec), legal
19            representative (including a trustee for the benefit of
20            such specified Person) or employee of such
21            specified Person, and (iii) any Person for which
22            such specified Person acts as an officer, director,
23            partner or employee.  As used in this definition of
24            "Affiliate, the term "control" and any derivatives
25            thereof mean the possession, directly or indirectly,
26            of the power to direct or cause the direction of the
27            management and policies of a Person, whether
28            through ownership of voting securities, by contract,

Declaration of Ed Sybesma

or otherwise.

9.    As the Addendum states at section 15, "<u>No other changes</u>", terms defined in the Manufacturing Agreement shall have the same meanings when used in the Addendum, unless expressly stated to the contrary.  Therefore, by defining "Hewlett Packard" in the Addendum to include its "Affiliates and its successors and assigns", it was my intention that this defined term should mean the same as in the original Manufacturing Agreement, and should include HP, as well as all subcontractor involved in the manufacturing process, because HP could "by contract, or otherwise", direct the management and policies of such subcontractors' actions with respect to the products at issue in this agreement.

10.    Attached as exhibit 4 is an email from me to Mr. SL Foong and others dated June 17, 2003.  Attached as exhibit 5 is Mr. Foong's response dated June 19, 2003, and attached as exhibit 6 is my June 19 response to Mr. Foong's email of the same date.  This correspondence for the most part discusses negotiating the Addendum.  However, one of the subjects discussed is the date of the original Manufacturing Agreement, which Mr. Foong told me he believed was January 8, though he said he did not have a full set of the contract documents.  I informed Mr. Foong in exhibit 4 that the version of the contract that I had in my files recited a date of January 30, 1998, and asked him for any version that he had with a different date. He responded in exhibit 5 that, "to resolve the date discrepancies and incomplete documents, we rely on the full complete set that you have in hand".  In exhibit 6, I agreed to this, and agreed to forward him copies of the original contract documents.  Finally, on June 30, 2003, I received from

Declaration of Ed Sybesma

1  Mr. Foong his acknowledgment of having received the copies of the

2  original contract documents, including the Manufacturing Agreement dated

3  January 30, 1998.  A copy of Mr. Foong's email to me acknowledging

4  receipt of the contract documents is attached as Exhibit 7.

5

6      11.    I understood that the issue was therefore resolved, and the

7  parties agreed the contract date was January 30, not January 8.  To my

8  knowledge, at no time thereafter did Mr. Foong or any other person from

9  Foamtec claim that the contract was dated as of January 8, rather than

10  January 30, until in 2007, when Foamtec sought to buy out AMG's interest

11  under the agreement, at which time I repeated AMG's position that the

12  contract was dated as of January 30, not January 8.

13

14      I declare under penalty of perjury under the laws of the United States

15  of America that the foregoing is true and correct, and that this declaration

16  was executed this ____ day of March, 2009 at Costa Mesa, California.

17

18                                    _____

19                                        Ed Sybesma

20

21

22

23

24

25

26

27

28

                            6                      Declaration of Ed Sybesma

**Exhibit 1**

AMG-ADD

# ADDENDUM TO MANUFACTURING AGREEMENT

This Addendum to Manufacturing Agreement (this "Addendum") is entered into as of June 19, 2003, by and between Advanced Materials Group, Inc., a Nevada corporation ("AMG"), and Foamex Asia Co. Ltd., a private limited company incorporated in the Kingdom of Thailand ("Foamex").

## RECITALS

A.    On or about January 30, 1998, Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation ("AMFS") and Foamtec (Singapore) Pte. Ltd., a private limited company incorporated in the Republic of Singapore, a wholly owned subsidiary of Foamex ("Foamtec") entered into that certain Manufacturing Agreement dated as of January 30, 1998 (the "Manufacturing Agreement") as well as that certain Advanced Materials Foreign Sales Corporation Limited Equipment Lease dated as of January 30, 1998 (the "Equipment Lease") and that certain Technical Information License Agreement dated as of January 30, 1998 (the "License Agreement").

B.    On or about May 1, 2001, AMFS and Foamex entered into that certain Variation to Manufacturing Agreement (the "May 1, 2001 Amendment"), modifying the percentage profit-sharing schedule set forth in section 3.1 of the Manufacturing Agreement. This Addendum, together with the Manufacturing Agreement, the May 1, 2001 Amendment, the Equipment Lease, the License Agreement, and the exhibits and attachments to the Manufacturing Agreement and the License Agreement are all collectively referred to herein as this "Business Agreement".

C.    AMG is the successor in interest to AMFS under the Manufacturing Agreement, under the Equipment Lease, and under the License Agreement, and Foamex is the successor in interest to Foamtec under the Manufacturing Agreement, under the Equipment Lease, and under the License Agreement; provided, however, that Foamex may conduct the Business or otherwise conduct operations under this Business Agreement, in whole or in part, through its wholly-owned subsidiary Foamtec.

D.    As a result of the joint venture Business established in connection with the Manufacturing Agreement, the business relationships of the parties hereto, and in particular that of Foamex, with Hewlett-Packard, for the distribution of Products to Hewlett-Packard, has been enhanced and solidified. Over the course of the performance of the terms of the Manufacturing Agreement, the parties have heretofore modified to some extent, and desire to further modify by this Addendum, the mechanics of distribution and financial relationships of the parties so as to effect further efficiencies in the operations hereunder. As a result of the changes heretofore effected and to be effected by this Addendum, AMG will relinquish substantially all of its direct involvement in and control over the distribution and billing activities of the Business in exchange for the right to receive a share of the profits of the Business for the term of the Manufacturing Agreement.

E.    The parties now desire, by the execution and delivery of this Addendum to Manufacturing Agreement, and by the recital contained in the paragraph C above, to confirm the

Exhibit 7 to Mortensen Decl.
Page 1 of 8

FM 0033

accession of AMG and Foamex as parties to the Manufacturing Agreement and related agreements, and to modify the Manufacturing Agreement as herein provided.

## AGREEMENT

14.  Section Numbering.  For convenience of reference and the avoidance of confusion, Section numbering contained in this Addendum is numbered to follow consecutively the Section numbering contained in the Manufacturing Agreement.

15.  No Other Changes.  Except as otherwise expressly provided herein, the Manufacturing Agreement, as amended by the May 1, 2001 Amendment, the License Agreement, and all of the terms and conditions contained in both the Manufacturing Agreement and the License Agreement, remain in full force and effect.  Except as expressly modified herein, terms which are defined in the Manufacturing Agreement and the License Agreement shall have the same meanings when used in this Addendum.

16.  Modification of Manufacturing Agreement.  The following Sections of the Manufacturing Agreement are hereby amended, effective as of the Addendum Effective Date, as follows:

16.1  Section 2.1 of the Manufacturing Agreement is amended to read as follows:

2.1.  Purposes.  The purposes for which this Agreement were originally entered into were for AMFS to acquire raw materials from Foamex USA, and to sell such raw materials to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished foam products to AMFS, which will then sell such products to Hewlett-Packard, and to certain other approved customers and products, such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis.

Following the Addendum Effective Date, subject to the provisions of Section 3.2(d) of the Manufacturing Agreement, the purposes for which this Business Agreement is entered into (the "Business") shall be to manufacture and sell to Hewlett-Packard Company, a Delaware corporation, including its Affiliates and its successors and assigns (collectively, "Hewlett-Packard"), finished foam products (the "Products"), with all manufacturing, sales, delivery, billing, and collection of and for the Products to be effected by Foamex as agent for the Business.

