1  Law Offices of George S. Burns
2  George S. Burns (Bar No. 124507)
   4100 MacArthur Boulevard, Suite 305
   Newport Beach, CA 92660
3  Telephone: (949) 263-6777
   Facsimile: (949) 263-6780
4
   Attorneys for Plaintiff
5  Advanced Materials Group, Inc., a Nevada corporation

6

7

8              UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11  Advanced Materials Group, Inc., a          )   CASE NO.  SACV 08-43 JVS
    Nevada corporation                         )   (RNBx)
12                                             )
                                               )
13                                             )
                 Plaintiff,                    )
14                                             )   **AMENDED TRIAL TESTIMONY**
    vs.                                        )   **OF DAVE KALASH**
15                                             )
                                               )   Date:  March 16, 2009
16  Foamtec (Singapore) Pte. Ltd., a           )   Time:  8:30 a.m.
    private limited company incorporated       )   Dept.: 11:00 a.m.
17  in Singapore; Foamex Asia Ltd., a          )
    private limited company incorporated       )
18  in the Kingdom of Thailand and             )
    DOES 1 through 10, inclusive               )   Complaint filed: December 11,
19                                             )   2007
                 Defendants.                    )
20  _____    )   Trial Date: March 31, 2009

21

22

23

24

25

26

27

28

## DECLARATION OF DAVE KALASH

I, Dave Kalash, declare:

1.    I was employed by Advanced Materials, Inc., a subsidiary of Advanced Materials Group, Inc. (collectively, "AMG").  I worked for AMG and its predecessors for over 20 years.  I was responsible for technical product sales, including sales of products to Hewlett Packard ("HP").  I have a thorough understanding of foam product manufacturing, sales, and industry standards, including HP's standards that must be met with respect to ink jet printer cartridges.

2.    I am familiar with the Manufacturing Agreement entered into by and between AMG and Foamtec (Singapore) LTD ("Foamtec"), as amended ("the Agreement").  A copy of the Agreement is attached hereto as Exhibit "A."

3.    I have knowledge and an understanding of the ink jet printer cartridge felt product manufactured pursuant to the Agreement ("the Product").  I have knowledge and an understanding of the machinery, equipment, intellectual property, trade secrets and technical know - how that AMG provided to Foamtec to manufacture the Product ("the Technology").  I have knowledge and an understanding of the raw materials needed to manufacture the Product, the means by which the Product is manufactured, and the process by which HP's orders for the Product are filled pursuant to the Agreement ("the Business").  I have knowledge and an understanding of the profit sharing obligations of the parties under the Agreement.

4.    I am familiar with the allegations of the Complaint filed by AMG in this action.

5.    I am familiar with the documentation Foamtec provided to AMG in connection with Foamtec's purported exercising of its right to purchase AMG's interest in the Agreement ("the Audit").

6.    AMG had to be, was and is approved by HP to fabricate and sell HP products.  AMG currently manufactures products ordered by HP, including orders for HP products that AMG sells to assembly subcontractors who had to be and have been approved by HP ("the HP - Approved Assembly Subcontractors").  The HP - Approved Assembly Subcontractors include:  Flextronics Int'l, KFT. Hungary; Flextronics Int'l, KFT. NYI Hungary;  Flextronics Ind (Malaysia) SDN BHD; Flextronics Tech (Shanghai) Co. LTD; Cal-Comp Electronics (Thailand) Public Co. Ltd., Cal-Comp Optical Electronics (Suzhou) Co. Ltd., Kinpo International Ltd.; Technocom Systems SDN BHD; Tech Group Asia, Ltd., and; Jabil Circuit (WUXI) Ltd.  AMG cannot fill an HP order for any HP product through any assembly subcontractor unless that contractor is approved by HP.

7.    AMG fills HP's orders for products by sales to HP directly and by sales to the HP - Approved Assembly Subcontractors.  In both cases, when AMG fills HP's orders, the purchase orders and/or sales records include the HP part number of the product ordered.  This was true during the lifetime of the Agreement.

8.    The HP - Approved Assembly Subcontractors have, and had, during the lifetime of the Agreement, the ability to purchase and sell HP's

Amended Declaration of Dave Kalash

1  orders for the Product of the Business.

2

3      9.      Under section 6.2 of the Agreement, the price Foamtec must

4  pay to AMG for AMG's interest in the Agreement includes an amount

5  based on a forecast of HP's future orders for the Product of the Business.

6  The forecast is not limited to orders that Foamtec fills by selling the

7  Product directly to HP.  The forecast must include all orders by HP of the

8  Products of the Business, including those Foamtec filled through sales of

9  the Product to the HP - Approved Assembly Subcontractors.

10

11      10.      I have reviewed the purported HP forecast of orders provided to

12  AMG by Foamtec in connection with Foamtec's purported purchase of

13  AMG's interest in the Agreement.  A copy of the forecast is attached hereto

14  as Exhibit "B."  The forecast is based only upon sales of the Product by

15  Foamtec directly to HP.

16

17      11.      Under sections 3.1 and 3.2 of the Agreement, the profits to be

18  shared with AMG during the lifetime of the Agreement include profits from

19  all orders by HP of the Products of the Business, which include when

20  Foamtec filled such orders through sales of the Product of the Business to

21  the HP - Approved Assembly Subcontractors.

22

23      12.      The documents provided to AMG during the Audit reflected only

24  sales of the Product by Foamtec directly to HP.  The Audit documents

25  included no records reflecting any HP orders of the Product of the

26  Business that Foamtec filled by sales to the HP - Approved Assembly

27  Subcontractors.

28

13.    Under sections 3.1 and 3.2 of the Agreement, the profit shared by the parties is determined by the difference between the price of material purchased to manufacture the Product and the price of the Product sold by Foamtec to HP and others when filling HP's orders for the Product.