16.2  Section 2.3 of the Manufacturing Agreement is amended to read as follows:

2.3.  Conduct.  On behalf of the Business, Foamex shall manufacture, sell and deliver to Hewlett-Packard the Products, and shall bill and collect from Hewlett-Packard for such sales.  Foamex shall use its reasonable best efforts to procure raw materials, manufacture the Products, utilize shipment and delivery practices, establish pricing for the Products, and

2

Exhibit 7 to Mortensen Decl.
Page 2 of 8

FM 0034

otherwise conduct its operations hereunder in a manner designed to maximize the profits to the Parties for the term of the Manufacturing Agreement.

16.3    The introductory paragraph, preceding the table in Section 3.1 of the Manufacturing Agreement is amended to read as follows:

3.1.    Profit Sharing.  Except as otherwise expressly stipulated herein, the interest of the respective Parties in the profits of the Business shall be as follows:

(The table setting forth profit-sharing percentages, as amended by the May 1, 2001 Amendment, shall remain unchanged, except to substitute AMG in place of AMFS and Foamex in place of Foamtec.)

16.4    The introductory paragraph of Section 3.2 of the Manufacturing Agreement is amended to read as follows:

3.2.    Calculation of Profits.  Profits are to be determined by deducting all costs arising under the Agreement from the revenues arising under the Agreement, all as determined on the accrual basis of accounting as determined under generally accepted accounting principles.

16.5    Subdivision (a) of Section 3.2 of the Manufacturing Agreement is amended to read as follows:

(a)    Revenues.  Payments due from Hewlett-Packard  for accrued sales of the Products to Hewlett-Packard.

16.6    Subdivision (c) of Section 3.2 of the Manufacturing Agreement is amended to substitute Foamex in place of AMFS wherever referenced therein, so as to reflect the substitution of Foamex responsibilities in place of those of AMG (AMFS) for the acquisition of materials and other manufacturing and distribution activities hereunder.

16.7    A new Subdivision (d) of Section 3.2 of the Manufacturing Agreement is hereby added to read as follows:

(d)    MFN Costs.  All materials, including foam, acquired for the Business from Foamex or from any Affiliate of Foamex shall be charged at the lowest price charged by Foamex or its Affiliates to any third party buyer.

16.8    Section 3.3 of the Manufacturing Agreement is deleted in its entirety.

16.9    Section 3.4 of the Manufacturing Agreement is amended to read as follows:

3.4    Time of Payments.  Payments by Foamex to AMG for AMG's percentage share of the profits as calculated under Sections 3.1 and 3.2 shall be made on a monthly basis within 60 ( sixty) business days after the

3

Exhibit 7 to Mortensen Decl.
Page 3 of 8

FM 0035

close of each calendar month, together with Foamex' detail of the revenues and costs used to calculate the Profits under Section 3.2 above. Payments by Foamex to AMG shall be subject to any withholding taxes or other deductions required by law (which shall be paid promptly and as required by law to the appropriate taxing authorities for the account of AMG, with full accounting therefor to AMG) and to set off for any liquidated sums due from AMFS or AMG to Foamex or Foamtec, including any debts going prior to the effective date of this Addendum.

16.10   The addresses for notice under Section 12.1 of the Manufacturing Agreement are amended to read as follows:

If to AMG, to:

Mr. Steve Scott, President
Advanced Materials Group, Inc.
20211 South Susana Road
Rancho Dominguez, CA 90221
facsimile:            (310) 763-6869
confirming no:    (310) 537-5444

with a copy to:

Ed Sybesma, Esq.
Rutan & Tucker, LLP
611 Anton Boulevard
Suite 1400
Costa Mesa, CA 92626
facsimile:            (714) 546-9035
confirming no:    (714) 641-3427

If to Foamex, to:

Mr. Steve Scibelli, President
Foamex Asia Co., Ltd.
175 Sathorn City Tower
22nd Floor
South Sathorn Road
Sathorn, Bangkok 10120
Thailand
facsimile:            66 (662) 679-6107
confirming no:    66 (662) 679-6106

4

Exhibit 7 to Mortensen Decl.
Page 4 of 8

with a copy to:

Mr. Steve Scibelli, President
Foamtec (Singapore) Pte. Ltd.
6, Sungei Kadut Crescent
Singapore 728689
facsimile:      (65) 6368 1831
confirming no:  (65) 6368 2898

17.    **Additional Provisions.**

17.1    AMG hereby guarantees to Foamex payment and performance of all obligations, if any, of AMFS under the Manufacturing Agreement.

17.2    Foamex hereby guarantees to AMG payment and performance of all obligations, if any, of Foamtec under the Manufacturing Agreement.

17.3    Representations and Warranties by AMG.  AMG represents and warrants to, and covenants with Foamex, as follows:

(a)    AMG is a corporation duly organized and validly existing under the laws of the State of Nevada and is in good standing in such jurisdiction. AMG is qualified to do business and in good standing as a foreign corporation in the State of California and in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the operations or financial condition of the Business.

(b)    AMG has the full right, power and authority to enter into this Addendum and this Business Agreement and will at all times have the full power and authority to perform its obligations under the Business Agreement. The Business Agreement has been duly authorized, executed and delivered by it, and this Business Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c)    AMG is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Business Agreement.

(d)    There is no litigation or proceeding pending or, to the best of AMG's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving AMG, which could, if adversely determined, materially and adversely affect the operations or financial condition of the Business or the performance of AMG's obligations under this Business Agreement.

5

Exhibit 7 to Mortensen Decl.
Page 5 of 8

FM 0037

(e)  AMG is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into an undertaking the performance of this Business Agreement.

17.4  Representations and Warranties by Foamex.  Foamex represents and warrants to, and covenants with AMG, as follows:

(a)  Foamex is a private limited company duly organized and validly existing under the laws of the Kingdom of Thailand and is in good standing in such jurisdiction.  Foamex is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the operations or financial condition of the Business.

(b)  Foamex has the full right, power and authority to enter into the Business Agreement and will at all times have the full power and authority to perform its obligations under the Business Agreement.  The Business Agreement has been duly authorized, executed and delivered by it, and this Business Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c)  Foamex is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Business Agreement.

(d)  There is no litigation or proceeding pending or, to the best of Foamex's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving Foamex, which could, if adversely determined, materially and adversely affect the operations or financial condition of the Business or the performance of Foamex's obligations under this Business Agreement.

(e)  Foamex is not, nor at any time will it be, in violation of any existing law, be it state, federal, or national, by entering into an undertaking the performance of this Business Agreement.

18.  Term and Effectiveness.  This Addendum shall be effective (the "Addendum Effective Date") commencing June 23, 2003.

19.  Entire Agreement.  The Business Agreement constitutes the entire agreement between the parties hereto concerning the subject matter thereof, and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties, and there are no warranties, representations or agreements among the parties except as set forth in the Business Agreement.  No amendment, supplement, modification, waiver, or termination of the Business Agreement, or any provision hereof, shall be binding unless executed in writing by the party against whom any of the foregoing is sought to be enforced.  No waiver of any provision of the Business Agreement shall constitute a waiver

6

Exhibit 7 to Mortensen Decl.
Page 6 of 8

FM 0038

of any other provision (whether similar or not), nor shall any waiver constitute a continuing waiver unless otherwise expressly provided hereunder or in writing signed by the party against whom any such waiver is sought to be enforced.