14.    The raw material that Foamtec purchased during the lifetime of the Agreement should have been used for HP's orders of the Product of the Business and represent Foamtec's costs of raw materials under the Agreement during the lifetime of the Agreement for the following reasons: (1) the Technology AMG provided to Foamtec was researched, designed and created for the purpose of manufacturing the Product of the Business; (2) Section 8.1 of the Agreement prevents Foamtec from engaging in the manufacture and/or sales of products identical to the Products of the Business other than for the purpose of the Business during the lifetime of the Agreement; and (3) Section 9.2(c) of the Agreement prevents Foamtec from being a party to a contract or other arrangement of any nature that will materially interfere with Foamtec's full, due and complete performance of the Agreement.  Thus, the total amount Foamtec paid for raw materials during the lifetime of the agreement should be determinative of the cost of materials used to determine the profits Foamtec owed AMG during the lifetime of the Agreement pursuant to section 3.1 of the Agreement.

15.    The raw  foam materials used in the ink jet cartridge printers goes by the trade names "Pele", "Monet", "Flame" and "Wax".  The equipment that AMG leased to Foamtec was specifically designed to make ink jet printer cartridge parts from this material.  This foam is highly technical and expensive, manufactured to HP specifications, and the amount of foam used in an HP ink jet cartridge is strictly regulated by HP.

Amended Declaration of Dave Kalash

03/11/2009 14:00 FAX 2095321522 ALADDINMOTEL Case 8:08-cv-00043-JVS-RNB Document 44 Filed 03/12/2009 Page 6 of 28 006/006

MAR-11-2009 WED 01:08 PM Law Office George Burns    FAX NO. 949 263 6780    P. 06

1  The foam has virtually no other practical use except as a part of an HP Ink
2  jet cartridge. Therefore, to audit sales made under the AMG/Foamex
3  agreements, one need only compare the amount of raw foam purchased
4  from Foamex against the royalties for sales reported by Foamtec under the
5  agreement, based on the agreed pricing for this material to HP. If there
6  were purchases made of raw foam that were substantially in excess of the
7  amount of finished product sold, then likely sales royalties were under-
8  reported.

9

10     I declare under penalty of perjury under the laws of the United States
11  of America that the foregoing is true and correct, and that this declaration
12  executed this _11th_ day of _MAR_, 2009, at _TVOLUMNE_, California.

_Dave Kalash_

Declaration of Dave Kalash

Exhibit "A"

DC&M Draft: 1/28/98

## MANUFACTURING AGREEMENT

THIS MANUFACTURING AGREEMENT (the "Agreement") is made and entered into as of the ____ day of January, 1998 (the "Closing Date"), by and between Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation ("AMFS"), and Foamtec (Singapore) Pte Ltd., a Singapore private limited company ("Foamtec").

### RECITALS

WHEREAS, AMFS proposes to obtain raw material from Foamtec's affiliate in the United States ("Foamex USA"), and to sell such raw material to Foamtec; and

WHEREAS, Foamtec proposes to fabricate foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished products to AMFS; and

WHEREAS, AMFS will sell such finished products to Hewlett-Packard and certain other approved customers and products, on a case-by-case basis; and

WHEREAS, AMFS has agreed to lease certain machinery and equipment (the "Equipment") to be located at Foamtec's facility pursuant to an equipment lease in the form of Exhibit A hereto (the "Equipment Lease") and certain intellectual property, trade secrets and "know-how" (the "Technology") pursuant to a license agreement in the form of Exhibit B hereto (the "License Agreement") to Foamtec for use in connection with the business contemplated by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, AMFS and Foamtec hereby covenant and agree as follows:

### ARTICLE 1
### DEFINITIONS

The following defined terms used in this Agreement shall have the respective meanings specified below.

*"Additional Term"* shall have the meaning set forth in Section 2.2(b).

An *"Affiliate"*, when used with respect to a specified Person, shall mean (i) any other Person directly or indirectly controlling, controlled by, or under common control with, such specified Person, (ii) any officer, director, partner (including any officer or director of AMFS or

Exhibit A to Kalash Decl.
Page 1 of 14

FM 0041

Foamtec), legal representative (including a trustee for the benefit of such specified Person) or employee of such specified Person, and (iii) any Person for which such specified Person acts as an officer, director, partner or employee. As used in this definition of "Affiliate," the term "control" and any derivatives thereof mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

"*Agreement*" shall have the meaning set forth in the preamble.

"*AMFS*" shall have the meaning set forth in the preamble.

"*Business*" shall have the meaning set forth in Section 2.1.

"*Business Plan*" shall have the meaning set forth in Section 6.4(1).

The "*Closing Date*" shall have the meaning set forth in the preamble.

The "*Defaulting Party*" shall have the meaning set forth in Section 7.1.

"*Equipment*" shall have the meaning set forth in the preamble.

"*Equipment Lease*" shall have the meaning set forth in the preamble.

"*Event of Default*" shall have the meaning set forth in Section 7.1.

"*Foamex USA*" shall have the meaning set forth in the preamble.

"*Foamtec*" shall have the meaning set forth in the preamble.

"*Indemnified Party*" shall have the meaning set forth in Section 11.2.

"*Indemnifying Party*" shall have the meaning set forth in Section 11.2.

"*License Agreement*" shall have the meaning set forth in the preamble.

"*Nondefaulting Party*" shall have the meaning set forth in Section 7.1.

"*Notice of Default*" shall have the meaning set forth in Section 7.1.

"*Party*" shall mean either of AMFS or Foamtec, as the context requires.

"*Parties*" shall mean AMFS and Foamtec.

-2-

Exhibit A to Kalash Decl.
Page 2 of 14

FM 0042

"*Person*" shall mean any individual, partnership, association, governmental instrumentality, corporation, trust or other legal person or entity.

"*Products*" shall have the meaning set forth in Section 2.1.