20.    Counterparts.  This Addendum may be executed in counterparts, and each executed counterpart shall be deemed to be a duplicate original of this Addendum.

21.    Headings.  The captions and headings contained in this Addendum are for convenience only and shall not affect the construction or interpretation of any provisions of this Addendum.

22.    Applicable Law.  The obligations, rights, duties, powers and remedies under this Addendum and of the parties hereto shall be governed and construed by the laws of the State of California.  If any legal action is necessary to enforce the terms and conditions of the Business Agreement, the parties hereby agree that the Superior Court of California, County of Orange, or, if applicable, federal District Court sitting in the County of Orange, State of California, shall be the sole venue and jurisdiction for the bringing of such action.

23.    Reformation and Severability of Provisions.  If any provision of this Addendum is found illegal, invalid or unenforceable pursuant to judicial or tribunal decree or decision, then such provision shall be deemed automatically adjusted to the minimum extent necessary to conform to the requirements for legality, validity and enforceability, as declared at such time and, as so adjusted, shall be deemed a provision of this Addendum as though originally included herein, and the remainder of this Addendum will remain legal, valid and enforceable according to its terms. In the event that the provision deemed illegal, invalid or unenforceable is of such a nature that it cannot be so adjusted, the provision shall be deemed deleted from this Addendum as though such provision had never been included herein.

        IN WITNESS WHEREOF, the parties have executed this Addendum as of the date first above written.

Dated:  June 19, 2003              Advanced Materials Group, Inc., a Nevada corporation

                                   By:  _____
                                        Steve Scott, President
                                                                    ("AMG")

Dated:  June 21, 2003              Foamex Asia Co. Ltd., a private limited company
                                        incorporated in the Kingdom of Thailand,

                                   By:  _____
                                        Steve Scibelli, President
                                                                    ("Foamex")

7

Exhibit 7 to Mortensen Decl.
Page 7 of 8

FM 0039

CONSENT & ACKNOWLEDGMENT.

By the execution of this Addendum below, AMFS and Foamtec each hereby respectively consent and agree to, and acknowledge the validity of, the foregoing recitals and provisions insofar as they affect the undersigned.

Dated: June 19, 2003          Advanced Materials Foreign Sales Corporation Ltd., a
                                        Bermuda corporation

                                        By: _____
                                              Steve Scott, President
                                                                            ("AMFS")

Dated: June 23, 2003          Foamtec (Singapore) Pte. Ltd., a private limited
                                        company incorporated in the Republic of
                                        Singapore

                                        By: _____
                                              Steve Scibelli, President
                                                                            ("Foamtec")

8

Exhibit 7 to Mortensen Decl.
Page 8 of 8

FM 0040

**Exhibit 2**



DC&M Draft: 1/28/98

# MANUFACTURING AGREEMENT

THIS MANUFACTURING AGREEMENT (the "Agreement") is made and entered into as of the 30th day of January, 1998 (the "Closing Date"), by and between Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation ("AMFS"), and Foamtec (Singapore) Pte Ltd., a Singapore private limited company ("Foamtec").

## RECITALS

WHEREAS, AMFS proposes to obtain raw material from Foamtec's affiliate in the United States ("Foamex USA"), and to sell such raw material to Foamtec; and

WHEREAS, Foamtec proposes to fabricate foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished products to AMFS; and

WHEREAS, AMFS will sell such finished products to Hewlett-Packard and certain other approved customers and products, on a case-by-case basis; and

WHEREAS, AMFS has agreed to lease certain machinery and equipment (the "Equipment") to be located at Foamtec's facility pursuant to an equipment lease in the form of Exhibit A hereto (the "Equipment Lease") and certain intellectual property, trade secrets and "know-how" (the "Technology") pursuant to a license agreement in the form of Exhibit B hereto (the "License Agreement") to Foamtec for use in connection with the business contemplated by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, AMFS and Foamtec hereby covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

The following defined terms used in this Agreement shall have the respective meanings specified below.

*"Additional Term"* shall have the meaning set forth in Section 2.2(b).

An *"Affiliate"*, when used with respect to a specified Person, shall mean (i) any other Person directly or indirectly controlling, controlled by, or under common control with, such specified Person, (ii) any officer, director, partner (including any officer or director of AMFS or

Exhibit 1 to Mortensen Decl.
Page 1 of 14

FM 0041



Foamtec), legal representative (including a trustee for the benefit of such specified Person) or employee of such specified Person, and (iii) any Person for which such specified Person acts as an officer, director, partner or employee. As used in this definition of "Affiliate," the term "control" and any derivatives thereof mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"*Agreement*" shall have the meaning set forth in the preamble.

"*AMFS*" shall have the meaning set forth in the preamble.

"*Business*" shall have the meaning set forth in Section 2.1.

"*Business Plan*" shall have the meaning set forth in Section 6.4(1).

The "*Closing Date*" shall have the meaning set forth in the preamble.

The "*Defaulting Party*" shall have the meaning set forth in Section 7.1.

"*Equipment*" shall have the meaning set forth in the preamble.

"*Equipment Lease*" shall have the meaning set forth in the preamble.

"*Event of Default*" shall have the meaning set forth in Section 7.1.

"*Foamex USA*" shall have the meaning set forth in the preamble.

"*Foamtec*" shall have the meaning set forth in the preamble.

"*Indemnified Party*" shall have the meaning set forth in Section 11.2.

"*Indemnifying Party*" shall have the meaning set forth in Section 11.2.

"*License Agreement*" shall have the meaning set forth in the preamble.

"*Nondefaulting Party*" shall have the meaning set forth in Section 7.1.

"*Notice of Default*" shall have the meaning set forth in Section 7.1.

"*Party*" shall mean either of AMFS or Foamtec, as the context requires.

"*Parties*" shall mean AMFS and Foamtec.

Exhibit 1 to Mortensen Decl.
Page 2 of 14

FM 0042

*"Person"* shall mean any individual, partnership, association, governmental instrumentality, corporation, trust or other legal person or entity.

*"Products"* shall have the meaning set forth in Section 2.1.

*"SIAC Rules"* shall have the meaning set forth in Section 10.2.

*"Technology"* shall have the meaning set forth in the preamble.

*"Term"* shall have the meaning set forth in Section 2.2.

## ARTICLE 2
## PURPOSES: TERM AND CONDUCT

2.1.   <u>Purposes.</u>  The purposes for which the Agreement is entered (the "Business") are for AMFS to acquire raw material from Foamex USA, and to sell such raw material to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished foam products to AMFS, which will then sell such products to Hewlett-Packard and to certain other approved customers and products, such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis (the "Products").

2.2.   <u>Term.</u>

(a)   The Agreement shall commence on the Closing Date and, subject to the provisions otherwise contained herein, shall terminate ten (10) years thereafter subject to renewal as provided in Section 2.2(b), below (the "Term") unless sooner terminated as otherwise provided in this Agreement or by law.

(b)   This Agreement may be renewed by either party for an additional five (5) year period (the "Additional Term"), provided the party desiring to renew the Agreement for such Additional Term notifies the other party in writing at least six months prior to expiration of the Term hereof.