"*SIAC Rules*" shall have the meaning set forth in Section 10.2.

"*Technology*" shall have the meaning set forth in the preamble.

"*Term*" shall have the meaning set forth in Section 2.2.

## ARTICLE 2
## PURPOSES: TERM AND CONDUCT

2.1.    Purposes.    The purposes for which the Agreement is entered (the "Business") are for AMFS to acquire raw material from Foamex USA, and to sell such raw material to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished foam products to AMFS, which will then sell such products to Hewlett-Packard and to certain other approved customers and products, such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis (the "Products").

2.2.    Term.

(a)    The Agreement shall commence on the Closing Date and, subject to the provisions otherwise contained herein, shall terminate ten (10) years thereafter subject to renewal as provided in Section 2.2(b), below (the "Term") unless sooner terminated as otherwise provided in this Agreement or by law.

(b)    This Agreement may be renewed by either party for an additional five (5) year period (the "Additional Term"), provided the party desiring to renew the Agreement for such Additional Term notifies the other party in writing at least six months prior to expiration of the Term hereof.

2.3.    Conduct.    The Agreement shall be effected as follows:

(a)    AMFS shall purchase raw material from Foamex USA at a price representing the best price for such material offered by Foamex USA anywhere in the world at that time. Foamtec will reasonably cooperate with AMFS to ensure AMFS receives from Foamex USA the pricing described in the previous sentence, and to make such books and records reasonably available as are necessary or desirable to AMFS's auditors to verify such best price.

(b)    AMFS will sell such raw material to Foamtec at a price as determined in

3

Exhibit A to Kalash Decl.
Page 3 of 14

FM 0043

Section 3.3(a), below.

(c)    Foamtec shall fabricate such raw material into finished product at Foamtec's facility, utilizing Foamtec's personnel and the Equipment and Technology of AMFS, and shall resell such finished product to AMFS at a price equal to the price determined as set forth in Section 3.3(b), below.

(d)    AMFS shall sell and deliver such finished products to Hewlett-Packard and such other customers at the same prices as are determined in accordance with Section 2.3(c) and Section 3.3(b).

## ARTICLE 3
## COSTING

3.1.    Profit Sharing.  Except as otherwise expressly stipulated herein, the interest of the respective Parties in the profits resulting from the difference between the price of the raw materials described in Section 2.3(a) and the retail price for sales to customers described in Section 2.3(d) shall be as follows (commencing as at the date of the first sale of the Products to a retail customer hereunder):

| Year | AMFS | Foamtec |
|------|------|---------|
| 1 | 65 | 35 |
| 2 | 60 | 40 |
| 3 | 50 | 50 |
| 4 | 45 | 55 |
| 5 | 40 | 60 |
| 6-10 | 35 | 65 |

3.2    Calculation of Profits.  Profits are to be determined by deducting all costs arising under the Agreement from the revenues arising under the Agreement.

(a)    Revenues.  Payments received from customers as contemplated by Section 2.3(c).

(b)    Costs - Foamtec.  Foamtec shall be permitted to charge AMFS, in U.S. dollars, amounts to compensate Foamtec for all raw materials, direct labor costs (including compensation and benefits), variable overhead (utilities, packaging, supplies, repairs and maintenance, outbound freight, inspection and manufacturing, supervision), fixed overhead (facility rent, purchasing, receiving, shipping, plant manager), operating expenses (sales and marketing, accounting, legal and audit) and an amortization charge for start-up costs. The foregoing manufacturing costs will be computed as further described in Schedule 3.2(b) and reviewed periodically and approved by the parties pursuant to Article 4. These manufacturing

4





costs must remain competitive to U.S. plant manufacturing standards, usage and plant space utilization.

(c)    Costs - AMFS.  Costs incurred by AMFS for direct material (including costs of transportation, duties, brokers' fees, insurance, manufacturing scrap and so forth), fixed overhead (including payments under the Equipment Lease and the License Agreement, and quality control and purchasing allocations), operating expenses (including sales and marketing) and non-operating expenses (including imputed interest charges for inventory and accounts receivable and an amortization charge for start-up costs will be charged as costs).  These costs will be reviewed periodically and approved by the parties pursuant to Article 4.

3.3    Calculation of Purchase Price.

(a)    The price described in Section 2.3(b) shall be determined by the parties pursuant to Article 4 and shall be intended to provide that the difference between the price paid by AMFS to Foamex USA for raw material and the price paid by Foamtec to AMFS for the same raw material shall represent the portion of the profit in good faith estimated to accrue to AMFS as set forth in Section 3.1 and as calculated in Section 3.2.

(b)    The price described in Section 2.3(c) shall be determined by the parties pursuant to Article 4 and shall be intended to provide in good faith that the difference between the price paid by Foamtec to AMFS for raw material and the price paid by AMFS to Foamtec for finished product fabricated from such raw material shall represent the portion of the profit in good faith estimated to accrue to Foamtec as set forth in Section 3.1 and as calculated in Section 3.2.

3.4    Time of Payments.  Payments by AMFS to Foamtec and payments by Foamtec to AMFS as contemplated herein shall be made on a quarterly basis within ten (10) business days after the quarter is closed, and shall be netted against each other, with such adjustments as may be determined in good faith by the parties pursuant to Article 4 so as to most accurately reflect the intent of the parties as set forth in Section 3.1.

## ARTICLE 4
## OVERSIGHT

4.1.    Oversight.  The parties shall perform under this Agreement under the joint direction of an appointee of each of AMFS (initially, Steve F. Scott) and Foamtec (initially, Stephen P. Scibelli).  Any disputes or disagreements arising from this Agreement shall initially be referred jointly to such appointees, who shall in good faith attempt to resolve such disputes promptly and within the spirit of this Agreement.