2.3.   <u>Conduct.</u>  The Agreement shall be effected as follows:

(a)   AMFS shall purchase raw material from Foamex USA at a price representing the best price for such material offered by Foamex USA anywhere in the world at that time.  Foamtec will reasonably cooperate with AMFS to ensure AMFS receives from Foamex USA the pricing described in the previous sentence, and to make such books and records reasonably available as are necessary or desirable to AMFS's auditors to verify such best price.

(b)   AMFS will sell such raw material to Foamtec at a price as determined in

3

Exhibit 1 to Mortensen Decl.
Page 3 of 14

FM 0043

Section 3.3(a), below.

(c)    Foamtec shall fabricate such raw material into finished product at Foamtec's facility, utilizing Foamtec's personnel and the Equipment and Technology of AMFS, and shall resell such finished product to AMFS at a price equal to the price determined as set forth in Section 3.3(b), below.

(d)    AMFS shall sell and deliver such finished products to Hewlett-Packard and such other customers at the same prices as are determined in accordance with Section 2.3(c) and Section 3.3(b).

## ARTICLE 3
## COSTING

3.1.    Profit Sharing.  Except as otherwise expressly stipulated herein, the interest of the respective Parties in the profits resulting from the difference between the price of the raw materials described in Section 2.3(a) and the retail price for sales to customers described in Section 2.3(d) shall be as follows (commencing as at the date of the first sale of the Products to a retail customer hereunder):

| Year | AMFS | Foamtec |
|------|------|---------|
| 1 | 65 | 35 |
| 2 | 60 | 40 |
| 3 | 50 | 50 |
| 4 | 45 | 55 |
| 5 | 40 | 60 |
| 6-10 | 35 | 65 |

3.2    Calculation of Profits.  Profits are to be determined by deducting all costs arising under the Agreement from the revenues arising under the Agreement.

(a)    Revenues.  Payments received from customers as contemplated by Section 2.3(c).

(b)    Costs - Foamtec.  Foamtec shall be permitted to charge AMFS, in U.S. dollars, amounts to compensate Foamtec for all raw materials, direct labor costs (including compensation and benefits), variable overhead (utilities, packaging, supplies, repairs and maintenance, outbound freight, inspection and manufacturing, supervision), fixed overhead (facility rent, purchasing, receiving, shipping, plant manager), operating expenses (sales and marketing, accounting, legal and audit) and an amortization charge for start-up costs. The foregoing manufacturing costs will be computed as further described in Schedule 3.2(b) and reviewed periodically and approved by the parties pursuant to Article 4. These manufacturing

4

Exhibit 1 to Mortensen Decl.
Page 4 of 14





costs must remain competitive to U.S. plant manufacturing standards, usage and plant space utilization.

(c)    Costs - AMFS.    Costs incurred by AMFS for direct material (including costs of transportation, duties, brokers' fees, insurance, manufacturing scrap and so forth), fixed overhead (including payments under the Equipment Lease and the License Agreement, and quality control and purchasing allocations), operating expenses (including sales and marketing) and non-operating expenses (including imputed interest charges for inventory and accounts receivable and an amortization charge for start-up costs will be charged as costs). These costs will be reviewed periodically and approved by the parties pursuant to Article 4.

3.3    Calculation of Purchase Price.

(a)    The price described in Section 2.3(b) shall be determined by the parties pursuant to Article 4 and shall be intended to provide that the difference between the price paid by AMFS to Foamex USA for raw material and the price paid by Foamtec to AMFS for the same raw material shall represent the portion of the profit in good faith estimated to accrue to AMFS as set forth in Section 3.1 and as calculated in Section 3.2.

(b)    The price described in Section 2.3(c) shall be determined by the parties pursuant to Article 4 and shall be intended to provide in good faith that the difference between the price paid by Foamtec to AMFS for raw material and the price paid by AMFS to Foamtec for finished product fabricated from such raw material shall represent the portion of the profit in good faith estimated to accrue to Foamtec as set forth in Section 3.1 and as calculated in Section 3.2.

3.4    Time of Payments.    Payments by AMFS to Foamtec and payments by Foamtec to AMFS as contemplated herein shall be made on a quarterly basis within ten (10) business days after the quarter is closed, and shall be netted against each other, with such adjustments as may be determined in good faith by the parties pursuant to Article 4 so as to most accurately reflect the intent of the parties as set forth in Section 3.1.

## ARTICLE 4
## OVERSIGHT

4.1.    Oversight.    The parties shall perform under this Agreement under the joint direction of an appointee of each of AMFS (initially, Steve F. Scott) and Foamtec (initially, Stephen P. Scibelli). Any disputes or disagreements arising from this Agreement shall initially be referred jointly to such appointees, who shall in good faith attempt to resolve such disputes promptly and within the spirit of this Agreement.

## ARTICLE 5
## BOOKS AND RECORDS: AUDITS

5.

Exhibit 1 to Mortensen Decl.
Page 5 of 14



FM 0045



5.1.    Books; Statements.  The Parties shall keep accurate, full and complete books and accounts showing its operations and transactions relating to the Business.

5.2.    Access.  Each Party shall have access to and may inspect and copy the books, accounts and records of the other Party maintained in accordance with Section 5.1, provided that any request for access to the books, accounts and records of the other Party must be reasonable.

5.3.    Audits.  In addition to the foregoing, any Party may, at its option and at its own expense, conduct internal audits of the books, records and accounts of the other Party, but only to the extent that such books, records and accounts relate to the Business.  Audits may be on either a continuous or a periodic basis or both and may be conducted by employees of any Party, or of an Affiliate of any Party, or by independent auditors retained by any Party.

5.4.    Other Information.  Each Party shall make available to the other Party such information and financial statements related to the Business, in addition to the foregoing, as shall be required by either of them in connection with the preparation of registration statements, current and periodic reports, proxy statements and other documents required to be filed under foreign, federal or state securities laws and shall cooperate in the preparation of any such documents.

## ARTICLE 6
## NO ASSIGNMENT; RIGHTS TO PURCHASE AN INTEREST

6.1.    Consent Required.  Except as provided in Section 6.2, without the prior written consent of the other Party (which may be withheld for any or no reason), no Party, nor any assignee or successor in interest of any Party, shall (voluntarily or involuntarily) sell, assign, give, pledge, hypothecate, encumber or otherwise transfer all or any part of its interest in this Agreement.

6.2    Right to Purchase and Sell.  At any time following the third anniversary of the date hereof, Foamtec shall have the right, exercisable from time to time by written notice to AMFS, to purchase the interest of AMFS under this Agreement at a price calculated as the present value, discounted at the average over the prior three months of the prime rate as announced from time to time by Wells Fargo Bank, N.A. Head Office as its prime rate, of the portion of the income reasonably expected to accrue to AMFS as provided in Section 3.1 hereof over the remaining balance of the initial Term hereof (if exercised during the initial Term) or for the balance of the Additional Term (if exercised during the Additional Term) based on the forecast from Hewlett-Packard of its orders for products of the Business during such period. Within 30 days of such notice, the Parties shall execute such documents and instruments reasonably acceptable to the Parties required to consummate the contemplated transaction, including AMFS' transfer of the Technology to Foamtec. The closing of such transaction shall take place within 30 days following the date on which any government regulatory approvals

6

Exhibit 1 to Mortensen Decl.
Page 6 of 14



required for consummation of the transaction have been obtained or otherwise satisfied.