## ARTICLE 5
## BOOKS AND RECORDS: AUDITS

5.1

FM 0045



5.1.  Books; Statements.  The Parties shall keep accurate, full and complete books and accounts showing its operations and transactions relating to the Business.

5.2.  Access.  Each Party shall have access to and may inspect and copy the books, accounts and records of the other Party maintained in accordance with Section 5.1, provided that any request for access to the books, accounts and records of the other Party must be reasonable.

5.3.  Audits.  In addition to the foregoing, any Party may, at its option and at its own expense, conduct internal audits of the books, records and accounts of the other Party, but only to the extent that such books, records and accounts relate to the Business.  Audits may be on either a continuous or a periodic basis or both and may be conducted by employees of any Party, or of an Affiliate of any Party, or by independent auditors retained by any Party.

5.4.  Other Information.  Each Party shall make available to the other Party such information and financial statements related to the Business, in addition to the foregoing, as shall be required by either of them in connection with the preparation of registration statements, current and periodic reports, proxy statements and other documents required to be filed under foreign, federal or state securities laws and shall cooperate in the preparation of any such documents.

## ARTICLE 6
## NO ASSIGNMENT; RIGHTS TO PURCHASE AN INTEREST

6.1.  Consent Required.  Except as provided in Section 6.2, without the prior written consent of the other Party (which may be withheld for any or no reason), no Party, nor any assignee or successor in interest of any Party, shall (voluntarily or involuntarily) sell, assign, give, pledge, hypothecate, encumber or otherwise transfer all or any part of its interest in this Agreement.

6.2  Right to Purchase and Sell.  At any time following the third anniversary of the date hereof, Foamtec shall have the right, exercisable from time to time by written notice to AMFS, to purchase the interest of AMFS under this Agreement at a price calculated as the present value, discounted at the average, over the prior three months of the prime rate as announced from time to time by Wells Fargo Bank, N.A. Head Office as its prime rate, of the portion of the income reasonably expected to accrue to AMFS as provided in Section 3.1 hereof over the remaining balance of the initial Term hereof (if exercised during the initial Term) or for the balance of the Additional Term (if exercised during the Additional Term) based on the forecast from Hewlett-Packard of its orders for products of the Business during such period. Within 30 days of such notice, the Parties shall execute such documents and instruments reasonably acceptable to the Parties required to consummate the contemplated transaction, including AMFS' transfer of the Technology to Foamtec. The closing of such transaction shall take place within 30 days following the date on which any government regulatory approvals

6



FM 0046

required for consummation of the transaction have been obtained or otherwise satisfied.

## ARTICLE 7
## TERMINATION

7.1.  <u>Event of Default</u>.  In the event:

(a)  a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator (or other similar official) shall take possession of a Party or any substantial part of its property without its consent, or a court having jurisdiction in the premises shall enter a decree or order for relief in respect of a Party, in an involuntary case under any applicable bankruptcy, insolvency, moratorium or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator (or other similar official) of such Party or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs and such decree or order shall remain unstayed and in effect for a period of 30 consecutive days; or

(b)  a Party shall commence a voluntary case under any applicable bankruptcy, insolvency, moratorium or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, conservator, sequestrator (or other similar official) of such Party or of any substantial part of its property, or shall make any general assignment for the benefit of creditors; or shall take any corporate action in furtherance of any of the foregoing; or

(c)  a Party shall admit in writing its inability to pay its debts as they mature; or

(d)  a Party shall give notice to any governmental body of insolvency or pending insolvency, or suspension or pending suspension of operations; or

(e)  any Party fails to perform any of its obligations or covenants or breaches any of its representations under this Agreement or pursuant to the agreements attached as Exhibits hereto (an "Event of Default");

then the other Party (the "Nondefaulting Party") shall have the right to give such party (the "Defaulting Party") a notice of default ("Notice of Default").  The Notice of Default shall set forth the nature of the obligations which the Defaulting Party has not performed.

7.2  <u>Thirty (30) Day Period After Event of Default</u>.

(a)  If within the thirty (30) day period following receipt of the Notice of Default, the Defaulting Party in good faith commences to perform such obligations and cure such

-7-



default, and thereafter prosecutes to completion with diligence and continuity the curing thereof and cures such default within a reasonable time, then it shall be deemed that the Notice of Default was not given and the Defaulting Party shall lose no rights hereunder. If, within such thirty (30) day period, the Defaulting Party does not commence in good faith the curing of such default or does not thereafter prosecute to completion with diligence and continuity the curing thereof, then the Nondefaulting Party may, at the option of the Nondefaulting Party, terminate this Agreement by giving the Defaulting Party written notice thereof.

(b)    Failure by a Nondefaulting Party to give any Notice of Default as specified herein, or any failure to insist upon strict performance of any of the terms of this Agreement, shall not constitute a waiver of any such breach or any of the terms of this Agreement. No breach shall be waived and no duty to be performed shall be altered or modified except by written instrument. One or more waivers or failures to give Notice of Default shall not be considered as a waiver of a subsequent or continuing breach of the same covenant.

7.3.    <u>Continuing Obligations</u>. The termination of this Agreement for any reason shall neither release either Party hereto from any liabilities, obligations or agreements which, pursuant to any provisions of this Agreement, are to survive or be performed after such termination nor shall it release either Party hereto from its liability to pay any sums of money accrued, due, and payable to the other Party or to discharge its then-accrued and unfulfilled obligations.

7.4.    <u>Not Exclusive Remedy</u>. The rights granted in Section 7.1 and Section 7.2 above shall not be deemed an exclusive remedy of a Nondefaulting Party or a Solvent Party, but all other rights and remedies, legal and equitable, shall be available to it.