## ARTICLE 7
### TERMINATION

7.1.    Event of Default. In the event:

(a)    a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator (or other similar official) shall take possession of a Party or any substantial part of its property without its consent, or a court having jurisdiction in the premises shall enter a decree or order for relief in respect of a Party in an involuntary case under any applicable bankruptcy, insolvency, moratorium or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator (or other similar official) of such Party or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs and such decree or order shall remain unstayed and in effect for a period of 30 consecutive days; or

(b)    a Party shall commence a voluntary case under any applicable bankruptcy, insolvency, moratorium or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, conservator, sequestrator (or other similar official) of such Party or of any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall take any corporate action in furtherance of any of the foregoing; or

(c)    a Party shall admit in writing its inability to pay its debts as they mature; or

(d)    a Party shall give notice to any governmental body of insolvency or pending insolvency, or suspension or pending suspension of operations; or

(e)    any Party fails to perform any of its obligations or covenants or breaches any of its representations under this Agreement or pursuant to the agreements attached as Exhibits hereto (an "Event of Default").

then the other Party (the "Nondefaulting Party") shall have the right to give such party (the "Defaulting Party") a notice of default ("Notice of Default"). The Notice of Default shall set forth the nature of the obligations which the Defaulting Party has not performed.

7.2    Thirty (30) Day Period After Event of Default.

(a)    If within the thirty (30) day period following receipt of the Notice of Default, the Defaulting Party in good faith commences to perform such obligations and cure such

-7-

Exhibit 1 to Mortensen Decl.
Page 7 of 14

FM 0047

default, and thereafter prosecutes to completion with diligence and continuity the curing thereof and cures such default within a reasonable time, then it shall be deemed that the Notice of Default was not given and the Defaulting Party shall lose no rights hereunder. If, within such thirty (30) day period, the Defaulting Party does not commence in good faith the curing of such default or does not thereafter prosecute to completion with diligence and continuity the curing thereof, then the Nondefaulting Party may, at the option of the Nondefaulting Party, terminate this Agreement by giving the Defaulting Party written notice thereof.

(b)     Failure by a Nondefaulting Party to give any Notice of Default as specified herein, or any failure to insist upon strict performance of any of the terms of this Agreement, shall not constitute a waiver of any such breach or any of the terms of this Agreement.  No breach shall be waived and no duty to be performed shall be altered or modified except by written instrument.  One or more waivers or failures to give Notice of Default shall not be considered as a waiver of a subsequent or continuing breach of the same covenant.

7.3.    Continuing Obligations.  The termination of this Agreement for any reason shall neither release either Party hereto from any liabilities, obligations or agreements which, pursuant to any provisions of this Agreement, are to survive or be performed after such termination nor shall it release either Party hereto from its liability to pay any sums of money accrued, due, and payable to the other Party or to discharge its then-accrued and unfulfilled obligations.

7.4.    Not Exclusive Remedy.  The rights granted in Section 7.1 and Section 7.2 above shall not be deemed an exclusive remedy of a Nondefaulting Party or a Solvent Party, but all other rights and remedies, legal and equitable, shall be available to it.

## ARTICLE 8
## COVENANT NOT TO COMPETE

8.1.    Covenant not to Compete.  Each Party and its Affiliates, so long as such Party remains a Party hereunder, are prohibited from directly or indirectly engaging in or possessing an interest in an activity, the purpose or business of which is identical to that described in Section 2.1, relating to the manufacture of products of the sort manufactured under this Agreement, to be sold to customers under this Agreement, during the Term of this Agreement, in Singapore or Malaysia. However, notwithstanding anything in this Agreement to the contrary, Foamex Asia Co., Ltd., a private limited company incorporated in the Kingdom of Thailand which is an Affiliate of Foamtec, shall have the right to sell raw materials to anyone in Singapore, Malaysia or elsewhere.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

9.1.    Representations and Warranties by AMFS.  AMFS represents and warrants to, and covenants with Foamtec, as follows:

8

Exhibit 1 to Mortensen Decl.
Page 8 of 14

FM 0048



(a)    AMFS is a corporation duly organized and validly existing under the laws of the State of California and is in good standing in such jurisdiction. AMFS is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the operation, or financial condition of the Business.

(b)    AMFS has the full right, power and authority to enter into this Agreement and will at all times have the full power and authority to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by it, and this Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other loss affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c)    AMFS is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Agreement.

(d)    There is no litigation or proceeding pending nor, to the best of AMFS's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving AMFS or its parent, which could, if adversely determined, materially and adversely affect the operation or financial condition of the Business or the performance of AMFS's obligations under this Agreement.

(e)    AMFS is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into and undertaking the performance of this Agreement.

9.2.    <u>Representations and Warranties by Foamtec</u>. Foamtec represents and warrants to, and covenants with, AMFS, as follows:

(a)    Foamtec is a private limited company duly organized and validly existing under the law of the Republic of Singapore and is in good standing in such jurisdiction. Foamtec is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the business or financial condition of the Business.

(b)    Foamtec has the full right, power and authority to enter into this Agreement and will at all times have the full power and authority to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by it, and this Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other loss affecting creditors' rights generally, or equitable principles, whether applied in a proceeding

FM 0049





in equity or law.

 (c) Foamtec is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Agreement.

 (d) There is no litigation or proceeding pending nor, to the best of Foamtec's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving Foamtec or its patent, which could, if adversely determined, materially and adversely affect the operation or financial condition of the Business or the performance of Foamtec's obligations under this Agreement.

 (e) Foamtec is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into and undertaking the performance of this Agreement.

## ARTICLE 10
## ARBITRATION

 10.1. _Arbitration._ Any dispute arising out of or in connection with this Agreement that has not been resolved pursuant to the procedures set forth in Article 4 shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force which rules are deemed to be incorporated by reference into this Section. The law of the arbitration shall be the Singapore International Act 1994. The Tribunal shall consist of three (3) arbitrators, each party to appoint one (1) arbitrator, and the two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the Tribunal. The governing law of this Agreement shall be the substantive law of the State of California, U.S.A. The language of the arbitration shall be English.

## ARTICLE 11
## INDEMNIFICATION

 11.1. _Indemnification._ Each Party shall indemnify, defend, and hold harmless the other Party (including those who have been, but no longer are, Parties) and its Affiliates from and against all loss, cost, liability and expense which may be imposed upon or reasonably incurred by the other Party or Affiliates, including reasonable attorneys' fees and disbursements and reasonable settlement payments, in connection with any claim, action, suit or proceeding or threat thereof, made or instituted in which the other Party or Affiliates may be involved or be made a party by reason of a breach of such Party's representations or covenants.

 11.2. _Procedure for Defense._ Promptly after receipt by a person or entity indemnified under any express provision of this Agreement (the "Indemnified Party") of notice of the commencement of any action against the Indemnified Party, such Indemnified Party shall give notice to the person or persons or entity or entities obligated to indemnify the Indemnified Party

-10-

Exhibit 1 to Mortensen Decl.
Page 10 of 14



FM 0050

pursuant to the express provisions of this Agreement (the "Indemnifying Party"). The Indemnifying Party shall be entitled to participate in the defense of the action and, to the extent that it may elect in its discretion by written notice to the Indemnified Party, to assume the control and defense and/or settlement of such action and the Indemnified Party shall execute such documents or otherwise to permit the Indemnifying Party to do so; provided, however, that (i) both the Indemnifying Party and the Indemnified Party must consent and agree to any settlement of any such action, except that if the Indemnifying Party has reached a bona fide settlement agreement with the plaintiff(s) in any such action and the Indemnified Party does not consent to such settlement agreement, then the dollar amount specified in the settlement agreement shall act as an absolute maximum limit on the indemnification obligation of the Indemnifying Party, and (ii) if the defendants in any such action include both the Indemnifying Party and the Indemnified Party and if the Indemnified Party shall have reasonably concluded that there are legal defenses available to it which are in conflict with those available to the Indemnifying Party, then the Indemnified Party shall have the right to select separate counsel to assert such legal defenses and otherwise to participate in the defense of such action on its own behalf, and the fees and disbursements of such separate counsel shall be included in the amount which the Indemnified Party is entitled to recover under the terms and subject to the conditions of this Agreement.