## ARTICLE 8
## COVENANT NOT TO COMPETE

8.1.    <u>Covenant not to Compete</u>. Each Party and its Affiliates, so long as such Party remains a Party hereunder, are prohibited from directly or indirectly engaging in or possessing an interest in an activity, the purpose or business of which is identical to that described in Section 2.1, relating to the manufacture of products of the sort manufactured under this Agreement, to be sold to customers under this Agreement, during the Term of this Agreement, in Singapore or Malaysia. However, notwithstanding anything in this Agreement to the contrary, Foamex Asia Co., Ltd., a private limited company incorporated in the Kingdom of Thailand which is an Affiliate of Foamtec, shall have the right to sell raw materials to anyone in Singapore, Malaysia or elsewhere.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

9.1.    <u>Representations and Warranties by AMFS</u>. AMFS represents and warrants to, and covenants with Foamtec, as follows:

FM 0048

(a)    AMFS is a corporation duly organized and validly existing under the laws of the State of California and is in good standing in such jurisdiction. AMFS is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the operation or financial condition of the Business.

(b)    AMFS has the full right, power and authority to enter into this Agreement and will at all times have the full power and authority to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by it, and this Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other loss affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c)    AMFS is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Agreement.

(d)    There is no litigation or proceeding pending nor, to the best of AMFS's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving AMFS or its parent, which could, if adversely determined, materially and adversely affect the operation or financial condition of the Business or the performance of AMFS's obligations under this Agreement.

(e)    AMFS is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into and undertaking the performance of this Agreement.

9.2.    <u>Representations and Warranties by Foamtec</u>. Foamtec represents and warrants to, and covenants with, AMFS, as follows:

(a)    Foamtec is a private limited company duly organized and validly existing under the law of the Republic of Singapore and is in good standing in such jurisdiction. Foamtec is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the business or financial condition of the Business.

(b).    Foamtec has the full right, power and authority to enter into this Agreement and will at all times have the full power and authority to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by it, and this Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other loss affecting creditors' rights generally, or equitable principles, whether applied in a proceeding

-9-

FM 0049

in equity or law.

(c)    Foamtec is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Agreement.

(d)    There is no litigation or proceeding pending nor, to the best of Foamtec's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving Foamtec or its parent, which could, if adversely determined, materially and adversely affect the operation or financial condition of the Business or the performance of Foamtec's obligations under this Agreement.

(e)    Foamtec is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into and undertaking the performance of this Agreement.

## ARTICLE 10
## ARBITRATION

10.1.    _Arbitration._ Any dispute arising out of or in connection with this Agreement that has not been resolved pursuant to the procedures set forth in Article 4 shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force which rules are deemed to be incorporated by reference into this Section. The law of the arbitration shall be the Singapore International Act 1994. The Tribunal shall consist of three (3) arbitrators, each party to appoint one (1) arbitrator, and the two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the Tribunal. The governing law of this Agreement shall be the substantive law of the State of California, U.S.A. The language of the arbitration shall be English.

## ARTICLE 11
## INDEMNIFICATION

11.1.    _Indemnification._ Each Party shall indemnify, defend, and hold harmless the other Party (including those who have been but no longer are, Parties) and its Affiliates from and against all loss, cost, liability and expense which may be imposed upon or reasonably incurred by the other Party or Affiliates, including reasonable attorneys' fees and disbursements and reasonable settlement payments, in connection with any claim, action, suit or proceeding or threat thereof, made or instituted in which the other Party or Affiliates may be involved or be made a party by reason of a breach of such Party's representations or covenants.

11.2.    _Procedure for Defense._ Promptly after receipt by a person or entity indemnified under any express provision of this Agreement (the "Indemnified Party") of notice of the commencement of any action against the Indemnified Party, such Indemnified Party shall give notice to the person or persons or entity or entities obligated to indemnify the Indemnified Party

FM 0050

pursuant to the express provisions of this Agreement (the "Indemnifying Party"). The Indemnifying Party shall be entitled to participate in the defense of the action and, to the extent that it may elect in its discretion by written notice to the Indemnified Party, to assume the control and defense and/or settlement of such action and the Indemnified Party shall execute such documents or otherwise to permit the Indemnifying Party to do so; provided, however, that (i) both the Indemnifying Party and the Indemnified Party must consent and agree to any settlement of any such action, except that if the Indemnifying Party has reached a bona fide settlement agreement with the plaintiff(s) in any such action and the Indemnified Party does not consent to such settlement agreement, then the dollar amount specified in the settlement agreement shall act as an absolute maximum limit on the indemnification obligation of the Indemnifying Party, and (ii) if the defendants in any such action include both the Indemnifying Party and the Indemnified Party and if the Indemnified Party shall have reasonably concluded that there are legal defenses available to it which are in conflict with those available to the Indemnifying Party, then the Indemnified Party shall have the right to select separate counsel to assert such legal defenses and otherwise to participate in the defense of such action on its own behalf, and the fees and disbursements of such separate counsel shall be included in the amount which the Indemnified Party is entitled to recover under the terms and subject to the conditions of this Agreement.

## ARTICLE 12
## NOTICES

12.1.  _Notices._  No notice or other communication hereunder shall be sufficient to affect any rights, remedies or obligations of any party hereto unless such notice or communication is in writing and delivered to the person or persons whose rights, remedies or obligations are affected, except that any such written notice or communication which is hand delivered, sent by facsimile transmission with proof of receipt, delivered by prepaid courier service or mailed by prepaid certified mail, return receipt requested, addressed to the respective and appropriate party as follows (or to such other address as the parties may indicate in writing in accordance with this Section), and shall be deemed sufficient upon hand delivery or facsimile transmission, one day after deposit with such courier service, or three days after such mailing, as the case may be:

    If to AMFS to:     Advanced Materials Foreign Sales Corporation Ltd.
                        c/o M.Q. Services, Ltd.
                        Bermuda Commercial Bank Building
                        2nd Floor, 44 Church Street
                        Hamilton, Bermuda HM12
                        Facsimile: (310) 763-6869
                        Attention: President

        with a copy to: Advanced Materials, Inc.
                        20211 S. Susana Road
                        Rancho Dominguez, CA 90221
                        Facsimile: (310) 763-6869