## ARTICLE 12
## NOTICES

12.1.  Notices.  No notice or other communication hereunder shall be sufficient to affect any rights, remedies or obligations of any party hereto unless such notice or communication is in writing and delivered to the person or persons whose rights, remedies or obligations are affected, except that any such written notice or communication which is hand delivered, sent by facsimile transmission with proof of receipt, delivered by prepaid courier service or mailed by prepaid certified mail, return receipt requested, addressed to the respective and appropriate party as follows (or to such other address as the parties may indicate in writing in accordance with this Section), and shall be deemed sufficient upon hand delivery or facsimile transmission, one day after deposit with such courier service, or three days after such mailing, as the case may be:



  If to AMFS to:    Advanced Materials Foreign Sales Corporation Ltd.
                        c/o M.Q. Services, Ltd.
                        Bermuda Commercial Bank Building
                        2nd Floor, 44 Church Street
                        Hamilton, Bermuda HM12
                        Facsimile: (310) 763-6869
                        Attention: President

           with a copy to: Advanced Materials, Inc.
                        20211 S. Susana Road
                        Rancho Domínguez, CA 90221
                        Facsimile: (310) 763-6869

Exhibit 1 to Mortensen Decl.
Page 11 of 14

FM 0051

Attention: President

If to Foamtec to:    Foamtec (Singapore) Pte Ltd.
6 Sungei Kadut Crescent
Singapore 728689
Facsimile: 65-368-1831

with a copy to: Foamex Asia Co., Ltd.
175 Sathorn City Tower
22nd Floor
South Sathorn Road
Thungmahamek, Sathorn, Bangkok 10120
Thailand
Facsimile: 662-679-6107
Attention: Mr. Steve Scibelli

12.2.  Copies.  A copy of any notice, service of process or other document in the nature thereof relating to this Agreement, received by any Party from anyone other than the other Party shall be delivered by the receiving Party to the other Party as soon as practicable.

ARTICLE 13
MISCELLANEOUS

13.1.  Governing Law: Ownership.  Except as is expressly herein stipulated to the contrary, the rights and obligations of the Parties and the administration and termination of the Agreement shall be governed by the laws of the State of California, U.S.A.  The validity, performance, and all matters relating to the interpretation and effect of this Agreement shall be governed by the internal law in effect in the State of California, without regard to principles of law (such as "conflicts of law") that might make the law of some other jurisdiction applicable.

13.2.  Additional Documents and Acts.  In connection with this Agreement, as well as all transactions contemplated by this Agreement, each Party agrees to execute and deliver such additional documents and instruments, and to perform such additional acts, as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions.  All approvals of either party hereunder shall be in writing.

13.3.  Service: Jurisdiction.  Each of the parties agrees to (a) the irrevocable designation of the Secretary of State of the State of California as its agent upon whom process against it may be served, and (b) personal jurisdiction in any action brought in any court, federal or state, within the State of California having subject matter jurisdiction arising under this Agreement.

13.4.  Pronouns.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may

12

Exhibit 1 to Mortensen Decl.
Page 12 of 14

FM 0052

require.

13.5.  Entire Agreement.  This instrument and the Schedule and Exhibits hereto and the agreements contemplated hereby or referred to herein contain all of the understandings and agreements of whatsoever kind and nature existing between the parties hereto with respect to this Agreement and the rights, interests, understandings, agreements and obligations of the respective parties pertaining to the Agreement.

13.6.  References of this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.7.  Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.8.  Binding Effect.  Except as herein otherwise expressly stipulated to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective successors and permitted assigns.

13.9.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and each of which shall constitute one and the same Agreement.

13.10.  Amendments.  This Agreement may not be amended, altered or modified except by a written instrument signed by each of the Parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SALES

ADVANCED  MATERIALS  FOREIGN CORPORATION LTD.

By: _____
Title: _PRESIDENT_____

FOAMTEC (SINGAPORE) PTE

By: _____
Title: _Presnet_____

Attachments:

Exhibit A:        Equipment Lease

13

Exhibit 1 to Mortensen Decl.
Page 13 of 14

FM 0053

Exhibit B:          License Agreement

Schedule 3.2(b)     Manufacturing Costs

03 D02\Q020\Jointvn8.agt

Exhibit 1 to Mortensen Decl.
Page 14 of 14

FM 0054

**Exhibit 3**

ADDENDUM DRAFT

To:     Steve Scott[sscott@advmatl.com];
Cc:     Steve Scibelli[spsjr@foamexasia.th.com]; Ratanesh Bal[ratanesh@straitslaw.com.sg]; Gayle
Arnold[garnold@advmatl.com]; Ed Sybesma[esybesma@rutan.com];
Subject:     ADDENDUM DRAFT
Sent:        Fri 6/6/2003 2:38:53 AM
From:        SLFOONG@

06 June 2003

Hi Steve,

## RE: CHANGES TO JOINT-VENTURE

While we work on the terms of our new arrangement, though complex sometimes, I sincerely
believe that our friendship and sense of fairness will help us see it to completion.

Prior to receiving opinions from legal counsel, as I am going away for a week's break, and in
case I miss any communications (e-mails) while on the move, there are two things, and a few
suggestions/questions, I like to put on paper for easy reference. Please let me know if I
misconstrued anything, or, please discuss/clarify with Steve Scibelli.

1. Legal status and standard descriptions to adhere to:
1.1: Foamex Asia Co. Ltd., ("FAC") a private limited company incorporated in the Kingdom of
Thailand, the party to execute our agreement with AMG.
1.2: Foamtec (Singapore) Pte. Ltd., ("FTS") a private limited company incorporated in the
Republic of Singapore, or may be described as a 'Singapore private limited company', a wholly
owned subsidiary of FAC and the entity that is carrying out the Business.
1.3: The "Products" in our agreement mean "the finished product of PU Foam used in the inkjet
cartridge of HP" (as opposed to finished products of ALL TYPES in inkjet cartridges).
1.4: The "Business" of both of us means 'the entire supply chain of the Products to HP
Singapore ("HPS") and Malaysia ("HPM"), and their contract manufacturers, wherever located in
Asia but linked back to the two agreed territories'. Where does new area, "HPAsia", come in?

2. Key terms outstanding:
2.1: The ADDENDUM applies to the "remainder" term of the Agreement (5 years left).
2.2: (This one part was under discussion with Steve Scibelli when latest draft arrived). His
intent was FAC shares profit with AMG as long as majority control as it exists in AMG today
stays. FAC's obligations terminate on any of these occurrences: (A) loss of existing majority
control, (B) AMG is unable to carry on as a going concern, and (C) maturity of agreement's age.
2.3: Identifying sales volume to HPS for the "Business" with AMG, at present, is a non-issue.