Exhibit A to Kalash Decl.
Page 11 of 14

FM 0051

Attention: President

If to Foamtec to:    Foamtec (Singapore) Pte Ltd.
6 Sungei Kadut Crescent
Singapore 728689
Facsimile: 65-368-1831

with a copy to: Foamex Asia Co., Ltd.
175 Sathorn City Tower
22nd Floor
South Sathorn Road
Thungmahamek, Sathorn, Bangkok 10120
Thailand
Facsimile: 662-679-6107
Attention: Mr. Steve Scibelli

12.2.    Copies.  A copy of any notice, service of process or other document in the nature thereof relating to this Agreement, received by any Party from anyone other than the other Party shall be delivered by the receiving Party to the other Party as soon as practicable.

## ARTICLE 13
## MISCELLANEOUS

13.1.    Governing Law; Ownership.  Except as is expressly herein stipulated to the contrary, the rights and obligations of the Parties and the administration and termination of the Agreement shall be governed by the laws of the State of California, U.S.A.  The validity, performance, and all matters relating to the interpretation and effect of this Agreement shall be governed by the internal law in effect in the State of California, without regard to principles of law (such as "conflicts of law") that might make the law of some other jurisdiction applicable.

13.2.    Additional Documents and Acts.  In connection with this Agreement, as well as all transactions contemplated by this Agreement, each Party agrees to execute and deliver such additional documents and instruments, and to perform such additional acts, as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions.  All approvals of either party hereunder shall be in writing.

13.3.    Service; Jurisdiction.  Each of the parties agrees to (a) the irrevocable designation of the Secretary of State of the State of California as its agent upon whom process against it may be served, and (b) personal jurisdiction in any action brought in any court, federal or state, within the State of California having subject matter jurisdiction arising under this Agreement.

13.4.    Pronouns.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may

12

Exhibit A to Kalash Decl.
Page 12 of 14



require.

13.5.  Entire Agreement.  This instrument and the Schedule and Exhibits hereto and the agreements contemplated hereby or referred to herein contain all of the understandings and agreements of whatsoever kind and nature existing between the parties hereto with respect to this Agreement and the rights, interests, understandings, agreements and obligations of the respective parties pertaining to the Agreement.

13.6.  References of this Agreement.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.7.  Headings.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.8.  Binding Effect.  Except as herein otherwise expressly stipulated to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, and their respective successors and permitted assigns.

13.9.  Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original and each of which shall constitute one and the same Agreement.

13.10.  Amendments.  This Agreement may not be amended, altered or modified except by a written instrument signed by each of the Parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

SALES

ADVANCED   MATERIALS   FOREIGN CORPORATION LTD.

By: _____
Title: UPRESIDENT

FOAMTEC (SINGAPORE) PTE

By: _____
Title: President

Attachments:

Exhibit A:          Equipment Lease

13

FM 0053

Exhibit B:              License Agreement

Schedule 3.2(b)         Manufacturing Costs

03002\Q020\jointvn8.agt

14

FM 0054

Exhibit "B"

| HP Forecasts as at 15-5-07 PART No. | Qty,000 | | 100% Forecast | | | | | | | 29-May-07 TOTAL Jul~Jan.2008 | Rev:25-Jun Full Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | F Jul-07 | F Aug-07 | F Sep-07 | F Oct-07 | F Nov-07 | F Dec-07 | F Jan-08 | | | |
| PELE | | | | | | | | O | | - | 1,109 |
| 4-75 Side | | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 2,113 | | 3,527 |
| 5-50 Ctr | | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 1,057 | | 1,793 |
| 4-75 Ctr | | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 3,651 | | 5,680 |
| | | | | | | | | | | - | |
| 4-75 Short 5183-5666 | | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 7,305 | | 11,330 |
| | | | | | | | | | | - | |
| CARLEX 5183-5934 | | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 43,678 | | 39,198 |
| | | | | | | | | | | - | - |
| FLAME 5187-5731 Thai 20% | | 5,549 / 1,387 | 5,594 / 1,398 | 5,522 / 1,381 | 4,984 / 1,246 | 5,599 / 1,400 | 5,466 / 1,366 | 5,426 / 1,356 | 38,139 / 9,535 | | 63,727 / 9,535 |
| FLICKER 5188-0405 | | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 43,002 / O | | 41,690 / 0 |
| WAX 5185-1099 Thai 20% | | 1,141 / 285 | 1,155 / 289 | 1,055 / 264 | 644 / 161 | 839 / 210 | 875 / 219 | - / 0 | 5,710 / 1,427 | | 13,902 / 1,427 |
| MINLEX 5187-2317 Thai 100% | | 609 Start 50% | 2,448 | 2,434 | 2,575 | 2,775 | 2,647 | 2,630 | 16,118 | | 16,118 |
| Total SG & Thai | | 20,019 | 26,332 | 25,034 | 24,515 | 26,217 | 24,674 | 24,944 | 171,735 | | 209,037 |