ADDENDUM DRAFT

Only in future, should HPS choose FTS as a single vendor, Steve Scibelli has agreed on a 50% share for AMG at the very least. I assume it is likely that HP sales may be gradual for another party FTS shares with.

How the mechanism works out, and the various implications, I think, are now being addressed in Article 16.6 in the ADDENDUM. In order to understand the drafted terms clearly, I would need your help to explain further, perhaps with a few simple examples.

I hope the above contents are clear and most of the outstanding issues are covered. Incidentally, I have to bug you on the machines. Circumstances may push FTS to acquire similar machines sooner from elsewhere and, thereafter, there will be constraints of cash and floor-space when AMG frees its machines too late. A firm indication from AMG in advance will be helpful to both of us.

Thank you & best regards,
SL FOONG.

**Exhibit 4**

**To:** 'slfoong@foamexasia.com.sg'[slfoong@foamexasia.com.sg];
**Cc:** 'Ratanesh Bal'[ratanesh@straitslaw.com.sg]; 'Gayle Arnold (E-mail)'[garnold@advmatl.com];
**Subject:** Addendum to Manufacturing Agreement
**Sent:** Tue 6/17/2003 8:19:29 PM
**From:** Sybesma, Ed

<u>030616 Redlined Draft Addendum to Manufacturing Agreement.doc</u>
<u>030616 Clean Draft Addendum to Manufacturing Agreement.doc</u>
<u>980130 Manufacturing Agreement & 'Variation' Amendment.pdf</u>

Dear Mr. Foong,

Thank you for your comments dated June 16, 2003.

Attached are redlined and clean versions of a revised draft of the Addendum to Manufacturing Agreement which, together with the comments below, should address the points raised in your message. Redlined changes are marked against the last clean versions which I transmitted to you.

With respect to the first sentence of your item number 2.1, if there are to be any changes in the obligations of the parties under the written contract, as amended by the Addendum, they need to be specifically identified and expressly set forth in the Addendum. There should be no unwritten understandings or implied changes whatsoever. Indeed, there are in fact no unwritten understandings or implied changes. Any change must be made in writing.

More specifically, we do not agree that Foamex is to be excused from any of the obligations under the Manufacturing Agreement except as expressly provided in the Addendum.

With respect to the potential for a venture with Rogers Foam, it is my understanding that AMG is prepared to address this issue in either of two ways: Either the matter can be left open for further discussion and future negotiation, or AMG is prepared to build such a provision into the contract now. In the latter event, however, any such provision would be subject to the caveat that in no event will AMG participate in less than fifty percent (50%) of all purchases by Hewlett-Packard of the Products in Asia in any given calendar year.

With respect to your item 2.2, although we do not understand the perceived need for such a letter, if your attorneys decide that you do need such a letter, they should prepare a letter which they believe is needed and submit it to us for consideration.

Your item 3 has been addressed in the attached revisions.

It is my understanding that, pursuant to a discussion between Gayle Arnold and Steve Scibelli, your item number 4, together with your proposed new Section 18.2 and your proposed change to section 19 (which related to item 18.2), have been dropped from consideration.

With reference to your discussion of Recital A, and the apparent discrepancy between the January 8, 1998, and January 30, 1998, dates, I am attaching a copy of the Manufacturing Agreement in my possession. Although the "Variation" to the agreement dated May 1, 2001, refers to a Manufacturing Agreement first executed on January 08, 1998, the Manufacturing Agreement itself contains the date January 30, 1998, in several different places, including in the opening paragraph of the Manufacturing Agreement, indicating the "as of" or effective date of the Manufacturing Agreement. If you have a copy of the Manufacturing Agreement which is different in any respect from that attached hereto, please provide us with a copy.

With respect to your comments to Section 16.1, we have made the first proposed modification, deleting the words "as amended".

Addendum to Manufacturing Agreement

With respect to the change which you request at the end of Section 16.1 and the change in Section 16.2, asking that we alter the agreement to delete reference to the fact that the actions which you will be taking will be as agent for and on behalf of the Business which is defined in and created by the Manufacturing Agreement, please be advised that this Business is in fact a joint venture of the parties and the Addendum is not intended to change that basic relationship between the parties. Accordingly, the attached revised draft retains the language referenced.

In response to the provision which you proposed be added to Section 16.5, we have instead proposed a new Section 3.2(d) to provide most favored nation status to the Business while at the same time permitting Foamex (for its own account, without sharing one half with AMG) to realize profits, if any, from the manufacturer of such foam products as costs below the MFN pricing.

In response to your comments regarding Section 16.7 of the Addendum, we have done the following:

- corrected the Section numbering;
- provided for payment and accounting to occur 60 days, rather than 20 days, following the end of each calendar month;
- include provisions for withholding taxes and legally required deductions, as well as setoffs for liquidated indebtedness; and
- clarified Section 3.2 to make it clear that the accounting for revenues and costs is to be done on an accrual basis, as I understand has been the case in the past.

Since the calculation of profits is made on an accrual basis, the exact length of the credit term extended to Hewlett-Packard is not directly relevant to the calculations. Likewise, no changes to the calculations or the amount of payment should occur following the end of any calendar month, regardless of the extent to which Hewlett-Packard makes either prompt or dilatory payment of the amounts due, and regardless of whether the payment is made by Foamex to AMG within 20 days or 60 days. Nevertheless, AMG understands that the cash flow implications to Foamex will be impacted by the practicalities of the credit terms extended to HP. This 60 date timeframe should accommodate that concern.

We have made the changes requested by you with respect to Sections 16.8 and 17.4(a).

As noted above, the remaining issues, relating to new Section 18.2 and a change in Section 19, have now been removed as issues.

Please do give us your further comments or authorization to proceed with these final changes.

Sincerely,

Ed Sybesma
Rutan & Tucker, LLP
611 Anton Boulevard, Suite 1400
Costa Mesa, California 92626
www.rutan.com
phone: (714) 641-3427
fax:    (714) 546-9035
e-mail: esybesma@rutan.com
NOTE: This message may have been dictated using voice recognition. It is possible that words were inserted in error which sound like, but are different than, the words actually dictated. If any word or phrase appears to be out of context or nonsensical, please substitute the appropriate sound-alike word or phrase to provide the appropriate meaning. Please excuse any such errors.

Addendum to Manufacturing Agreement

CONFIDENTIAL:  The information contained in this electronic mail message is confidential information that may be covered by the Electronic Communications Privacy Act, 18 USC Sections 2510-2521, intended only for the use of the individual or entity named above, and may be privileged.  If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please immediately notify us by telephone (714-641-5100), and delete the original message.  Thank you.

**Exhibit 5**

**To:**    Ed Sybesma[esybesma@rutan.com];
**Cc:**    Steve Scibelli[spsjr@foamexasia.th.com]; Ratanesh[ratanesh@straitslaw.com.sg]; Gayle Arnold[garnold@advmatl.com];
**Subject:**    Your E-mail, 18 June.
**Sent:**    Thur 6/19/2003 3:16:37 PM
**From:**    SLFOONG@

Agrdate.TIF

Dear Mr. Sybesma,

Thank you for your response.   I was able to access Addendums, unfortunately, Outlook Express shut out .PDF documents from opening.