| ROYALTIES (Estimated) | HP Price | Royalty per unit | 90% Forecast; 10% Cost-down | | | | | | end 08-Jan | TOTAL Jul~Jan.2008 | Rev:25-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | | |
| 4-75 Side | $ 0.1360 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 5-50 Ctr | $ 0.1460 | $ (0.0027) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 4-75 Ctr | $ 0.1330 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 4-75 Short 5183-5666 | $ 0.0810 | $ (0.0008) EOL | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| CARLEX 5183-5934 | $ 0.0270 | $ 0.0025 | $7,790 | $16,853 | $15,082 | | | | | $39,725 | |
| | $ 0.0243 | $ 0.0015 | | | | $9,064 | $9,357 | $8,097 | $8,613 | $35,131 | |
| FLAME 5187-5731 | $ 0.0342 | $ 0.0018 | $8,989 | $9,062 | $8,946 | $8,074 | $9,071 | $8,854 | $8,789 | $61,785 | |
| | $ 0.0308 | $ 0.0006 | $749 | $755 | $746 | $673 | $756 | $738 | $732 | $5,149 | |
| FLICKER 5188-0405 | $ 0.0225 | $ 0.0004 | $1,992 | $2,130 | $2,002 | $2,215 | $2,342 | $2,241 | $2,558 | $15,480 | |
| WAX 5185-1099 | $ 0.0873 | $ 0.0055 | $5,647 | $5,718 | $5,223 | $3,188 | $4,154 | $4,332 | $0 | $28,262 | |
| | $ 0.0786 | $ 0.0024 | $616 | $624 | $570 | $348 | $453 | $473 | $0 | $3,084 | |
| MINLEX 5187-2317 | $ 0.0380 | $ (0.0014) | N/A | N/A | N/A | | | | | $0 | |
| | $ 0.0342 | $ (0.0028) | | | | N/A | N/A | N/A | N/A | $0 | |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Forecast (100%) | | | $25,783 | $35,142 | $32,569 | $23,562 | $26,133 | $24,735 | $20,692 | $188,616 | |
| Estimates pro-rated to end 08-Jan-2008, | | | | | | | | | Ends 08-Jan | | |
| = 5 workdays ÷ 22 workdays = | | | | | | | | | $4,703 | $172,627 | |
| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | | |
| Wells Fargo Rate | | 8.25% p.a. | 0.6875% p.m. | | | | | | | | |
| Present Value | | | $ 25,607 | $ 34,654 | $ 31,906 | $ 22,925 | $ 25,253 | $ 23,739 | $ 4,483 | $ 168,577 | |
| NPV = | | | $ 168,577 | | | | | | | | |
| Total Royalties (aligned) | | | $25,783 | $35,142 | $32,569 | $23,562 | $26,133 | $24,735 | $4,703 | $172,627 | |

Exhibit B to Kalash Decl. Page 1 of 4

Subject: FW: HP Confidential: June Forecast

**From:** Tan, Hui Leng [mailto:hui-leng.tan@hp.com]
**Sent:** 07 June 2007 09:16
**To:** Phoebe Ng
**Cc:** C T KOH; Kenng@foamexasia.com.sg; Cheung, Marco-Mh
**Subject:** HP Confidential: June Forecast

Phoebe,

How is the forecast for this month. Kindly acknowledge acceptance and ensure sufficient inventory and buffer to meet Hp requirements.

I spoken to Ken yesterday, we are depleting the inventory level for FMX Int'l Wax. Pls start to keep a lean inventory.

| Foamtec | | | Quantity per pieces in Thousand ('000) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| No | Part No | Description | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
| 1 | 5183-5666 | Short Side Foam 4.75 | 982 | 1,165 | 1,082 | 1,087 | 1,037 | 870 | 985 | 1,069 | 461 | 795 | 787 | 653 |
| 2 | 5185-0797 | Side Foam 4.75 | 360 | 220 | 294 | 338 | 329 | 295 | 236 | 254 | 259 | 256 | 204 | 216 |
| 3 | 5185-0798 | Centre Foam 5.5 | 180 | 110 | 147 | 169 | 165 | 147 | 118 | 127 | 129 | 128 | 102 | 108 |
| 4 | 5185-0799 | Centre Foam 4.75 | 491 | 583 | 541 | 544 | 518 | 435 | 492 | 535 | 230 | 397 | 394 | 327 |
| 6 | 5185-1099 | Felted Wax | 1,212 | 851 | 419 | 424 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 6 | 5187-5731 | Flame | 5,886 | 6,494 | 6,072 | 6,042 | 5,471 | 6,159 | 6,053 | 6,159 | 5,543 | 6,380 | 6,453 | 7,275 |
| 7 | 5188-0405 | Flicker | 4,972 | 6,139 | 5,895 | 4,392 | 4,840 | 4,456 | 3,758 | 3,970 | 4,146 | 4,770 | 3,394 | 5,145 |
| 8 | 5183-5934 | Carlex | 3,395 | 3,521 | 7,178 | 6,914 | 6,793 | 6,864 | 5,788 | 5,506 | 5,430 | 6,263 | 6,267 | 6,418 |
| | 5187-2317 | Unfelted Wax | 0 | 0 | 2,127 | 2,061 | 1,985 | 2,003 | 2,141 | 2,061 | 1,855 | 1,891 | 1,867 | 1,945 |

Note:

The above forecast is a current "Snapshot" of HP IJMS's best estimate of future expected demand for your product. It is being provided to be used as a business planning tool. It is not to be considered as a letter of intent for raw materials nor a commitment to purchase finished product. This forecasted information is subjected to periodic adjustment based on changing market and manufacturing demand. This data is considered to HP proprietary information and is not to be shared with other parties

Regards,
Hui Leng

Hewlett-Packard Singapore (Private) Limited
Registration No: 197000137C

Exhibit B to Kalash Decl.
Page 2 of 4

FM 0137

Subject: FW: HP Confidential: May Forecast

**From:** Tan, Hui Leng [mailto:hui-leng.tan@hp.com]
**Sent:** 15 May 2007 10:24
**To:** Phoebe Ng ; ckelsey@foamexasia.co.th
**Cc:** C T KOH; Wei-Liang, Teh; kenng@foamexasia.com.sg
**Subject:** RE: HP Confidential: May Forecast

...ris & Phoebe,

...re is a change in the requirement of unfelted wax. Re-attached below is the amendment in blue. Thanks.