Instead, I have attached a copy each of the first page of the Manufacturing Agreement, where it showed 08 January 1998, and the Technical Information License Agreement in which no date was written.   I will also fax to you, in case inaccessible from e-mail.

Incidentally, I could not find Exhibit A (Equipment Lease) and Schedule 3.2 (B) (manufacturing cost) in Foamex's set of agreement.   May I suggest that to resolve the date discrepancies and incomplete documents, we rely on the full complete set that you have in hand, from which you could provide a duplicate set to me (I'm in Foamtec's address) together with the signed Addendum.

I believe you have addressed our major concerns and after confirmation with Steve Scibelli on his discussions with Gayle Arnold that you mentioned, I have no further changes except for No. 16.10, please add "President" (of Foamex Asia) after Mr. Steve Scibelli, and No. 17.4, first sentence, Foamex ... warrants to ... Foamex? (AMG).

With regards to our request for a letter to confirm the transfer of rights, if you consider it legally acceptable in the USA, we shall respect your advice.

The information that I have is Steve Scibelli will return to his desert home, your 19 June night, and he asked for the signature pages only to be faxed to him for endorsement.   He leaves for Asia a few days later.   His home fax No: (760) 771 4210.   If you have difficulties contacting him, or if you have questions, please let me know.

Many thanks for your cooperation.

Yours sincerely,
SL FOONG.

Your E-mail, 18 June.

c.c.  Gayle Arnold - I appreciate your help to contact Steve Scibelli if attorney
requires.

**EXHIBIT 6**

RE: Your E-mail, 18 June.

**To:** 'SLFOONG@'[slfoong@foamexasia.com.sg];
**Cc:** Steve Scibelli[spsjr@foamexasia.th.com]; Ratanesh[ratanesh@straitslaw.com.sg]; Gayle Arnold[garnold@advmatl.com];
**Subject:** RE: Your E-mail, 18 June.
**Sent:** Thur 6/19/2003 5:46:36 PM
**From:** Sybesma, Ed

030619 Addendum to Manufacturing Agreement.doc
030619 Addendum to Manufacturing Agreement.pdf

Dear Mr. Foong,

Thank you for helping to bring this matter to fruition.

Attached is the final version of the Addendum, incorporating the two additional changes which you suggested.

Pursuant to your requests, I will transmit to you by mail a full set of the prior contract documents and will transmit to Mr. Scibelli, by fax, signature pages for execution by him. (I have also attached a PDF copy of the final Addendum so that, if Mr. Scibelli receives this message at home he will have perhaps a cleaner copy to use for signatures than the copy which will come by facsimile.)

Please forward the fax and ink signatures to me at your earliest convenience. I expect to have ink signatures from Steve Scott by tomorrow, which I will also forward to you by fax and by mail.

Please let me know if you have any questions.

Sincerely,

Ed Sybesma
Rutan & Tucker, LLP
611 Anton Boulevard, Suite 1400
Costa Mesa, California 92626
www.rutan.com
phone: (714) 641-3427
fax:     (714) 546-9035
e-mail: esybesma@rutan.com
NOTE: This message may have been dictated using voice recognition. It is possible that words were inserted in error which sound like, but are different than, the words actually dictated. If any word or phrase appears to be out of context or nonsensical, please substitute the appropriate sound-alike word or phrase to provide the appropriate meaning. Please excuse any such errors.

CONFIDENTIAL: The information contained in this electronic mail message is confidential information that may be covered by the Electronic Communications Privacy Act, 18 USC Sections 2510-2521, intended only for the use of the individual or entity named above, and may be privileged. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone (714-641-5100), and delete the original message. Thank you.

-----Original Message-----
**From:** SLFOONG@ [mailto:slfoong@foamexasia.com.sg]
**Sent:** Thursday, June 19, 2003 8:17 AM
**To:** Ed Sybesma

**EXHIBIT 7**

**To:**   Ed Sybesma[esybesma@rutan.com];
**Cc:**   Pat Jian[phanarat@foamexasia.th.com]; Steve Scibelli[spsjr@foamexasia.th.com];
**Subject:**   Signatures to Original Addendum
**Sent:**   Mon 6/30/2003 6:38:50 AM
**From:**   SLFOONG@

30 June 2003, Monday.

Mr. Ed Sybesma              BY E-MAIL & FAX
Rutan & Tucker, LLP          Fax:      1511-1-714-546 9035

Dear Mr. Sybesma

RE: SIGNING OF ADDENDUM

I returned to Foamtec, Singapore from Bangkok today.   I thank you and confirm receipt of your two airmail envelopes, arrived this morning, with letter dates and contents as follows:

19 June:  one set of original Addendum (unsigned) and
one set of photocopied documents making up the existing Manufacturing Agreement dated 30 January 1998.
20 June: the second set of original Addendum, signed by Steve Scott.

Below is what Foamex Asia and I will do:

1. I send the two sets of Addendum to Foamex, Bangkok for signing by Steve Scibelli.

2. Bangkok office will courier back to Rutan & Tucker (for your attention) the set with the signatures of Steve Scibelli alone.    Understandably, you will need signing by Steve Scott again to complete AMG's set.   Foamex Asia retains the set with the signatures of all four companies.

3. Bangkok office needs to notify me (by fax or e-mail) when all the above work is done and courier to me a copy of the Addendum for Foamtec's filing.

It is a pleasure to work with someone who acts with a similar sense of urgency.   I hope that the above completes the process-cycle, otherwise, please let me know early.

Yours faithfully,
FOAMTEC (SINGAPORE) PTE LTD

FOONG SIEW LEONG
ADVISER

c.c.    Steve Scibelli/Pat Jian

Signatures to Original Addendum

(Pat – please attend to the above matters as we have discussed).

## PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of Orange, State of California. I am over the age of 18 years and not a party to this action. My business address is the Law Offices of George S. Burns, 4100 MacArthur Boulevard, Suite 305, Newport Beach, California 92660.

On March 11, 2009, I served a copy, including all exhibits, if any, of the following document(s):

### TRIAL TESTIMONY OF ED SYBESMA

on the parties in this action listed in the attached Proof of Service List, which is incorporated herein by this reference, by the following means:

X  **(BY PERSONAL SERVICE)** I caused each such envelop to be sealed and given to a courier authorized by our attorney service to receive documents for delivery on the same date. A proof of service signed by the authorized courier will be filed forthwith.

X  **(BY ELECTRONIC SERVICE)** service deemed effective via the United States District Court Central District of California's Electronic Case Filing (CM/ECF) system

1.  **(BY FEDERAL EXPRESS)** I am readily familiar with the practice of the Law Offices of George S. Burns for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express for overnight delivery.

X  **(DISTRICT)** I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on March 11, 2009, at Newport Beach, California.

Tammy Martin

1

SERVICE LIST
Advanced Materials Group, Inc. v. Foamtec and Foamex Asia
Case No. SACV 08-43 JVS (RNBx)

2

3

4    Mr. Charles H. Kanter                    Attorneys for Defendants Foamtec
     Palmieri, Tyler, Wiener, Wilhelm &       (Singapore) Pte. Ltd and Foamex
5    Wladron LLP                              Asia Ltd.
     2603 Main Street
6    East Tower, Suite 1300
     Irvine, California 92614-4281
7
     Telephone: (949) 851-9400
8    Facsimile: (949) 757-1225
     ckanter@ptwww.com
9    rgarretson@ptwww.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28