...ds,
...Leng

...t-Packard Singapore (Private) Limited
Registration No: 197000137C
Tel: 65 6727 6542
Fax: 65 6274 8663

| Reamtec | Part No | Description | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 5183-6666 | Short Side Foam 4.75 | 823 | 960 | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 475 | 938 | 849 |
| | 5185-0797 | Side Foam 4.75 | 352 | 360 | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 259 | 256 | 204 |
| 3 | 5185-0798 | Centre Foam 5.5 | 176 | 180 | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 129 | 128 | 102 |
| 3 | 5185-0799 | Centre Foam 4.75 | 411 | 480 | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 238 | 469 | 425 |
| 44 | 5185-1099 | Felted Wax | 1,144 | 1,260 | 1,426 | 1,444 | 1,319 | 805 | 1,049 | 1,094 | 1,097 | 862 | 1,148 | 1,020 |
| | 5187-5731 | Flame | 6,520 | 6,163 | 6,936 | 6,992 | 6,903 | 6,230 | 6,999 | 6,832 | 6,782 | 6,136 | 7,317 | 6,969 |
| | 5188-0405 | Flicker | 0 | 5,758 | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 6,850 | 8,019 | 6,363 |
| | 5183-5934 | Carlex | 0 | 2,970 | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 5,452 | 6,184 | 6,118 |
| | 5187-2317 | Unfelted Wax | 0 | 0 | 1,218 | 2,448 | 2,434 | 2,575 | 2,775 | 2,647 | 2,630 | 2,555 | 2,830 | 2,832 |

*Quantity per pieces in Thousand ('000)*

Exhibit B to Kalash Decl.
Page 3 of 4

FM 0138

6/27/2007

From: Tan, Hui Leng
Sent: 10 May 2007 11:00
To: Phoebe Ng
Cc: 'C T KOH'; Wei-Liang, Teh; 'kenng@foamexasia.com.sg'
Subject: HP Confidential: May Forecast

Hi Phoebe,

Below is May forecast. Pls ensure sufficient inventory & upside capacity to cater to Hp demands. Kindly acknowledge receipt and acceptance.

Foamtec

| Part No | Description | Quantity per pieces in Thousand ('000) | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr |
| 5183-5666 | Short Side Foam 4.75 | 823 | 960 | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 475 | 938 | 849 |
| 5185-0797 | Side Foam 4.75 | 352 | 360 | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 259 | 256 | 204 |
| 5185-0798 | Centre Foam 5.5 | 176 | 180 | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 129 | 128 | 102 |
| 5185-0799 | Centre Foam 4.75 | 411 | 480 | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 238 | 469 | 425 |
| 5185-1099 | Felled Wax | 1,144 | 1,260 | 1,426 | 1,444 | 1,319 | 805 | 1,049 | 1,094 | 1,097 | 862 | 1,148 | 1,020 |
| 5187-5731 | Flame | 6,520 | 6,163 | 6,936 | 6,992 | 6,903 | 6,230 | 6,999 | 6,832 | 6,782 | 6,136 | 7,317 | 6,959 |
| 5188-0405 | Flicker | 0 | 5,758 | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 6,850 | 8,019 | 6,363 |
| 5183-5934 | Carlex | 0 | 2,970 | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 5,462 | 6,184 | 6,118 |
| 5187-2317 | Unfelted Wax | 0 | 0 | 2,016 | 4,044 | 3,974 | 3,913 | 4,309 | 4,125 | 3,952 | 3,762 | 4,250 | 4,182 |

Note:

The above forecast is a current "Snapshot" of HP IJMS's best estimate of future expected demand for your product. It is being provided to be used as a business planning tool. It is not to be considered as a letter of intent for raw materials nor a commitment to purchase finished product. This forecasted information is subjected to periodic adjustment based on changing market and manufacturing demand. This data is considered to HP proprietary information and is not to be shared with other parties

...rds,
Hui Leng

Hewlett-Packard Singapore (Private) Limited
(Registration No: 197000137C)
DID: 65 6727 6542
Fax: 65 6274 8663

6/27/2007

FM 0139

# PROOF OF SERVICE

I, the undersigned, declare:

I am employed in the County of Orange, State of California. I am over the age of 18 years and not a party to this action. My business address is the Law Offices of George S. Burns, 4100 MacArthur Boulevard, Suite 305, Newport Beach, California 92660.

On March 12, 2009, I served a copy, including all exhibits, if any, of the following document(s):

## AMENDED TRIAL TESTIMONY OF DAVE KALASH

on the parties in this action listed in the attached Proof of Service List, which is incorporated herein by this reference, by the following means:

X    **(BY PERSONAL SERVICE)** I caused each such envelop to be sealed and given to a courier authorized by our attorney service to receive documents for delivery on the same date. A proof of service signed by the authorized courier will be filed forthwith.

X    **(BY ELECTRONIC SERVICE)** service deemed effective via the United States District Court Central District of California's Electronic Case Filing (CM/ECF) system

☐    **(BY FEDERAL EXPRESS)** I am readily familiar with the practice of the Law Offices of George S. Burns for the collection and processing of correspondence for overnight delivery and know that the document(s) described herein will be deposited in a box or other facility regularly maintained by Federal Express for overnight delivery.

X    **(DISTRICT)** I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed on March 12, 2009, at Newport Beach, California.

Tammy Martin

SERVICE LIST
Advanced Materials Group, Inc. v. Foamtec and Foamex Asia
Case No.  SACV 08-43 JVS (RNBx)

Mr. Charles H. Kanter
Palmieri, Tyler, Wiener, Wilhelm &
Wladron LLP
2603 Main Street
East Tower, Suite 1300
Irvine, California 92614-4281

Telephone: (949) 851-9400
Facsimile: (949) 757-1225
ckanter@ptwww.com
rgarretson@ptwww.com

Attorneys for Defendants Foamtec
(Singapore) Pte. Ltd and Foamex
Asia Ltd.