Charles H. Kanter, Bar No. 071410
ckanter@ptwww.com
Erica M. Sorosky, Bar No. 251314
esorosky@ptwww.com
PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
2603 Main Street
East Tower - Suite 1300
Irvine, California 92614-4281
Telephone: (949) 851-9400
Facsimile: (949) 757-1225

Attorneys for Defendants Foamtec (Singapore) Pte.
Ltd. and Foamex Asia Ltd.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| Advanced Materials Group, Inc., a Nevada Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>Foamtec (Singapore) Pte. Ltd., a private limited company incorporated in Singapore; and Foamex Asia Ltd, a private limited company incorporated in the Kingdom of Thailand and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. SACV08-00043 JVS (RNBx)<br><br>**DECLARATION OF STEPHEN SCIBELLI**<br><br>Judge: Hon. James Selna<br><br>Trial Date: March 31, 2009<br>Time: 8:30 a.m.<br>Dept: 10-C |

///
///
///
///
///
///
///
///
///

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

# DECLARATION OF STEPHEN SCIBELLI

I, Stephen Scibelli, hereby declare:

1. The following statements are within my personal knowledge and if sworn as a witness, I could and would testify competently thereto.

2. Paragraphs 3 through 12 of this Declaration are foundational and background paragraphs relating to the parties, the agreements between the parties, and Foamtec's buyout of AMG's interests. Paragraphs 13 through 20 of this Declaration relate specifically to the issues which are the subject of phase one of this trial.

3. At all times relevant hereto and, specifically, in January of 1998 at the time the Manufacturing Agreement was executed, I was the President of Foamtec (Singapore) Pte. Ltd., a Singapore private limited company. At all times relevant hereto and, specifically, during the initial ten-year term of the Manufacturing Agreement, I was also the President of Foamex Asia Co., Ltd. Foamtec (Singapore) Pte. Ltd. was a wholly owned subsidiary of Foamex Asia Co., Ltd. At all times hereinafter, the term "Foamtec" shall refer collectively to Foamex Asia Co., Ltd. and Foamtec (Singapore) Pte. Ltd. In or about September of 2007, Foamex Asia Co., Ltd. changed its name to Foamtec International Co., Ltd., a Thailand private limited company. I am the President of Foamtec International Co., Ltd.

4. I currently live in Bangkok, Thailand.

5. Plaintiff Advanced Materials Group, Inc. ("AMG") and defendant Foamtec (Singapore) Pte. Ltd. are parties to a Manufacturing Agreement ("Agreement") executed in January of 1998, whereby they agreed to combine efforts to sell certain foam products to Hewlett Packard in Singapore. Attached hereto as Exhibit A is a true and correct copy of the Agreement.

6. The Agreement was originally entered into between Foamtec (Singapore) Pte. Ltd., a wholly-owned subsidiary of Foamex Asia Co., Ltd., and Advanced Material Foreign Sales Corporation, Ltd. ("AMFS"), a wholly-owned subsidiary of AMG. Foamtec (Singapore) Pte. Ltd. assigned its rights and obligations under the Agreement

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

DECLARATION OF STEPHEN SCIBELLI

1  to Foamex Asia Co., Ltd., and AMFS assigned its rights and obligations under the
2  Agreement to AMG.

3     7.     As President of Foamtec, I was personally and intimately involved in the
4  negotiation of the terms of the Agreement. I was the principal negotiator for Foamtec
5  with regard to the Agreement. The principal negotiator for AMG with regard to the
6  Agreement was Steve Scott, then President of AMG. I signed the Agreement on behalf
7  of Foamtec, and Steve Scott signed the Agreement on behalf of AMG. Pursuant to the
8  Agreement, AMG would acquire raw foam material and sell such raw material to
9  Foamtec to fabricate finished foam products at Foamtec's facility in Singapore.
10  Foamtec would lease machinery from AMG and would use these machines supplied by
11  AMG for the manufacture of the finished foam products. Foamtec would manufacture
12  the products and re-sell them to AMG, who would then sell such products to Hewlett
13  Packard.

14     8.     The Agreement ran for a period of ten years (the "Initial Term"). Either
15  party to the Agreement had a conditional right to extend the Initial Term for an
16  additional period of five years ("Additional Term"), but Foamtec had a right to buy out
17  the interest of AMG. The buyout, if exercised by Foamtec, would terminate the
18  Agreement. (*See* Articles 2.2 and 6.2 of Exhibit A.) Therefore, AMG could only
19  exercise its right to extend the Agreement for the five-year Additional Term if Foamtec
20  did not exercise its buyout right.

21     9.     In January 1998, at the same time the Agreement was executed, AMG and
22  Foamtec entered into companion agreements entitled Advanced Materials Foreign Sales
23  Corporation Limited Equipment Lease ("Equipment Lease") and Technical Information
24  License Agreement ("License Agreement"). True and correct copies of the Equipment
25  Lease and the License Agreement are attached hereto as Exhibits B and C, respectively.

26     10.    On June 19, 2003, AMG and Foamtec entered into the "Addendum to the
27  Manufacturing Agreement" ("Addendum"). A true and correct copy of the Addendum
28  is attached hereto as Exhibit D. As President of Foamtec, I was personally involved in

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

F:\LIT\596\Foamtec - Advanced Materials Group\Pleadings\TRIAL DOCS\Declaration of Stephen Scibelli 03 09.doc

the negotiation of the terms of the Addendum. The principal negotiator for AMG with regard to the Addendum was Steve Scott, then President of AMG. I signed the Addendum on behalf of Foamtec, and Steve Scott signed the Addendum on behalf of AMG. The Addendum was drafted, among other reasons, to set forth in writing a major shift in duties of the parties. Because AMG was having severe financial problems, Foamtec had taken over <u>all</u> of AMG's duties under the Agreement. At this point in time, AMG was doing nothing except collecting a check for their share of the profits. Thus, the contributions of each of the parties had changed significantly since the time the original profit-sharing schedule was established in the Agreement.

11. On May 30, 2007, Foamtec gave notice of its intent to buy out AMG in writing by way of a letter from counsel for Foamtec to Mr. Mortensen, President of AMG. Mr. Mortensen had taken over the presidency of AMG. Mr. Steve Scott was no longer employed by AMG at this time. The letter was sent to Mr. Mortensen at the Dallas, Texas, headquarters of AMG, where Mr. Mortensen worked. Attached hereto as <u>Exhibit E</u> is a true and correct copy of the letter from counsel for Foamtec to Mr. Mortensen whereby Foamtec elected to buy out AMG.

12. As President of Foamtec, I was personally involved in the decision of Foamtec to buy out AMG under the Agreement. In addition, I was personally involved in supervising the calculation of the amount of the buyout check which Foamtec owed to AMG under the buyout price formula set forth in Article 6.2 of the Agreement. On June 29, 2007, Foamtec mailed AMG a buyout check in the sum of $168,577, the amount of AMG's projected income under the Agreement for the balance of the Initial Term, calculated through January 8, 2008. Also enclosed with this letter was a detailed calculation of the $168,577 purchase price, together with the underlying Hewlett-Packard forecasts upon which the buyout price was based. Attached hereto as <u>Exhibit G</u> is a true and correct copy of the letter from counsel for Foamtec and its enclosures. AMG cashed the buyout check in the amount of $168,577. In addition, after Foamtec mailed the buyout check to AMG and AMG cashed the check, AMG demanded that

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

Foamtec return to AMG two pieces of AMG's heavy equipment ("Equipment") that Foamtec was using to manufacture foam products in Asia. These two pieces of Equipment were manufacturing presses. This demand was in conformance with the Equipment Lease, under which Foamtec was using the Equipment. The term of the Equipment Lease ended when the Manufacturing Agreement ended. (Exhibit B, ¶ 1.) In addition, the Equipment Lease, at paragraph 7, required Foamtec to return the Equipment to AMG upon the "expiration or termination of the [Equipment] Lease". (Exhibit B, ¶ 7.) Foamtec complied with AMG's request and shipped these two manufacturing presses back to AMG.

13. There are two, virtually identical, signed written Agreements. One is dated January 8, 1998, and the other is dated January 30, 1998. Foamtec calculated the buyout price it paid AMG using January 8, 1998, as the date the parties entered into the Agreement. AMG has argued that January 30, 1998, is the date the parties entered into the Agreement and should be used for calculating the ten-year period of the Initial Term and the amount of the buyout price. In Foamtec's Motion for Summary Adjudication, because the amount of money involved was relatively small and because Foamtec did not want this to be a disputed issue, Foamtec offered to pay AMG, in addition to the buyout sum already paid, the amount purportedly owed to AMG from January 8 to January 30, 2008. Foamtec has now done this. Attached hereto as Exhibit H is a true and correct copy of my attorney's letter to George Burns, counsel for AMG, enclosing Foamtec's check to AMG in the amount of $15,240. Also enclosed with this letter and attached to Exhibit H is a Hewlett Packard Sales Forecast Sheet showing the basis for calculating the amount of $15,240. This amount represents the additional sum that Foamtec would have paid to AMG for the buyout price if the buyout price had been calculated through January 30, 2008, instead of through January 8, 2008.

14. The issue in phase one of this trial is limited, by stipulation of the parties and Order of the Court, to the following: What products were intended to be covered by the Agreement and what customers were intended to be covered by the Agreement.

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

DECLARATION OF STEPHEN SCIBELLI

1    15.    With regard to the issue of what products were covered by the Agreement,

2    I have read the trial testimony declaration of Steve Scott submitted by Advanced

3    Materials Group.  That declaration is consistent with the trial testimony declaration of

4    Steve Scott submitted by Foamtec.  It is also consistent with my experience and

5    understanding as to the product covered by the Agreement.  In sum, as set forth below,

6    the only product covered by the Agreement is the ink jet cartridge foam used by Hewlett

7    Packard in the ink jet cartridges in the Hewlett Packard ink jet printers.  This type of

8    foam (hereinafter "Ink Jet Foam") is a special and unique type of foam which is very

9    expensive as compared to other types of foam.  The Ink Jet Foam is cut by Foamtec into

10   a particular shape, and this Ink Jet Foam is then inserted into a plastic ink jet cartridge

11   by Hewlett Packard at their facility.  The Ink Jet Foam is specially designed to hold and

12   dispense the ink used by Hewlett Packard in the ink jet printer.  It is an expensive foam

13   that involves a unique manufacturing process using heat and pressure.  There are four

14   basic firmnesses of Ink Jet Foams, each with a different thickness.  Different Hewlett

15   Packard ink jet printer models require different firmnesses of the Ink Jet Foam.  I agree

16   with the statement in the Trial Testimony Declaration of Dave Kalash submitted by

17   AMG at paragraph 15 that the Ink Jet Foam "is highly technical and expensive, [and is]

18   manufactured to HP specifications . . .".  I further agree with the statement of David

19   Kalash in this same paragraph that "the foam has virtually no other practical use except

20   as a part in the HP ink jet cartridge."  Several other types of foam, other than Ink Jet

21   Foam are used in various different parts in the Hewlett Packard ink jet printers.

22   However, as stated above, only the Ink Jet Foam used in the Hewlett Packard ink jet

23   printer cartridges were covered by the Agreement.

24   16.    Based upon my negotiations with Steve Scott regarding the Agreement and

25   the Addendum, it was the understanding and intent of both AMG and Foamtec that the

26   only product covered by the Agreement and the Addendum was the Ink Jet Foam used

27   in the ink jet printer cartridge in the Hewlett Packard ink jet printers.  This

28   understanding is supported not only by the negotiations and discussions of the parties

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

DECLARATION OF STEPHEN SCIBELLI

with regard to the Agreement and the Addendum, but also by the course of conduct of both parties over the 10-year Initial Term of the Agreement.

17.  During the Initial 10-year Term of the Agreement, AMG manufactured and sold at least one other product that I know of, to Hewlett Packard for use in the Hewlett Packard ink jet printer. It was a needlepoint felt-type product which was used as part of the "spittoon" in the Hewlett Packard ink jet printer. The issue of whether this product was supposed to be included under the Agreement came up in discussions I had with Steve Scott. Steve Scott and I specifically agreed that this type of product was not covered by the Manufacturing Agreement. This position is consistent with paragraph 10 of the Steve Scott Trial Testimony Declaration submitted by AMG. Therein, Mr. Scott makes clear that all products other than the Ink Jet Foam for the Hewlett Packard ink jet printer cartridge were not covered by the Agreement and that both AMG and Foamtec were free to sell such other products to Hewlett Packard or to Hewlett Packard subcontractors, and that such sales were specifically not covered by the Agreement.

18.  As part of my duties as the President of Foamtec, I am familiar with and have personal knowledge of the various types of foams purchased by Foamtec as well as other raw materials purchased by Foamtec, and I am also familiar with the types of products that Foamtec has sold to Hewlett Packard. I am also familiar with the types of foam and the types of products which Foamtec has sold to the alleged subcontractors of Hewlett Packard, including Flextronics, Cal Comp, Technocom Systems, Kinpo, Jabil and Tech Group Asia ("Alleged Subcontractors"). During the approximate 10-year period that the Agreement was in force and effect (1998 through 2008), Foamtec never sold any Ink Jet Foam products to the Alleged Subcontractors.

19.  In fact, Hewlett Packard Singapore only purchased Ink Jet Foam from Foamtec and from Rogers Foam, a competitor of Foamtec, and they did not purchase any Ink Jet Foam from the Alleged Subcontractors. Foamtec would have had to have received permission from Hewlett Packard in order to sell Ink Jet Foam to any of the Alleged Subcontractors. No such permission was ever requested or received. Foamtec

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

DECLARATION OF STEPHEN SCIBELLI

F:\LIT\596\Foamtec - Advanced Materials Group\Pleadings\TRIAL DOCS\Declaration of Stephen Scibelli 03 09.doc

1 would have gotten in trouble with Hewlett Packard, one of Foamtec's major customers,
2 if Foamtec had sold Ink Jet Foam to any of the Alleged Subcontractors.

3     20.    I have reviewed the annual royalty statements which Foamtec prepared and
4 provided to AMG each year when Foamtec paid AMG their royalties under the
5 Agreement. All of the part numbers on these royalty statements relate only to Hewlett
6 Packard ink jet printers and are for Ink Jet Foam sold to Hewlett Packard. Foamtec has
7 fully and properly accounted for and paid to AMG all royalties due and owing under the
8 Agreement for all Ink Jet Foam sold to Hewlett Packard, which is the only product
9 covered under the Agreement.

10     21.    The Agreement at paragraph 2.1 and the Addendum at paragraph 16.1 both
11 specifically state that the purpose of the Agreement is to ". . . sell such products to
12 Hewlett Packard and to certain other approved customers and products, such products
13 and customers to be approved unanimously by the parties from time to time on a case by
14 case basis." Except for the Ink Jet Foam sold to Hewlett Packard, Foamtec never
15 approved, nor did Foamtec and AMG unanimously approve, any other customer or
16 product which was to be covered by the Agreement.

17     22.    Although it is irrelevant because Foamtec never sold any Ink Jet Foam to
18 Flextronics, Cal Comp, Technocom Systems, Kinpo, Jabil and Tech Group Asia
19 ("Alleged Subcontractors"), as stated above, none of the Alleged Subcontractors were
20 ever unanimously approved as customers under the Agreement. Further, the Agreement
21 does not utilize the term "subcontractor" when referring to potential customers. The
22 only potential addition of customers under the language of the Agreement involves the
23 use of the term "Affiliate". This term is defined in the Agreement, in essence, as a
24 company which Hewlett Packard has "the power to direct or cause the direction of the
25 management <u>and</u> policies" of the company. (Emphasis added.) In my understanding,
26 this would refer to a subsidiary of Hewlett Packard or a like situation. To the best of my
27 knowledge, all of the Alleged Subcontractors are independent companies who are not

28

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

DECLARATION OF STEPHEN SCIBELLI

1   subsidiaries of or related to Hewlett Packard, and Hewlett Packard does not have the

2   power to direct the management <u>and</u> policies of the Alleged Subcontractors.

3      I declare under penalty of perjury under the laws of the State of California that the

4   foregoing is true and correct.

5      Executed this 18th day of March, 2009, at La Quinta, California.

6

7

8

9                     Stephen Scibelli

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

DECLARATION OF STEPHEN SCIBELLI

D:\PROGRA~1\RIGHTFAX\outgoing\00000128.001.DOC

EXHIBIT A



# MANUFACTURING AGREEMENT

THIS MANUFACTURING AGREEMENT (the "Agreement") is made and entered into as of the _____ day of January 8, 1998 (the "Closing Date"), by and between Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation ("AMFS"), and Foamtec (Singapore) Pte Ltd., a Singapore private limited company ("Foamtec").

## RECITALS

WHEREAS, AMFS proposes to obtain raw material from [Foamex USA], and to sell such raw material to Foamtec; and

WHEREAS, Foamtec proposes to fabricate foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished products to AMFS; and

WHEREAS, AMFS will sell such finished products to Hewlett-Packard and certain other approved customers and products, on a case-by-case basis; and

WHEREAS, AMFS has agreed to lease certain machinery and equipment (the "Equipment") to be located at Foamtec's facility pursuant to an equipment lease in the form of Exhibit A hereto (the "Equipment Lease") and certain intellectual property, trade secrets and "know-how" (the "Technology") pursuant to a license agreement in the form of Exhibit B hereto (the "License Agreement") to Foamtec for use in connection with the business contemplated by this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, AMFS and Foamtec hereby covenant and agree as follows:

## ARTICLE 1
## DEFINITIONS

The following defined terms used in this Agreement shall have the respective meanings specified below.

*"Additional Term"* shall have the meaning set forth in Section 2.2(b).

An *"Affiliate"*, when used with respect to a specified Person, shall mean (i) any other Person directly or indirectly controlling, controlled by, or under common control with, such specified Person, (ii) any officer, director, partner (including any officer or director of AMFS or Foamtec), legal representative (including a trustee for the benefit of such specified Person) or

EXHIBIT A                    FM 0001

employee of such specified Person, and (iii) any Person for which such specified Person acts as an officer, director, partner or employee. As used in this definition of "Affiliate," the term "control" and any derivatives thereof mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities, by contract, or otherwise.

*"Agreement"* shall have the meaning set forth in the preamble.

*"AMFS"* shall have the meaning set forth in the preamble.

*"Business"* shall have the meaning set forth in Section 2.1.

*"Business Plan"* shall have the meaning set forth in Section 6.4(1).

The *"Closing Date"* shall have the meaning set forth in the preamble.

The *"Defaulting Party"* shall have the meaning set forth in Section 7.1.

*"Equipment"* shall have the meaning set forth in the preamble.

*"Equipment Lease"* shall have the meaning set forth in the preamble.

*"Event of Default"* shall have the meaning set forth in Section 7.1.

*"[Foamex USA"]* shall have the meaning set forth in the preamble.

*"Foamtec"* shall have the meaning set forth in the preamble.

*"Indemnified Party"* shall have the meaning set forth in Section 11.2.

*"Indemnifying Party"* shall have the meaning set forth in Section 11.2.

*"License Agreement"* shall have the meaning set forth in the preamble.

*"Nondefaulting Party"* shall have the meaning set forth in Section 7.1.

*"Notice of Default"* shall have the meaning set forth in Section 7.1.

*"Party"* shall mean either of AMFS or Foamtec, as the context requires.

*"Parties"* shall mean AMFS and Foamtec.

*"Person"* shall mean any individual, partnership, association, governmental instrumentality, corporation, trust or other legal person or entity.

2

FM 0002

EXHIBIT A, PAGE 2

*"Products"* shall have the meaning set forth in Section 2.1.

*"SIAC Rules"* shall have the meaning set forth in Section 10.2.

*"Technology"* shall have the meaning set forth in the preamble.

*"Term"* shall have the meaning set forth in Section 2.2.

## ARTICLE 2
## PURPOSES: TERM AND CONDUCT

2.1.   Purposes.  The purposes for which the Agreement is entered (the"Business") are for AMFS to acquire raw material from [Foamex USA], and to sell such raw material to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished foam products to AMFS, which will then sell such products to Hewlett-Packard and to certain other approved customers and products, such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis (the "Products").

2.2.   Term.

(a)   The Agreement shall commence on the Closing Date and, subject to the provisions otherwise contained herein, shall terminate ten (10) years thereafter subject to renewal as provided in Section 2.2(b), below (the "Term") unless sooner terminated as otherwise provided in this Agreement or by law.

(b)   This Agreement may be renewed by either party for an additional five (5) year period (the "Additional Term"), provided the party desiring to renew the Agreement for such Additional Term notifies the other party in writing at least six months prior to expiration of the Term hereof.

2.3.   Conduct.  The Agreement shall be effected as follows:

(a)   AMFS shall purchase raw material from [Foamex USA] at a price representing the best price for such material offered by [Foamex USA] anywhere in the world at that time.  Foamtec will reasonably cooperate with AMFS to make such books and records reasonably available as are necessary or desirable to AMFS's auditors to verify such best price.

(b)   AMFS will sell such raw material to Foamtec at a price as determined in Article 3, below.

(c)   Foamtec shall fabricate such raw material into finished product at Foamtec's facility, utilizing Foamtec's personnel and the Equipment and Technology of AMFS, and shall

3

FM 0003

EXHIBIT A, PAGE 3

resell such finished product to AMFS at a price equal to the price determined as set forth in Article 3, below.

(d)     AMFS shall sell and deliver such finished products to Hewlett-Packard and such other customers at the retail price, and with respect to such other products at such prices, as are determined in accordance with Section 2.3(c).

## ARTICLE 3
## COSTING

3.1.   <u>Profit Sharing</u>.  Except as otherwise expressly stipulated herein, the interest of the respective Parties in the profits resulting from the difference between the price of the raw materials described in Section 2.3(a) and the retail price for sales to customers described in Section 2.3(d) shall be as follows (commencing as at the date of the first sale of the Products to a retail customer hereunder):

| <u>Year</u> | <u>AMFS</u> | <u>Foamtec</u> |
|---|---|---|
| 1 | 65 | 35 |
| 2 | 60 | 40 |
| 3 | 50 | 50 |
| 4 | 45 | 55 |
| 5 | 40 | 60 |
| 6-10 | 35 | 65 |

3.2   <u>Calculation of Profits</u>.  Profits are to be determined by deducting all costs arising under the Agreement from the revenues arising under the Agreement.

(a)     <u>Revenues</u>.  Payments received from customers as contemplated by Section 2.3(c).

(b)     <u>Costs - Foamtec</u>.  Foamtec shall be permitted to charge AMFS, in U.S. dollars, amounts to compensate Foamtec for all raw materials, direct labor costs (including compensation and benefits), variable overhead (utilities, packaging, supplies, repairs and maintenance, outbound freight, inspection and manufacturing, supervision), fixed overhead (facility rent, purchasing, receiving, shipping, plant manager), operating expenses (sales and marketing, accounting, legal and audit) and an amortization charge for start-up costs.  The foregoing manufacturing costs will be computed as further described in Schedule 3.2(b) and reviewed periodically and approved by the parties pursuant to Article 4.  These manufacturing costs must remain competitive to U.S. plant manufacturing standards, usage and plant space utilization.

(c)     <u>Costs - AMFS</u>.  Costs incurred by AMFS for direct material (including costs of transportation, duties, brokers' fees, insurance, manufacturing scrap and so forth), fixed

4

FM 0004

overhead (including payments under the Equipment Lease and the License Agreement, and quality control and purchasing allocations), operating expenses (including sales and marketing) and non-operating expenses (including imputed interest charges for inventory and accounts receivable and an amortization charge for start-up costs will be charged as costs). These costs will be reviewed periodically and approved by the parties pursuant to Article 4.

### 3.3 Calculation of Purchase Price.

(a) The price described in Section 2.3(b) shall be determined by the parties pursuant to Article 4 and shall be intended to provide that the difference between the price paid by AMFS to [Foamex USA] for raw material and the price paid by Foamtec to AMFS for the same raw material shall represent the portion of the profit in good faith estimated to accrue to AMFS as set forth in Section 3.1 and as calculated in Section 3.2.

(b) The price described in Section 2.3(c) shall be determined by the parties pursuant to Article 4 and shall be intended to provide in good faith that the difference between the price paid by Foamtec to AMFS for raw material and the price paid by AMFS to Foamtec for finished product fabricated from such raw material shall represent the portion of the product profit in good faith estimated to accrue to Foamtec as set forth in Section 3.1 and as calculated in Section 3.2.

3.4 Time of Payments. Payments by AMFS to Foamtec and payments by Foamtec to AMFS as contemplated herein shall be made on a quarterly basis within ten (10) business days after the quarter is closed, and shall be netted against each other, with such adjustments as may be determined in good faith by the parties pursuant to Article 4 so as to most accurately reflect the intent of the parties as set forth in Section 3.1.

ARTICLE 4
OVERSIGHT

4.1. Oversight. The parties shall perform under this Agreement under the joint direction of an appointee of each of AMFS (initially, Steve F. Scott) and Foamtec (initially, Stephen P. Scibelli). Any disputes or disagreements arising from this Agreement shall initially be referred jointly to such appointees, who shall in good faith attempt to resolve such disputes promptly and within the spirit of this Agreement.

ARTICLE 5
BOOKS AND RECORDS; AUDITS

5.1. Books; Statements. The Parties shall keep accurate, full and complete books and accounts showing its operations and transactions relating to the Business.

5

FM 0005

EXHIBIT A, PAGE 5

5.2.    Access.  Each Party shall have access to and may inspect and copy the books, accounts and records of the other Party maintained in accordance with Section 5.1, provided that any request for access to the books, accounts and records of the other Party must be reasonable.

5.3.    Audits.  In addition to the foregoing, any Party may, at its option and at its own expense, conduct internal audits of the books, records and accounts of the other Party, but only to the extent that such books, records and accounts relate to the Business.  Audits may be on either a continuous or a periodic basis or both and may be conducted by employees of any Party, or of an Affiliate of any Party, or by independent auditors retained by any Party.

5.4.    Other Information.  Each Party shall make available to the other Party such information and financial statements related to the Business, in addition to the foregoing, as shall be required by either of them in connection with the preparation of registration statements, current and periodic reports, proxy statements and other documents required to be filed under foreign, federal or state securities laws and shall cooperate in the preparation of any such documents.

## ARTICLE 6
## NO ASSIGNMENT; RIGHTS TO PURCHASE AN INTEREST

6.1.    Consent Required.  Except as provided in Section 6.2, without the prior written consent of the other Party (which may be withheld for any or no reason), no Party, nor any assignee or successor in interest of any Party, shall (voluntarily or involuntarily) sell, assign, give, pledge, hypothecate, encumber or otherwise transfer all or any part of its interest in this Agreement.

6.2    Right to Purchase and Sell.  At any time following the third anniversary of the date hereof, Foamtec shall have the right, exercisable from time to time by written notice to AMFS, to purchase the interest of AMFS under this Agreement at a price calculated as the present value, discounted at the average over the prior three months of the prime rate as announced from time to time by Wells Fargo Bank, N.A. Head Office as its prime rate, of the portion of the income reasonably expected to accrue to AMFS as provided in Section 3.1 hereof over the remaining balance of the initial Term hereof (if exercised during the initial Term) or for the balance of the Additional Term (if exercised during the Additional Term) based on the forecast from Hewlett-Packard of its orders for products of the Business during such period.  Within 30 days of such notice, the Parties shall execute such documents and instruments reasonably acceptable to the Parties required to consummate the contemplated transaction, including AMFS' transfer of the Technology to Foamtec.  The closing of such transaction shall take place within 30 days following the date on which any government regulatory approvals required for consummation of the transaction have been obtained or otherwise satisfied.

6

FM 0006

ARTICLE 7
TERMINATION

7.1.  Event of Default.  In the event:

(a)  a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator (or other similar official) shall take possession of a Party or any substantial part of its property without its consent, or a court having jurisdiction in the premises shall enter a decree or order for relief in respect of a Party in an involuntary case under any applicable bankruptcy, insolvency, moratorium or other similar law now or hereafter in effect, or appointing a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator (or other similar official) of such Party or for any substantial part of its property, or ordering the winding-up or liquidation of its affairs and such decree or order shall remain unstayed and in effect for a period of 30 consecutive days; or

(b)  a Party shall commence a voluntary case under any applicable bankruptcy, insolvency, moratorium or other similar law now or hereafter in effect, or shall consent to the entry of an order for relief in an involuntary case under any such law, or shall consent to the appointment of or taking possession by a receiver, liquidator, assignee, trustee, custodian, conservator, sequestrator (or other similar official) of such Party or of any substantial part of its property, or shall make any general assignment for the benefit of creditors, or shall take any corporate action in furtherance of any of the foregoing; or

(c)  a Party shall admit in writing its inability to pay its debts as they mature; or

(d)  a Party shall give notice to any governmental body of insolvency or pending insolvency, or suspension or pending suspension of operations; or

(e)  any Party fails to perform any of its obligations or covenants or breaches any of its representations under this Agreement or pursuant to the agreements attached as Exhibits hereto (an "Event of Default"),

then the other Party (the "Nondefaulting Party") shall have the right to give such party (the "Defaulting Party") a notice of default ("Notice of Default").  The Notice of Default shall set forth the nature of the obligations which the Defaulting Party has not performed.

7.2  Thirty (30) Day Period After Event of Default.

(a)  If within the thirty (30) day period following receipt of the Notice of Default, the Defaulting Party in good faith commences to perform such obligations and cure such default, and thereafter prosecutes to completion with diligence and continuity the curing thereof and cures such default within a reasonable time, then it shall be deemed that the Notice of Default was not given and the Defaulting Party shall lose no rights hereunder.  If, within such

7

FM 0007

thirty (30) day period, the Defaulting Party does not commence in good faith the curing of such default or does not thereafter prosecute to completion with diligence and continuity the curing thereof, then the Nondefaulting Party may, at the option of the Nondefaulting Party, terminate this Agreement by giving the Defaulting Party written notice thereof.

(b)      Failure by a Nondefaulting Party to give any Notice of Default as specified herein, or any failure to insist upon strict performance of any of the terms of this Agreement, shall not constitute a waiver of any such breach or any of the terms of this Agreement. No breach shall be waived and no duty to be performed shall be altered or modified except by written instrument. One or more waivers or failures to give Notice of Default shall not be considered as a waiver of a subsequent or continuing breach of the same covenant.

7.3.      <u>Continuing Obligations</u>. The termination of this Agreement for any reason shall neither release either Party hereto from any liabilities, obligations or agreements which, pursuant to any provisions of this Agreement, are to survive or be performed after such termination nor shall it release either Party hereto from its liability to pay any sums of money accrued, due, and payable to the other Party or to discharge its then-accrued and unfulfilled obligations.

7.4.      <u>Not Exclusive Remedy</u>. The rights granted in Section 7.1 and Section 7.2 above shall not be deemed an exclusive remedy of a Nondefaulting Party or a Solvent Party, but all other rights and remedies, legal and equitable, shall be available to it.

## ARTICLE 8
## COVENANT NOT TO COMPETE

8.1.      <u>Covenant not to Compete</u>. Each Party and its Affiliates, so long as such Party remains a Party hereunder, are prohibited from directly or indirectly engaging in or possessing an interest in an activity, the purpose or business of which is identical to that described in Section 2.1, relating to the manufacture of products of the sort manufactured under this Agreement, to be sold to customers under this Agreement, during the Term of this Agreement, in Singapore or Malaysia. However, notwithstanding anything in this Agreement to the contrary, Foamex Asia Co., Ltd., a private limited company incorporated in the Kingdom of Thailand which is an Affiliate of Foamtec, shall have the right to sell raw materials to anyone in Singapore, Malaysia or elsewhere.

## ARTICLE 9
## REPRESENTATIONS AND WARRANTIES

9.1.      <u>Representations and Warranties by AMFS</u>. AMFS represents and warrants to, and covenants with, Foamtec, as follows:

(a)      AMFS is a corporation duly organized and validly existing under the laws of the State of California and is in good standing in such jurisdiction. AMFS is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure

8

FM 0008

to be so qualified or in good standing would have a material adverse impact on the operation or financial condition of the Business.

(b) AMFS has the full right, power and authority to enter into this Agreement and will at all times have the full power and authority to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by it, and this Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other loss affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c) AMFS is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Agreement.

(d) There is no litigation or proceeding pending nor, to the best of AMFS's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving AMFS or its parent, which could, if adversely determined, materially and adversely affect the operation or financial condition of the Business or the performance of AMFS's obligations under this Agreement.

(e) AMFS is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into and undertaking the performance of this Agreement.

9.2. <u>Representations and Warranties by Foamtec</u>. Foamtec represents and warrants to, and covenants with, AMFS, as follows:

(a) Foamtec is a private limited company duly organized and validly existing under the law of the Republic of Singapore and is in good standing in such jurisdiction. Foamtec is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the business or financial condition of the Business.

(b) Foamtec has the full right, power and authority to enter into this Agreement and will at all times have the full power and authority to perform its obligations under this Agreement. This Agreement has been duly authorized, executed and delivered by it, and this Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other loss affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c) Foamtec is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Agreement.

9

FM 0009

(d)     There is no litigation or proceeding pending nor, to the best of Foamtec's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving Foamtec or its parent, which could, if adversely determined, materially and adversely affect the operation or financial condition of the Business or the performance of Foamtec's obligations under this Agreement.

(e)     Foamtec is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into and undertaking the performance of this Agreement.

## ARTICLE 10
## ARBITRATION

10.1.  Arbitration. Any dispute arising out of or in connection with this Agreement that has not been resolved pursuant to the procedures set forth in Article 4 shall be referred to and finally resolved by arbitration in Singapore in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force which rules are deemed to be incorporated by reference into this Section.  The law of the arbitration all be the Singapore International Act 1994.  The Tribunal shall consist of three (3) arbitrators, ach party to appoint one (1) arbitrator, and the two arbitrators thus appointed shall choose the third arbitrator who will act as the presiding arbitrator of the Tribunal.  The governing law of this Agreement shall be the substantive law of the State of California, U.S.A.  The language of the arbitration shall be English.

## ARTICLE 11
## INDEMNIFICATION

11.1.  Indemnification.  Each Party shall indemnify, defend, and hold harmless the other Party (including those who have been, but no longer are, Parties) and its Affiliates from and against all loss, cost, liability and expense which may be imposed upon or reasonably incurred by the other Party or Affiliates, including reasonable attorneys' fees and disbursements and reasonable settlement payments, in connection with any claim, action, suit or proceeding or threat thereof, made or instituted in which the other Party or Affiliates may be involved or be made a party by reason of a breach of such Party's representations or covenants.

11.2.  Procedure for Defense.  Promptly after receipt by a person or entity indemnified under any express provision of this Agreement (the "Indemnified Party") of notice of the commencement of any action against the Indemnified Party, such Indemnified Party shall give notice to the person or persons or entity or entities obligated to indemnify the Indemnified Party pursuant to the express provisions of this Agreement (the "Indemnifying Party").  The Indemnifying Party shall be entitled to participate in the defense of the action and, to the extent that it may elect in its discretion by written notice to the Indemnified Party, to assume the control and defense and/or settlement of such action and the Indemnified Party shall execute such documents or otherwise to permit the Indemnifying Party to do so; provided, however, that (i) both the Indemnifying Party and the Indemnified Party must consent and agree to any settlement

10

FM 0010

of any such action, except that if the Indemnifying Party has reached a bona fide settlement agreement with the plaintiff(s) in any such action and the Indemnified Party does not consent to such settlement agreement, then the dollar amount specified in the settlement agreement shall act as an absolute maximum limit on the indemnification obligation of the Indemnifying Party, and (ii) if the defendants in any such action include both the Indemnifying Party and the Indemnified Party and if the Indemnified Party shall have reasonably concluded that there are legal defenses available to it which are in conflict with those available to the Indemnifying Party, then the Indemnified Party shall have the right to select separate counsel to assert such legal defenses and otherwise to participate in the defense of such action on its own behalf, and the fees and disbursements of such separate counsel shall be included in the amount which the Indemnified Party is entitled to recover under the terms and subject to the conditions of this Agreement.

## ARTICLE 12
## NOTICES

12.1.  Notices.  No notice or other communication hereunder shall be sufficient to affect any rights, remedies or obligations of any party hereto unless such notice or communication is in writing and delivered to the person or persons whose rights, remedies or obligations are affected, except that any such written notice or communication which is hand delivered, sent by facsimile transmission with proof of receipt, delivered by prepaid courier service or mailed by prepaid certified mail, return receipt requested, addressed to the respective and appropriate party as follows (or to such other address as the parties may indicate in writing in accordance with this Section), and shall be deemed sufficient upon hand delivery or facsimile transmission, one day after deposit with such courier service, or three days after such mailing, as the case may be:

If to AMFS to:      Advanced Materials Foreign Sales Corporation Ltd.
                    c/o M.Q. Services, Ltd.
                    Bermuda Commercial Bank Building
                    2nd Floor, 44 Church Street
                    Hamilton, Bermuda HM12
                    Facsimile: _____
                    Attention: President

with a copy to:     Advanced Materials, Inc.
                    20211 S. Susana Road
                    Rancho Dominguez, CA  90221
                    Facsimile:  (310) 763-6869
                    Attention:  President

If to Foamtec to:   Foamtec (Singapore) Pte Ltd.
                    6 Sungei Kadut Crescent
                    Singapore 728689
                    Facsimile: 65-368-1831

11

FM 0011

EXHIBIT A, PAGE 11

with a copy to:    Foamex Asia Co., Ltd.
                   175 Sathorn City Tower
                   22nd Floor
                   South Sathorn Road
                   Thungmahamek, Sathorn, Bangkok 10120
                   Thailand
                   Facsimile: 662-679-6107
                   Attention: Mr. Steve Scibelli

12.2. Copies. A copy of any notice, service of process or other document in the nature thereof relating to this Agreement, received by any Party from anyone other than the other Party shall be delivered by the receiving Party to the other Party as soon as practicable.

## ARTICLE 13
## MISCELLANEOUS

13.1. Governing Law; Ownership. Except as is expressly herein stipulated to the *contrary*, the rights and obligations of the Parties and the administration and termination of the Agreement shall be governed by the laws of the State of California, U.S.A. The validity, performance, and all matters relating to the interpretation and effect of this Agreement shall be governed by the internal law in effect in the State of California, without regard to principles of law (such as "conflicts of law") that might make the law of some other jurisdiction applicable.

13.2. Additional Documents and Acts. In connection with this Agreement, as well as all transactions contemplated by this Agreement, each Party agrees to execute and deliver such additional documents and instruments, and to perform such additional acts, as may be necessary or appropriate to effectuate, carry out and perform all of the terms, provisions and conditions of this Agreement, and all such transactions. All approvals of either party hereunder shall be in writing.

13.3. Service; Jurisdiction. Each of the parties agrees to (a) the irrevocable designation of the Secretary of State of the State of California as its agent upon whom process against it may be served, and (b) personal jurisdiction in any action brought in any court, federal or state, within a State of California having subject matter jurisdiction arising under this Agreement.

13.4. Pronouns. All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural, as the identity of the person or persons may require.

13.5. Entire Agreement. This instrument and the Schedule and Exhibits hereto and the agreements contemplated hereby or referred to herein contain all of the understandings and agreements of whatsoever kind and nature existing between the parties hereto with respect to this Agreement and the rights, interests, understandings, agreements and obligations of the respective parties pertaining to the Agreement. ·

12

FM 0012

13.6.  <u>References of this Agreement</u>.  Numbered or lettered articles, sections and subsections herein contained refer to articles, sections and subsections of this Agreement unless otherwise expressly stated.

13.7.  <u>Headings</u>.  All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

13.8.  <u>Binding Effect</u>.  Except as herein otherwise expressly stipulated to the contrary, this Agreement shall be binding, upon and inure to the benefit of the parties signatory hereto, and their respective successors and permitted assigns.

13.9.  <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original and each of which shall constitute one and the same Agreement.

13.10.  <u>Amendments</u>.  This Agreement may not be amended, altered or modified except by a written instrument signed by each of the Parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.

ADVANCED MATERIALS FOREIGN SALES
CORPORATION LTD.

By: _____
Title: _____

FOAMTEC (SINGAPORE) PTE

By: _____
Title: _____

Attachments:

Exhibit A:          Equipment Lease

Exhibit B:          License Agreement

Schedule 3.2(b)     Manufacturing Costs

0300210020\jointvn7.agt

13

FM 0013

EXHIBIT A, PAGE 13

EXHIBIT B



DC&M Draft: 1/28/98

# EXHIBIT A

## ADVANCED MATERIALS FOREIGN SALES CORPORATION LTD.
## EQUIPMENT LEASE

Foamtec (Singapore) Pte.                                    January 30, 1998
Name of ("Lessee")                                              Date

Advanced Materials Foreign Sales Corporation Ltd. ("Lessor"), by its acceptance hereof at its home office, hereby leases to Lessee, and Lessee hereby leases from Lessor, in accordance with the terms and conditions hereinafter set forth, the Equipment together with all replacements, parts, repairs, additions, attachments and accessories incorporated therein or now or hereafter affixed thereto (hereinafter collectively called the "Equipment") described in the attached schedule annexed hereto and made a part hereof (hereinafter called the "Schedule").

1.    **Term of Lease.**

The Lease is effective from the date executed by Lessor and shall remain in force during the term of the Manufacturing Agreement dated the date hereof between the parties hereto (the "Manufacturing Agreement"), and during any extensions thereof (the "Term").

2.    **Rental Commencement Date.**

The Rental Commencement Date of this Lease for the purpose of determining when the monthly rental payments begin hereunder shall be the date on which Lessor notifies Lessee that the Equipment is installed, ready for use, at Lessee's installation site.

3.    **Installation.**

The Equipment will be installed, ready for use, by Lessor, without additional charge, on the Installation Date specified in the Schedule. Lessee shall, at its expense, have the installation site prepared in accordance with Lessor's site preparation instructions thirty (30) days before the scheduled Installation Date to enable Lessor to promptly deliver and begin installing the Equipment. In the event Lessor's installation personnel arrive at Lessee's installation site on the scheduled Installation Date and the installation site has not been prepared in conformance with Lessor's site preparation instructions, the additional cost incurred by Lessor for travel, labor and subsistence shall be payable by Lessee at Lessor's then standard rates.

4.    **Rental Payments.**

To- SUTAN & TUCKER,LLP                    ·From·    Received May-21-03 11:13am    Page 18

The annual rental payment for the Equipment as set forth in the attached Schedule shall begin on the Rental Commencement Date and be charged in advance on the Rental Commencement Date and each anniversary thereof. All rent shall be charged as a cost of Lessor in accordance with Section 3.2(c) of the Manufacturing Agreement.

5.    Payment of Taxes.

Lessee shall also pay all taxes, however designated, which are levied or based on this Lease, the Equipment or its use, lease, operation, or value, including, without limitation, personal property taxes, retailer's occupation taxes, state and local privilege or excise taxes based on gross revenue, and any penalties or interest in connection therewith or taxes or amounts in lieu thereof paid or payable by Lessor or Lessee in respect of the foregoing, but excluding taxes based on Lessor's net income. Charges for taxes, penalties and interest, if any, shall be promptly paid by Lessee. Payments made by Lessee pursuant to this Clause 5 hereof may not be charged as a cost of Lessee in accordance with Section 3.2(b) of the Manufacturing Agreement. In the event Lessee defaults in the payment of any such tax, Lessor may pay such tax and shall be reimbursed by Lessee, with interest (plus attorneys fees and costs, if any) as additional rent. The foregoing obligations shall survive the termination of this Lease.

6.    Location and Use.

The Equipment will be kept by Lessee in its sole possession and control, will at all times be located at the location specified in the Schedule, and will not be removed without the prior written consent of Lessor. Lessee will not make or permit to be made any alteration or addition to the Equipment without the prior written consent of Lessor and Lessee will keep and maintain the Equipment free and clear of all liens, charges and encumbrances (except any placed thereon by Lessor).

7.    Transportation and Return of Equipment.

All transportation and other charges for delivery and installation of the Equipment to Lessee's premises shall be paid by Lessee. On expiration or termination of this Lease, Lessee, at its own risk and expense, will immediately return the Equipment to Lessor in the same condition as delivered, reasonable wear and tear excepted, at such location as Lessor shall designate. Payments made by Lessee pursuant to this Clause 7 hereof may not be charged as a cost of Lessee in accordance with Section 3.2(b) of the Manufacturing Agreement. In the event Lessee fails to promptly return the Equipment upon expiration or termination of the Lease, Lessee shall pay to Lessor, as additional rental, twice the monthly rental payment set forth in the Schedule for each month, or part thereof, in which Lessee fails to return the Equipment.

2

8.    Warranty.

The Equipment is warranted against defects in materials or workmanship during the Term hereof. Upon receipt of notice of such defects during the warranty period, Lessor will, at its option, either repair or replace Equipment which proves to be defective. The foregoing warranty shall not apply to defects resulting from improper or inadequate maintenance by Lessee; unauthorized modification or misuse; operation outside the environmental specifications for the product; or improper site preparation and maintenance.

THE WARRANTIES SET FORTH ABOVE ARE EXCLUSIVE AND NO OTHER WARRANTY, WHETHER WRITTEN OR ORAL, IS EXPRESSED OR IMPLIED. LESSOR SPECIFICALLY DISCLAIMS THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

THE REMEDIES PROVIDED HEREIN ARE LESSEE'S SOLE AND EXCLUSIVE REMEDIES. IN NO EVENT SHALL LESSOR BE LIABLE FOR ANY LOSS OR DAMAGE CLAIMED TO HAVE RESULTED FROM THE USE, OPERATION OR PERFORMANCE OF LESSOR'S PRODUCTS REGARDLESS OF THE FORM OF ACTION EXCEPT FOR LOSS OR DAMAGE CAUSED BY THE GROSS NEGLIGENCE OF LESSOR. IN NO EVENT SHALL LESSOR BE LIABLE TO LESSEE FOR: (1) ANY SPECIAL, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES; (2) ANY DAMAGES RESULTING FROM LOSS OF USE, DATA OR PROFITS; OR (3) ANY CLAIMS WHETHER IN CONTRACT OR TORT, THAT AROSE MORE THAN ONE YEAR PRIOR TO INSTITUTION OF SUIT THEREON.

9.    Insurance, Indemnity and Risk of Loss.

A.    Until such time as the Equipment is returned and delivered to Lessor or its designee and accepted by Lessor, Lessee shall, at its sole expense, procure and maintain in force at all times (a) insurance naming Lessor as an additional insured, protecting against liability for bodily injury and property damage resulting from the ownership, installation, functioning, operation, presence, use or possession of the Equipment or any part thereof, in such amounts as shall be reasonably acceptable to Lessor, and (b) insurance against loss, theft, damage or destruction of the Equipment from any cause, and against such other risks, including flood, as Lessor may direct, in an amount not less than the aggregate amount of the total rental payments due hereunder for the Term or for the Lessor's full list price of the Equipment, whichever amount is greater, with loss payable to Lessor or its assignee as their interests may appear, and with such insurance companies as Lessor shall reasonably approve. Payments made by Lessee pursuant to this Clause 9 hereof may not be charged as a cost of Lessee in accordance with Section 3.2(b) of the Manufacturing Agreement. All policies shall provide that they cannot be amended

3

Received May-21-03 11:38am From- To-RUTAN & TUCKER,LLP. Page 03

without the consent of Lessor or its assignees. All policies and endorsements, or certificates thereof, shall be promptly furnished to Lessor. At least thirty (30) days prior to the expiration of the then current policy term, renewal policies and endorsements, or certificates thereof, shall be provided to Lessor. Each insurer shall agree in writing to give Lessor or its assignee thirty (30) days prior written notice of the effective date of any alteration or cancellation of such policy. In the event Lessee fails to procure or maintain said insurance as hereinbefore specified, Lessor shall have the right, but shall not be obligated, to effect such insurance. In that event, the cost thereof shall be repayable to Lessor with the next rental payment due, and failure to repay the same shall carry with it the same consequence as failure to pay any rental payment.

B.     Lessee shall bear the entire risk of loss, theft, damage or destruction of the Equipment from any cause whatsoever, and no loss, theft, damage or destruction of the Equipment shall relieve Lessee of the obligation to pay rental payments or any other obligation under this Lease. If any item of Equipment should be damaged by reason of any cause, and be capable of repair, Lessee shall repair the same at Lessee's sole expense as quickly as circumstances permit without any abatement or reduction of rental payments. In such event, should Lessor be indemnified under any insurance policy or policies pursuant to the provisions of this Lease, provided that no default by Lessee exists hereunder, Lessor shall pay to Lessee the proceeds received by Lessor from such insurance to assist Lessee in defraying the cost and expense of such repair. If any item of Equipment should be lost, stolen, destroyed, or damaged beyond repair by any cause whatsoever, Lessee shall pay Lessor an amount equal to the full list price of the Equipment less depreciation and the amount of any insurance received by Lessor.

C.     Lessee shall immediately give notice to Lessor of any damage to any of the Equipment constituting or which might constitute an event of loss under the applicable insurance policies.

D.     Lessee shall indemnify and save Lessor and its assignee, if any, harmless from all claims, liability, injury, loss and damage of any kind (including claims for strict liability in tort) and any costs and expenses incurred in connection therewith (including reasonable attorneys' fees) asserted by Lessee or others arising from or allegedly caused by the installation, presence, use, possession, selection, leasing, renting, operation, control, maintenance, delivery and return of the Equipment, or ownership of any of the Equipment and from loss of any kind, however caused, arising from the malfunctioning or destruction of the Equipment, and such indemnity shall survive termination of this Lease for any reason. Insurance costs incurred by Lessee to insure Lessee for the risks relevant to this Clause 9(D) may not be charged as a cost of Lessee in accordance with Section 3.2(b) of the Manufacturing Agreement.

10.    Assignment; No Set-off Against Assignee.

4

EXHIBIT B, PAGE 4

Lessor shall have the right to assign all or any part of its rights under this Lease without notice to Lessee, but such assignment shall not relieve Lessor in any manner whatsoever of Lessor's obligations hereunder. In such event, Lessor's assignee shall be entitled to enforce the rights assigned but shall be under no liability to Lessee to perform any of the obligations of Lessor hereunder (except for the application of any insurance proceeds received by the assignee as provided for herein), and Lessee's rights hereunder as against Lessor shall be unaffected, except as herein specifically provided. Lessee agrees that following its receipt of notice of any assignment by Lessor of this Lease or of the rental payments payable hereunder, it will pay the rental payments due hereunder directly to the assignee (or to whomever the assignee shall designate), notwithstanding (a) any agreements or amendments hereto now or hereafter entered into by Lessor with Lessee, (b) the commencement by or against Lessor of any proceeding under the laws of the United States or any State relating to bankruptcy or insolvency or the appointment therein of any trustee or receiver or similar officer to take custody of Lessor's estate or the making by Lessor of an assignment for the benefit of creditors, or (c) the availability of any claim, demand, defense (other than payment), set-off, counterclaim or recoupment which Lessee may have against Lessor other than arising out of (x) any breach of any obligation of Lessor in respect of the Equipment, or (y) by reason of any other indebtedness or liability at any time owing to Lessee by Lessor. Any assignee of Lessor's rights may reassign such rights with the same force and effect as an original assignment. Lessee will not modify or consent to any modification of the terms of this Lease, assign this Lease, or sublet or move any Item of Equipment without the prior written consent of Lessor and its assignee, if any.

11.   Default and Remedies.

A.   If (a) Lessee shall fail to pay any rental payment or any other payment hereunder within five (5) days after the date when such obligation is due; or (b) Lessee shall fail to perform any other term or condition of this Lease for a period of ten (10) days after written notice thereof from Lessor to Lessee; or (c) proceedings under United States or other national or local bankruptcy law or other insolvency laws shall be instituted against Lessee, or a trustee or receiver or similar officer shall be appointed for Lessee or any of its property, or any of the Equipment shall be attached or levied upon and such proceedings shall not be vacated or fully stayed within fifteen (15) days thereof; or (d) Lessee shall make an assignment for the benefit of creditors or institute proceedings to be adjudicated a bankrupt or insolvent or admit in writing its inability to pay its debts as they become due; or (e) Lessee attempts to remove, sell, transfer, encumber, sublet or part with possession of the Equipment, or assigns or attempts to assign all or any part of this Lease or Lessee's rights hereunder; or (f) Lessee ceases doing business as a going concern, sells substantially all of its assets out of the ordinary course of business, merges or consolidates with any other person, or, if a corporation, sustains a change in the ownership of more than 20% in the aggregate of its issued and outstanding stock of any class except a change of ownership as a result of (x) a transfer to an Affiliate (as defined

5

EXHIBIT B, PAGE 5

in the Manufacturing Agreement) or (y) a bona fide reorganization, or abandons any or all of the Equipment; or (g) Lessee is a corporation and ceases its corporate existence or good standing; or (h) Lessee has made any material misrepresentation (including the failure to disclose a material f act) under this Lease or in connection with any credit or other information submitted or furnished to Lessor, or breached any warranties made by it under this Lease; or (i) any adverse change in the financial condition of Lessee or any surety or guarantor shall occur; then, in any such event, the Lessee shall be deemed to have breached this Lease and shall be in default hereunder.

B.      Upon the happening of any event of default, the Lessor shall have the right to do any of the following without demand or notice of any kind: (a) declare the balance of the rental payments and all other sums due and payable to Lessor and to become due hereunder immediately due and payable forthwith, and Lessor shall have the right to take immediate possession of the Equipment, and to lease or sell, or both, the Equipment or any portion thereof, upon such terms as Lessor may elect and to apply the net proceeds, less reasonable selling and administrative expenses, on account of Lessee's obligations hereunder; or (b) terminate this Lease as to any and all Equipment, and take immediate possession of the Equipment as aforesaid, and retain the same as Lessor's sole property, in full satisfaction of Lessee's obligations hereunder and as liquidated damages for Lessee's breach; or (c) exercise any other right or remedy which may be available to Lessor under the Uniform Commercial Code or other applicable law including, without limitation, the right to recover damages for breach hereof.

C.      Lessor shall have no obligation to exercise any such remedy, and the exercise of any thereof shall not release Lessee from its obligations hereunder. In addition, all of Lessor's remedies shall be cumulative, and action on one shall not be deemed to constitute an election or waiver of any other right to which Lessor may be entitled.

D.      In addition to all of the foregoing, in the event of default, Lessee shall pay Lessor's reasonable attorneys' fees, together with an amount equal to all expenses paid or incurred by Lessor in the enforcement of any of Lessor's rights or privileges hereunder.

12.     General.

A.      Personal Property. This Lease is a contract of lease only, and nothing herein shall be construed as conveying to Lessee any right, title or interest in or to any of the Equipment except its rights as a Lessee only. The Equipment is and shall be and shall at all times remain personal property irrespective of its use or the manner in which it may be attached to real property. Lessee agrees to procure for Lessor such estoppel certificates, landlord's and mortgagee's waivers or other similar documents as Lessor may reasonably request. Lessee, at the request of Lessor, shall execute, and pay any filing and recording fees relating to, financing statements or other documents or instruments under the Uniform Commercial Code or similar statutes which Lessor may deem necessary to evidence or protect its interest in the Equipment or in this Lease (such fees and related

6

FM 0019

Received May-21-03 11:85am From- To-RITAN & TUCKER,LLP. Page 06

costs incurred by Lessee may not be charged as a cost of Lessee in accordance with Section 3.2(b) of the Manufacturing Agreement), and Lessee hereby appoints Lessor or its assignee and any officer of Lessor or its assignee as Lessee's attorney in fact and authorizes Lessor or such assignee or such officer to execute and file any such statement, document or instrument for and on behalf of Lessee.

B.     Performance.  If Lessee fails to perform any of its obligations hereunder, Lessor may, but shall not be required to, perform the same.  The costs of such performance and the amount of any attorneys' fees or other expenses incurred by Lessor in so doing shall be added to the next or any subsequent rental payment due hereunder and shall be paid by Lessee in accordance with Section 4 hereof.

C.     Exoneration for Entering Premises.  In the event that it shall be necessary for Lessor or its designee to enter upon premises owned or leased by Lessee to inspect the Equipment, to perform any obligations of Lessee or to recover possession of the Equipment, upon the expiration or earlier termination of this Lease, Lessor or such designee may do so without court order or other process of law and shall not be liable to Lessee for any damage arising out of such entry and performance or repossession, except for damages caused by Lessor's gross negligence or willful misconduct.

D.     Notices.  Any notice, consent, waiver or other communication (except invoices and requests for documents) given hereunder by either party shall be in writing and mailed, postage prepaid, certified mail, return receipt requested, to the other party at the address set forth herein or to such other address as such party shall hereafter designate by notice in writing to the other party.

E.     Effect of Agreement; Assignment by Lessee.  This Lease shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, representatives, successors and assigns; provided, however, that Lessee may not assign this Lease or any of Lessee's rights hereunder or sublease any of the Equipment or permit others to use the Equipment without the prior written consent of Lessor. Any assignment or sublease effected by Lessee without such consent shall be void and shall not relieve Lessee of any of its obligations or liabilities hereunder nor confer any rights upon the intended assignee.

F.     Headings.  The headings and sub-headings of the various sections of this Agreement are inserted merely for the purpose of convenience and do not expressly or by implication limit, define or extend the specific terms of the section so designated.

G.     Survival of Obligations.  All covenants and obligations of Lessee to be performed pursuant to this Lease, including all payments to be made by Lessee hereunder, shall survive the expiration or earlier termination of this Lease.

7

H.   **Severability.**  In the event that any provisions of this Lease shall be or become illegal or unenforceable in whole or in part for any reason whatsoever, the remaining provisions shall nevertheless be valid, binding and subsisting as if such illegal or unenforceable provision had never been contained herein.

I.   **Delay and Non-Waiver.**  No delay or omission by Lessor to exercise any remedy or right accruing upon a default shall impair any such remedy or right, nor be construed to be a waiver of any such default or any other default, nor an acquiescence therein, nor a waiver of or in any manner affect Lessor's right not to waive any subsequent default of the same or of a different nature.

J.   **Arbitration.**  In the event of any dispute arising out of the terms of this agreement the parties shall attempt to reach an amicable settlement.  Failing such settlement the dispute shall be settled by arbitration in accordance with the Rules of the Singapore International Arbitration Centre in effect at the time of arbitration, by one or more arbitrators designated in conformity with these rules, the awards being formal and binding.  The place of the arbitration shall be Los Angeles, California.  The arbitration shall be conducted in the English language.

K.   **Governing Law.**  This Lease shall be governed and construed in accordance with the laws of the State of California.

L.   **Entire Agreement.**  This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof, and all negotiations and understandings have been merged herein.  No modifications or amendments shall be valid unless in writing and executed by the parties hereto.  The terms and conditions of this Lease shall prevail notwithstanding any variance therein from the terms and conditions of any other document relating to this transaction, whether prepared and submitted by Lessor or by Lessee.

By execution hereof, the undersigned hereby certifies that he has read this Lease and that he is a duly authorized corporate officer, partner or proprietor of the below-named Lessee and is duly authorized to execute this Lease on behalf of Lessee.

LESSOR:                                    LESSEE:

ADVANCED MATERIALS FOREIGN                 FOAMTEC (SINGAPORE) PTE.
SALES CORPORATION LTD.

Accepted On: _January 30, 1998_            Signed By: _Steph Suble_

Signed By: _____                 Title: _____President____

8

FM 0021

Title: President_____    Address:_____

Address: 20211 S. Susana Rd.
Rancho Dominguez CA 90221

Attachment: Equipment Lease Schedule

9

51

## EQUIPMENT LEASE SCHEDULE

This Schedule forms a part of and is subject to all of the terms and conditions set forth in the Equipment Lease to which it is affixed.

EQUIPMENT LEASED:

RENTAL PAYMENTS:                    $1 per annum.

ESTIMATED INSTALLATION DATE:

03002\0020\equip4.lse

FM 0023

EXHIBIT C



# EXHIBIT B

## TECHNICAL INFORMATION LICENSE AGREEMENT

This TECHNICAL INFORMATION LICENSE AGREEMENT is effective this _____ day of January, 1998, ("Agreement") by and between Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation ("AMFS") and Foamtec (Singapore) Pte. Ltd., a Singapore private limited company ("Foamtec"), either or both of which may also hereinafter be referred to respectively as the "Party" or "Parties" to this Agreement.

WHEREAS this Agreement is an attachment to a Joint Venture Agreement between the Parties of even date herewith (the "Joint Venture Agreement");

WHEREAS Foamtec is entering a joint venture with AMFS and requires a license of certain technology in support of Foamtec's obligations thereunder; and

WHEREAS AMFS represents that it is the owner of certain technology that (a) is used in connection with the business of the Joint Venture that AMFS is forming with Foamtec and (b) is also otherwise used by AMFS (hereinafter "Shared Use Technology");

NOW, THEREFORE, in consideration of the promises and the mutual covenants of this Agreement, the parties hereto agree as follows:

## ARTICLE I. DEFINITIONS

1.1     The term "Products" and other capitalized terms not otherwise defined in this Agreement shall have the meaning ascribed to them in the Joint Venture Agreement.

1.2     The term "Technical Information", as used herein, means all information and assistance (including, but not limited to, data, know-how, technical, manufacturing, marketing information, designs, drawings, specifications, bills of materials, and documentation of processes) which pertains to the Shared Use Technology identified in Schedule A to this Agreement. AMFS and Foamtec acknowledge that until November 1990, Mr. Steve Scibelli, the President of Foamtex Co., Ltd., an Affiliate (as defined in the Joint Venture Agreement) of Foamtec, was the principal owner of Advanced Materials, Inc., an Affiliate of AMFS and, as a result thereof, Foamtec has prior knowledge of certain fabrication techniques used up until November 1990 to make finished foam products for Hewlett-Packard, although the parties also acknowledge that such knowledge, other than as it relates to so-called Monet processes, would not be relevant to the Shared Use Technology.

## ARTICLE II. Licenses Granted

2.1     AMFS grants and agrees to grant to Foamtec an irrevocable, fully paid-up perpetual, non-exclusive, non-transferable license to make the Products in Singapore as contemplated in the Joint Venture Agreement using all applicable Technical Information.

# EXHIBIT C

FM 0024

2.2    No license, either express or implied, is granted by AMFS to Foamtec hereunder with respect to any patent or information or other intellectual property except as specifically stated above.

2.3    No license, either express or implied, is granted hereunder to use as a trademark or otherwise the trademarks "Advanced Materials" or any other trademark or trade or product name of AMFS, or any word or mark similar thereto.

2.4    Nothing contained in this Agreement shall constitute, or be construed to be, a limitation or restriction on either Foamtec or AMFS to use existing technologies for future businesses.

2.5    Nothing contained in this Agreement shall constitute, or be construed to be, to require AMFS to license Foamtec to use AMFS patents or technology for other than the Products.

2.6    Nothing contained in this Agreement shall constitute, or be construed to be, a limitation or restriction upon any right otherwise possessed by Foamtec or AMFS to make, use or sell any product, or parts therefor, in any country, except as otherwise provided in the Joint Venture Agreement.

2.7    AMFS agrees that no fees shall be charged for the license granted hereunder.

ARTICLE III.  Enforcement of Intellectual Property Rights

3.1    AMFS shall at all times have the sole right to take whatever steps it deems necessary or desirable to enforce its rights in the licensed Technical Information, including the filing and prosecution of litigation; and AMFS shall have the right to include Foamtec as a party in such litigation where necessary for the conduct thereof. If AMFS and Foamtec desires to agree to joint participation in any suit or other enforcement action with respect to any of the Technical Information, the respective responsibilities of the parties, and their contributions to the costs and participation in any recoveries, will be agreed upon in writing prior to undertaking such joint enforcement action.

3.2    AMFS does not make any representation to Foamtec regarding the scope or enforceability of the Technical Information, and does not warrant that any Products manufactured or sold under this Agreement will not infringe patents of others.

3.3    In the event of any actual or threatened infringement suit against Foamtec or its customers which would affect the manufacture, use or sale of Products, Foamtec shall promptly give written notice thereof to AMFS, and AMFS will make available to Foamtec free of charge any information in its possession which AMFS believes will assist Foamtec in defending or otherwise dealing with such suit.

2

FM 0025

## ARTICLE IV. Technical Information

4.1　Foamtec shall be entitled to receive only the data, know-how and assistance as set forth in Schedule A.

4.2　If approval by any government is required in order to render this Agreement fully effective, AMFS shall not be obligated to furnish any information or assistance hereunder until such approval has been obtained and evidence thereof has been supplied to AMFS.

4.3　All Technical Information covered by this Agreement is property of AMFS and shall be maintain in confidence by Foamtec.

4.4　Foamtec agrees that it will not at any time knowingly disclose to any third party (except to its employees who reasonably require such information in connection with the performance of their regular duties) any Technical Information which is communicated to Foamtec by AMFS under this Agreement. The foregoing obligation of confidentiality shall not apply to any Technical Information that (a) is or may become generally available to the general public through no t of the receiving party or any of its employees; (b) Foamtec can demonstrate by means of prior d( )mentation was in its unrestricted possession at the time such Technical Information was first communicated to Foamtec by AMFS; or (c) Foamtec received such information from a third party independent of AMFS and such third party having a bona fide right to disclose such information to Foamtec without any obligation of confidentiality.

## ARTICLE V. Miscellaneous Provisions

5.1　Waiver: Failure of either party to insist upon the strict performance of any provisions hereof or to exercise any right or remedy shall not be deemed a waiver of any right or remedy with respect to any existing or subsequent breach or default; the election by either party of any particular right or remedy shall not be deemed to exclude any other; and all rights and remedies of either party shall be cumulative.

5.2　Notice: Any notice required or permitted hereunder shall be in writing and shall be sufficiently given when mailed postpaid first class registered or certified mail and addressed to the for whom it is intended at its record address, or when sent by facsimile, and such notice shall be jective as of the date it is deposited in the mail or when a facsimile notice of receipt is received. The record address of AMFS for this purpose is its address set forth in the preamble and the record address of Foamtec is its address set forth in the preamble of this Agreement. Either party may, at any time substitute for its previous record address any other address by giving written notice of the substitution.

5.3　Government Approvals: Foamtec shall, at its own expense, take whatever steps are required to satisfy the laws and requirements of the respective countries within respect to declaring, recording and otherwise rendering this Agreement valid.

3

5.4 <u>Severability:</u> If any section or provision of this Agreement in any way contravene a law of any state or country in which this Agreement is effective, the remaining section of this Agreement shall not be affected thereby and this Agreement shall be modified to conform with such law. Notwithstanding the foregoing, in the event of any such contravention AMFS may at its option terminate this Agreement forthwith by giving to Foamtec written notice of termination.

5.5 <u>Arbitration:</u> In the event of any dispute arising out of the terms of this agreement the parties shall attempt to reach an amicable settlement. Failing such settlement the dispute shall be settled by arbitration in accordance with the Rules of the Singapore International Arbitration Centre in effect at the time of arbitration, by one or more arbitrators designated in conformity with these rules, the awards being formal and binding. The place of the arbitration shall be Los Angeles, California. The arbitration shall be conducted in the English language.

5.6 <u>Governing Law:</u> This Agreement shall be interpreted and construed in accordance with the laws of the State of California except as governed by the trade secret laws of the United States of America.

5.7 <u>Force Majeure:</u> Neither Party shall be in default under this Agreement for any delay or failure to perform hereunder due to causes beyond its control and without its fault or negligence, including but not limited to acts of nature, acts of any government in its sovereign or contractual capacity, strikes, fires, floods, riots or embargoes; provided, however, that prompt written notice is given to the other Party describing such cause.

5.8 <u>Export.</u> Foamtec agrees to reasonably cooperate with AMFS to enable AMFS to comply with all applicable export regulations and secure all required export approvals prior to disclosure of any technology conveyed under this license to a non US person either inside or outside the United States of America or prior to the export or sale of a product of the technology conveyed under this license to a non US person either inside or outside the United States of America.

5.9 <u>Entire Agreement:</u> This Agreement contains all of the terms and conditions agreed upon by AMFS and Foamtec regarding the specific subject matter hereof; and this Agreement may be modified only by an instrument in writing executed on behalf of AMFS and Foamtec by their respective duly authorized representatives.

Foamtec and AMFS have caused this Agreement to be executed, in duplicate, by their respective duly authorized representatives on the dates and at the places indicated below.

| ADVANCED MATERIALS FOREIGN SALES CORPORATION LTD. | FOAMTEC (SINGAPORE) PTE. |
|---|---|
| By _____ | By _____ |
| Typed STEVE SCOTT | Typed STEPHEN SCISSELL |
| Title CEO | Title President |
| Date JANUARY 16, 1998 | Date 1-27-98 |

4

FM 0027

EXHIBIT D

AMG-ADD

# ADDENDUM TO MANUFACTURING AGREEMENT

This Addendum to Manufacturing Agreement (this "Addendum") is entered into as of June 19, 2003, by and between Advanced Materials Group, Inc., a Nevada corporation ("AMG"), and Foamex Asia Co. Ltd., a private limited company incorporated in the Kingdom of Thailand ("Foamex").

## RECITALS

A.     On or about January 30, 1998, Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation ("AMFS") and Foamtec (Singapore) Pte. Ltd., a private limited company incorporated in the Republic of Singapore, a wholly owned subsidiary of Foamex ("Foamtec") entered into that certain Manufacturing Agreement dated as of January 30, 1998 (the "Manufacturing Agreement") as well as that certain Advanced Materials Foreign Sales Corporation Limited Equipment Lease dated as of January 30, 1998 (the "Equipment Lease") and that certain Technical Information License Agreement dated as of January 30, 1998 (the "License Agreement").

B.     On or about May 1, 2001, AMFS and Foamex entered into that certain Variation to Manufacturing Agreement (the "May 1, 2001 Amendment"), modifying the percentage profit-sharing schedule set forth in section 3.1 of the Manufacturing Agreement.  This Addendum, together with the Manufacturing Agreement, the May 1, 2001 Amendment, the Equipment Lease, the License Agreement, and the exhibits and attachments to the Manufacturing Agreement and the License Agreement are all collectively referred to herein as this "Business Agreement".

C.     AMG is the successor in interest to AMFS under the Manufacturing Agreement, under the Equipment Lease, and under the License Agreement, and Foamex is the successor in interest to Foamtec under the Manufacturing Agreement, under the Equipment Lease, and under the License Agreement; provided, however, that Foamex may conduct the Business or otherwise conduct operations under this Business Agreement, in whole or in part, through its wholly-owned subsidiary Foamtec.

D.     As a result of the joint venture Business established in connection with the Manufacturing Agreement, the business relationships of the parties hereto, and in particular that of Foamex, with Hewlett-Packard, for the distribution of Products to Hewlett-Packard, has been enhanced and solidified.  Over the course of the performance of the terms of the Manufacturing Agreement, the parties have heretofore modified to some extent, and desire to further modify by this Addendum, the mechanics of distribution and financial relationships of the parties so as to effect further efficiencies in the operations hereunder.  As a result of the changes heretofore effected and to be effected by this Addendum, AMG will relinquish substantially all of its direct involvement in and control over the distribution and billing activities of the Business in exchange for the right to receive a share of the profits of the Business for the term of the Manufacturing Agreement.

E.     The parties now desire, by the execution and delivery of this Addendum to Manufacturing Agreement, and by the recital contained in the paragraph C above, to confirm the

## EXHIBIT D

FM 0033

accession of AMG and Foamex as parties to the Manufacturing Agreement and related agreements, and to modify the Manufacturing Agreement as herein provided.

## AGREEMENT

14.  Section Numbering. For convenience of reference and the avoidance of confusion, Section numbering contained in this Addendum is numbered to follow consecutively the Section numbering contained in the Manufacturing Agreement.

15.  No Other Changes. Except as otherwise expressly provided herein, the Manufacturing Agreement, as amended by the May 1, 2001 Amendment, the License Agreement, and all of the terms and conditions contained in both the Manufacturing Agreement and the License Agreement, remain in full force and effect. Except as expressly modified herein, terms which are defined in the Manufacturing Agreement and the License Agreement shall have the same meanings when used in this Addendum.

16.  Modification of Manufacturing Agreement. The following Sections of the Manufacturing Agreement are hereby amended, effective as of the Addendum Effective Date, as follows:

16.1  Section 2.1 of the Manufacturing Agreement is amended to read as follows:

2.1.  Purposes. The purposes for which this Agreement were originally entered into were for AMFS to acquire raw materials from Foamex USA, and to sell such raw materials to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, utilizing machinery and technology supplied by AMFS, for resale of finished foam products to AMFS, which will then sell such products to Hewlett-Packard, and to certain other approved customers and products, such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis.

Following the Addendum Effective Date, subject to the provisions of Section 3.2(d) of the Manufacturing Agreement, the purposes for which this Business Agreement is entered into (the "Business") shall be to manufacture and sell to Hewlett-Packard Company, a Delaware corporation, including its Affiliates and its successors and assigns (collectively, "Hewlett-Packard"), finished foam products (the "Products"), with all manufacturing, sales, delivery, billing, and collection of and for the Products to be effected by Foamex as agent for the Business.

16.2  Section 2.3 of the Manufacturing Agreement is amended to read as follows:

2.3.  Conduct. On behalf of the Business, Foamex shall manufacture, sell and deliver to Hewlett-Packard the Products, and shall bill and collect from Hewlett-Packard for such sales. Foamex shall use its reasonable best efforts to procure raw materials, manufacture the Products, utilize shipment and delivery practices, establish pricing for the Products, and

2

FM 0034

otherwise conduct its operations hereunder in a manner designed to maximize the profits to the Parties for the term of the Manufacturing Agreement.

16.3    The introductory paragraph, preceding the table in Section 3.1 of the Manufacturing Agreement is amended to read as follows:

   3.1.    Profit Sharing.  Except as otherwise expressly stipulated herein, the interest of the respective Parties in the profits of the Business shall be as follows:

   (The table setting forth profit-sharing percentages, as amended by the May 1, 2001 Amendment, shall remain unchanged, except to substitute AMG in place of AMFS and Foamex in place of Foamtec.)

16.4    The introductory paragraph of Section 3.2 of the Manufacturing Agreement is amended to read as follows:

   3.2.    Calculation of Profits.  Profits are to be determined by deducting all costs arising under the Agreement from the revenues arising under the Agreement, all as determined on the accrual basis of accounting as determined under generally accepted accounting principles.

16.5    Subdivision (a) of Section 3.2 of the Manufacturing Agreement is amended to read as follows:

   (a)    Revenues.  Payments due from Hewlett-Packard for accrued sales of the Products to Hewlett-Packard.

16.6    Subdivision (c) of Section 3.2 of the Manufacturing Agreement is amended to substitute Foamex in place of AMFS wherever referenced therein, so as to reflect the substitution of Foamex responsibilities in place of those of AMG (AMFS) for the acquisition of materials and other manufacturing and distribution activities hereunder.

16.7    A new Subdivision (d) of Section 3.2 of the Manufacturing Agreement is hereby added to read as follows:

   (d)    MFN Costs.  All materials, including foam, acquired for the Business from Foamex or from any Affiliate of Foamex shall be charged at the lowest price charged by Foamex or its Affiliates to any third party buyer.

16.8    Section 3.3 of the Manufacturing Agreement is deleted in its entirety.

16.9    Section 3.4 of the Manufacturing Agreement is amended to read as follows:

   3.4    Time of Payments.  Payments by Foamex to AMG for AMG's percentage share of the profits as calculated under Sections 3.1 and 3.2 shall be made on a monthly basis within 60 ( sixty) business days after the

3

FM 0035

close of each calendar month, together with Foamex' detail of the revenues and costs used to calculate the Profits under Section 3.2 above. Payments by Foamex to AMG shall be subject to any withholding taxes or other deductions required by law (which shall be paid promptly and as required by law to the appropriate taxing authorities for the account of AMG, with full accounting therefor to AMG) and to set off for any liquidated sums due from AMFS or AMG to Foamex or Foamtec, including any debts going prior to the effective date of this Addendum.

16.10 The addresses for notice under Section 12.1 of the Manufacturing Agreement are amended to read as follows:

If to AMG, to:

Mr. Steve Scott, President
Advanced Materials Group, Inc.
20211 South Susana Road
Rancho Dominguez, CA 90221
facsimile:              (310) 763-6869
confirming no:          (310) 537-5444

with a copy to:

Ed Sybesma, Esq.
Rutan & Tucker, LLP
611 Anton Boulevard
Suite 1400
Costa Mesa, CA 92626
facsimile:              (714) 546-9035
confirming no:          (714) 641-3427

If to Foamex, to:

Mr. Steve Scibelli, President
Foamex Asia Co., Ltd.
175 Sathorn City Tower
22nd Floor
South Sathorn Road
Sathorn, Bangkok 10120
Thailand
facsimile:          66 (662) 679-6107
confirming no:      66 (662) 679-6106

4

FM 0036

with a copy to:

Mr. Steve Scibelli, President
Foamtec (Singapore) Pte. Ltd.
6, Sungei Kadut Crescent
Singapore 728689
facsimile:              (65) 6368 1831
confirming no:          (65) 6368 2898

17.   **Additional Provisions.**

17.1   AMG hereby guarantees to Foamex payment and performance of all obligations, if any, of AMFS under the Manufacturing Agreement.

17.2   Foamex hereby guarantees to AMG payment and performance of all obligations, if any, of Foamtec under the Manufacturing Agreement.

17.3   Representations and Warranties by AMG.  AMG represents and warrants to, and covenants with Foamex, as follows:

(a)   AMG is a corporation duly organized and validly existing under the laws of the State of Nevada and is in good standing in such jurisdiction. AMG is qualified to do business and in good standing as a foreign corporation in the State of California and in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the operations or financial condition of the Business.

(b)   AMG has the full right, power and authority to enter into this Addendum and this Business Agreement and will at all times have the full power and authority to perform its obligations under the Business Agreement. The Business Agreement has been duly authorized, executed and delivered by it, and this Business Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c)   AMG is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Business Agreement.

(d)   There is no litigation or proceeding pending or, to the best of AMG's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving AMG, which could, if adversely determined, materially and adversely affect the operations or financial condition of the Business or the performance of AMG's obligations under this Business Agreement.

5

FM 0037

(e)    AMG is not, nor at any time will it be, in violation of any existing law, be it state or federal, by entering into an undertaking the performance of this Business Agreement.

17.4    Representations and Warranties by Foamex. Foamex represents and warrants to, and covenants with AMG, as follows:

(a)    Foamex is a private limited company duly organized and validly existing under the laws of the Kingdom of Thailand and is in good standing in such jurisdiction. Foamex is qualified to do business and in good standing as a foreign corporation in any other jurisdiction where the failure to be so qualified or in good standing would have a material adverse impact on the operations or financial condition of the Business.

(b)    Foamex has the full right, power and authority to enter into the Business Agreement and will at all times have the full power and authority to perform its obligations under the Business Agreement. The Business Agreement has been duly authorized, executed and delivered by it, and this Business Agreement constitutes its valid and binding obligation, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, moratorium or other laws affecting creditors' rights generally, or equitable principles, whether applied in a proceeding in equity or law.

(c)    Foamex is not, nor at any time will it be, a party to any contract or other arrangement of any nature that will materially interfere with its full, due and complete performance of this Business Agreement.

(d)    There is no litigation or proceeding pending or, to the best of Foamex's knowledge and belief, is any investigation pending or litigation, proceeding, or investigation threatened involving Foamex, which could, if adversely determined, materially and adversely affect the operations or financial condition of the Business or the performance of Foamex's obligations under this Business Agreement.

(e)    Foamex is not, nor at any time will it be, in violation of any existing law, be it state, federal, or national, by entering into an undertaking the performance of this Business Agreement.

18.    Term and Effectiveness. This Addendum shall be effective (the "Addendum Effective Date") commencing June 23, 2003.

19.    Entire Agreement. The Business Agreement constitutes the entire agreement between the parties hereto concerning the subject matter thereof, and supersede all prior and contemporaneous agreements, understandings, negotiations, and discussions, whether oral or written, of the Parties, and there are no warranties, representations or agreements among the parties except as set forth in the Business Agreement. No amendment, supplement, modification, waiver, or termination of the Business Agreement, or any provision hereof, shall be binding unless executed in writing by the party against whom any of the foregoing is sought to be enforced. No waiver of any provision of the Business Agreement shall constitute a waiver

6

of any other provision (whether similar or not), nor shall any waiver constitute a continuing waiver unless otherwise expressly provided hereunder or in writing signed by the party against whom any such waiver is sought to be enforced.

20. Counterparts. This Addendum may be executed in counterparts, and each executed counterpart shall be deemed to be a duplicate original of this Addendum.

21. Headings. The captions and headings contained in this Addendum are for convenience only and shall not affect the construction or interpretation of any provisions of this Addendum.

22. Applicable Law. The obligations, rights, duties, powers and remedies under this Addendum and of the parties hereto shall be governed and construed by the laws of the State of California. If any legal action is necessary to enforce the terms and conditions of the Business Agreement, the parties hereby agree that the Superior Court of California, County of Orange, or, if applicable, federal District Court sitting in the County of Orange, State of California, shall be the sole venue and jurisdiction for the bringing of such action.

23. Reformation and Severability of Provisions. If any provision of this Addendum is found illegal, invalid or unenforceable pursuant to judicial or tribunal decree or decision, then such provision shall be deemed automatically adjusted to the minimum extent necessary to conform to the requirements for legality, validity and enforceability, as declared at such time and, as so adjusted, shall be deemed a provision of this Addendum as though originally included herein, and the remainder of this Addendum will remain legal, valid and enforceable according to its terms. In the event that the provision deemed illegal, invalid or unenforceable is of such a nature that it cannot be so adjusted, the provision shall be deemed deleted from this Addendum as though such provision had never been included herein.

IN WITNESS WHEREOF, the parties have executed this Addendum as of the date first above written.

Dated: June 19, 2003        Advanced Materials Group, Inc., a Nevada corporation

By: _____
Steve Scott, President

("AMG")

Dated: June 23, 2003        Foamex Asia Co. Ltd., a private limited company
incorporated in the Kingdom of Thailand,

By: _____
Steve Scibelli, President

("Foamex")

7

FM 0039

CONSENT & ACKNOWLEDGMENT.

By the execution of this Addendum below, AMFS and Foamtec each hereby respectively consent and agree to, and acknowledge the validity of, the foregoing recitals and provisions insofar as they affect the undersigned.

Dated: June 19, 2003

Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation

By: _____
    Steve Scott, President

("AMFS")

Dated: June 23, 2003

Foamtec (Singapore) Pte. Ltd., a private limited company incorporated in the Republic of Singapore

By: _____
    Steve Scibelli, President

("Foamtec")

8

FM 0040

EXHIBIT E

LAW OFFICES

## PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

2603 MAIN STREET
EAST TOWER - SUITE 1300
IRVINE, CALIFORNIA 92614-4281
(949) 851-9400
www.ptwww.com

P.O. BOX 19712
IRVINE, CA 92623-9712

WRITER'S DIRECT
DIAL NUMBER
(949) 851-7210
mperez@ptwww.com

FACSIMILE (949) 851-1554
(949) 851-3844
(949) 757-1225

REFER TO FILE NO.
33492-000

ANGELO J. PALMIERI (1926-1996)
ROBERT F. WALDRON (1927-1998)

ALAN H. WIENER*
ROBERT C. IHRKE*
JAMES E. WILHELM*
DENNIS G. TYLER* ·
MICHAEL J. GREENE*
DENNIS W. GHAN*
DAVID D. PARR*
CHARLES H. KANTER*
PATRICK A. HENNESSEY
DON FISHER
GREGORY N. WEILER
WARREN A. WILLIAMS
JOHN R. LISTER
CYNTHIA M. WOLCOTT
GARY C. WEISBERG
MICHAEL H. LEIFER
SCOTT R. CARPENTER
RICHARD A. SALUS
NORMAN J. RODICH
RONALD M. COLE

MICHAEL L. D'ANGELO
STEPHEN A. SCHECK
DONNA S. WOLF
HEATHER C. WHITMORE
ELISE L. ENOMOTO
RYAN M. EASTER
ELIZABETH VALADEZ
MELISA R. PEREZ
ANISH J. BANKER
RENETTA A. CAYA
MICHAEL I. KEHOE
ROBERT H. GARRETSON
JASON E. BURNETT
RYAN M. PRAGER
JOSEPH W. HANEY III
JULIA A. GOWIN
CHADWICK C. BUNCH
ANNIE C. CHU
AMBERLYNN K. DEATON
HEATHER H. WHITEHEAD

*A PROFESSIONAL CORPORATION

May 30, 2007

**VIA FACSIMILE & FEDERAL EXPRESS**

Mr. William G. Mortensen, President
Advanced Materials Group, Inc.
3303 Lee Parkway, Suite 105
Dallas, TX 75219

     Re:    Termination of Manufacturing Agreement

Dear Mr. Mortensen:

This letter is sent on behalf of Foamex Asia Co. Ltd., a private limited company incorporated in the Kingdom of Thailand ("Foamex"). Foamex is hereby electing to purchase the interest of Advanced Materials Group, Inc., a Nevada corporation ("AMG"), under the Manufacturing Agreement dated January 8, 1998 by and between the predecessors in interest to Foamex and AMG, as amended by the Variation to Manufacturing Agreement dated May 1, 2001 and the Addendum to Manufacturing Agreement dated June 19, 2003 (collectively, the "Manufacturing Agreement"). AMG is the successor in interest to Advanced Materials Foreign Sales Corporation Ltd., a Bermuda corporation, and Foamex is the successor in interest to Foamtec (Singapore) Pte. Ltd., a private limited company incorporated in the Republic of Singapore. Capitalized terms used but not defined herein shall have the meaning ascribed such terms in the Manufacturing Agreement.

Section 6.2 of the Manufacturing Agreement provides that at any time following the third anniversary of the date of the Manufacturing Agreement, Foamex shall have the right, exercisable by written notice to AMG, to purchase the interest of AMG under the Manufacturing Agreement (the "Interest"). The purchase price for the Interest is to be calculated as the present value, discounted at the average over the prior three months of the prime rate as announced by Wells Fargo Bank, N.A. Head Office as its prime rate, of the portion of the income reasonably expected to accrue to AMG over the balance of the initial Term, based on the forecast from Hewlett-Packard of its orders for products during such period (the "Purchase Price"). The initial Term of the Manufacturing Agreement ends January 8, 2008.

## EXHIBIT E

As provided in the Manufacturing Agreement, the closing of the transaction is to take place within 30 days following the date on which any government regulatory approvals required for consummation of the transaction have been obtained or otherwise satisfied (the "Closing Date"). As no regulatory approvals are required in connection with this transaction, Foamex proposes that June 30, 2007 be the Closing Date, at which time Foamex will pay AMG the Purchase Price for the Interest. The Purchase Price as of the Closing Date will be $164,094.00, subject to any withholding taxes or other deductions required by law. Enclosed with this letter is a detailed calculation of the Purchase Price. Upon AMG's receipt of the Purchase Price, AMG will have no further interest or rights to amounts payable under the Manufacturing Agreement.

Please feel free to have your counsel contact me with any questions regarding this notice.

Very truly yours,

Melisa R. Perez

MRP:dz
Enclosure

cc:    Foong Siew Leong (via email)
       Phanarat Jianthanakanon (via email)
       Ed Sybesma, Esq. (via fax)
       Alan H. Wiener, Esq. (via email)

From: Origin ID: APVA (949)851-7212
Darlene Zellner
PALMIERI, TYLER, WIENER, WILHE
2603 MAIN STREET
EAST TOWER - SUITE 1300
IRVINE, CA 92614



Ship Date: 30MAY07
ActWgt: 1 LB
System#: 3982644/INET7011
Account#: S ********




Delivery Address Bar Code



CLS9225072/5123

SHIP TO: (972)432-0602      BILL SENDER
**William G. Mortensen, President**
**Advanced Materials Group, Inc.**
**3303 Lee Parkway**
**Suite 105**
**Dallas, TX 75219**

Ref #    34492-000 (MRP 891)
Invoice #
PO #
Dept #



**PRIORITY OVERNIGHT**                     **THU**
                                           Deliver By:
TRK#   **7986 8540 1700**   FORM   31MAY07
                             0201
                                    **DFW**   A1
**75219**   -TX-US



AD DALA

---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.
FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

LAW OFFICES
# PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

TELECOPIER   (949) 851-1554          2603 MAIN STREET          WRITER'S DIRECT
             (949) 851-3844      EAST TOWER – SUITE 1300        DIAL NUMBER
             (949) 757-1225          P.O. BOX 19712             (949) 851-7210
                              IRVINE, CALIFORNIA 92614-4281   mperez@ptwww.com
                                   (949) 851-9400

## *FACSIMILE COVER SHEET*

| | | |
|---|---|---|
| **Date:** | May 30, 2007 | |
| **File Name:** | Foamex | **File No.:**   34492-000 |

| To | Fax No. | Telephone No. |
|---|---|---|
| William G. Mortensen, President Advanced Materials Group, Inc. | (972) 432-0595 | (972) 432-0602 |
| William G. Mortensen, President Advanced Materials Group, Inc. | (310) 763-5869 | (310) 537-5444 |

| **From:** | Melisa R. Perez |
|---|---|

**TOTAL NUMBER OF PAGES INCLUDING THIS FORM IS:  3**

*Message:*

Correspondence from Melisa R. Perez, dated May 30, 2007, regarding Termination of Manufacturing Agreement

ORIGINAL WILL:

☒ BE SENT BY MAIL

☐ BE SENT BY MESSENGER            ☒ BE SENT BY FEDEX/OVERNIGHT COURIER

☐ BE SENT BY E-MAIL               ☐ NOT BE SENT

If all pages are not received, please call Darlene Zentner at (949) 851-7212.

THIS COVER SHEET AND ANY DOCUMENTS ACCOMPANYING IT ARE INTENDED FOR THE INDIVIDUAL OR ENTITY SET FORTH AS THE ADDRESSEE, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE SO THAT ARRANGEMENTS CAN BE MADE FOR RETURNING THE ORIGINAL MESSAGE TO US.  THANK YOU.

# Confirmation Report—Memory Send

Page        : 001
Date & Time: May-30-07  10:37am
Line 1      :
Line 2      :
E-mail      : wcp785@ptwww.com
Machine ID  :

| | | |
|---|---|---|
| Job number | : | 852 |
| Date | : | May-30 10:33am |
| To | : | ☎917145469035 |
| Number of pages | : | 003 |
| Start time | : | May-30 10:35am |
| End time | : | May-30 10:37am |
| Pages sent | : | 003 |
| Status | : | OK |

Job number  : 852          *** SEND SUCCESSFUL ***

---

LAW OFFICES

## PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

TELECOPIER      (949) 851-1554          2603 MAIN STREET                    WRITER'S DIRECT
                (949) 851-3844      EAST TOWER — SUITE 1300                 DIAL NUMBER
                (949) 757-1225          P.O. BOX 19712                      (949) 851-7210
                                    IRVINE, CALIFORNIA 92614-4281        mperez@ptwww.com
                                        (949) 851-9400

---

### FACSIMILE COVER SHEET

| | |
|---|---|
| **Date:** | May 30, 2007 |
| **File Name:** | Foamex |

| | | |
|---|---|---|
| **To** | **Fax No.:** | **Telephone No.:** |
| Ed Sybesma | (714) 546-9035 | (714) 641-3427 |
| Rutan & Tucker | | |
| **From:** Melisa R. Perez | | |

**TOTAL NUMBER OF PAGES INCLUDING THIS FORM IS:  3**

*Message:*

Attached for your information is a copy of the correspondence to William G. Mortensen, President of Advanced Materials Group, Inc. from Melisa R. Perez, dated May 30, 2007, regarding Termination of Manufacturing Agreement

**ORIGINAL WILL:**

☐ BE SENT BY MAIL                          ☐ BE SENT BY FEDEX/OVERNIGHT COURIER

☐ BE SENT BY MESSENGER                      ☒ NOT BE SENT

☐ BE SENT BY E-MAIL

If all pages are not received, please call Darlene Zentner at (949) 851-7212.

THIS COVER SHEET AND ANY DOCUMENTS ACCOMPANYING IT ARE INTENDED FOR THE INDIVIDUAL OR ENTITY SET FORTH AS THE ADDRESSEE, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE PERSON OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE SO THAT ARRANGEMENTS CAN BE MADE FOR RETURNING THE ORIGINAL MESSAGE TO US.  THANK YOU.

EXHIBIT F

INTENTIONALLY

OMITTED

EXHIBIT G

## PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

ANGELO J. PALMIERI (1926-1998)
ROBERT F. WALDRON (1927-1998)

ALAN H. WIENER*
ROBERT C. IHRKE*
JAMES E. WILHELM*
DENNIS O. TYLER*
MICHAEL J. GREENE*
DENNIS W. GHAN*
DAVID D. PARR*
CHARLES H. KANTER*
PATRICK A. HENNESSEY
DON FISHER
GREGORY N. WEILER
WARREN A. WILLIAMS
JOHN R. LISTER
CYNTHIA M. WOLCOTT
GARY C. WEISBERG
MICHAEL H. LEIFER
SCOTT R. CARPENTER
RICHARD A. SALUS
NORMAN J. RODICH
RONALD M. COLE
MICHAEL L. D'ANGELO
STEPHEN A. SCHECK

DONNA S. WOLF
HEATHER C. WHITMORE
ELISE L. ENOMOTO
RYAN M. EASTER
ELIZABETH VALADEZ
MELISA R. PEREZ
ANISH J. BANKER
RENETTA A. CAYA
MICHAEL I. KEHOE
ROBERT H. GARRETSON
JASON E. BURNETT
RYAN M. PRAGER
JOSEPH W. HANEY III
JAMIE LEE
JULIA A. GOWIN
CHADWICK C. BUNCH
ANNIE C. CHU
AMBERLYNN K. DEATON
JERAD BELTZ
HEATHER H. WHITEHEAD
ERIN BALSARA
BRETT HORVATH

*A PROFESSIONAL CORPORATION

2603 MAIN STREET
EAST TOWER - SUITE 1300
IRVINE, CALIFORNIA 92614-4281
(949) 851-9400
www.ptwww.com

P.O. BOX 19712
IRVINE, CA 92623-9712

WRITER'S DIRECT
DIAL NUMBER
(949) 851-7210
mperez@ptwww.com

FACSIMILE (949) 851-1554
(949) 851-3844
(949) 757-1225

REFER TO FILE NO.
34492-000

June 29, 2007

### VIA FACSIMILE & OVERNITE EXPRESS

Mr. William G. Mortensen, President
Advanced Materials Group, Inc.
20211 South Susana Road
Rancho Dominguez, CA 90221

Re:   Payment for Purchase of Interest

Dear Mr. Mortensen:

Pursuant to Section 6.2 of the Manufacturing Agreement dated January 8, 1998 by and between the predecessors in interest to Foamex Asia Co. Ltd. ("FAC") and Advanced Materials Group., Inc. ("AMG"), as amended by the Variation to Manufacturing Agreement dated May 1, 2001 and the Addendum to Manufacturing Agreement dated June 19, 2003 (collectively, the "Manufacturing Agreement"), FAC exercised its right to purchase AMG's interest under the Manufacturing Agreement (the "Interest") pursuant to written notification dated May 30, 2007 (the "Notice").

Enclosed with this letter is a check payable to AMG in the amount of $168,577.00, representing the purchase price for the Interest (the "Purchase Price"), calculated from July 1, 2007 through January 8, 2008 (the "Purchase Period"). Also enclosed with this letter is a detailed calculation of the Purchase Price, together with the underlying Hewlett-Packard forecasts upon which the Purchase Price is based. **The enclosed Hewlett-Packard forecasts are confidential and not to be disclosed to any other party.** As you will see in the enclosures, Hewlett-Packard has decreased its forecasted orders since the date of the Notice. FAC has, however, continued to base its calculation of the Purchase Price on the higher forecasted orders in place at the time of the Notice.

To evidence FAC's strong belief that the Purchase Price has been calculated in good faith under the terms of the Manufacturing Agreement, FAC has agreed to re-calculate the Purchase Price pursuant to Section 6.2 of the Agreement following the expiration of the Purchase Period,

### EXHIBIT G

substituting the actual orders placed by Hewlett-Packard during the Purchase Period in place of the forecasted orders. In the event that the aggregate of the actual orders placed during the Purchase Period results in a higher Purchase Price under such re-calculation, FAC will remit the difference in the Purchase Price calculation to AMG (the "Additional Payment"), although under no obligation to do so under the terms of the Manufacturing Agreement.

Other than the Additional Payment, if applicable, the Purchase Price represents payment in full by FAC for the Interest and AMG shall not be entitled to any further payments under the Manufacturing Agreement.

Very truly yours,

Melisa R. Perez

MRP:dz
Enclosures

cc:    Foong Siew Leong (via email w/encls.)
        Phanarat Jianthanakanon (via email w/encls.)
        Ed Sybesma, Esq. (via facsimile w/encls.)
        Alan H. Wiener, Esq. (via email w/encls.)

THIS DOCUMENT WAS PRINTED ON PAPER CONTAINING ULTRAVIOLET FIBERS AND AN ARTIFICIAL WATERMARK

PALMIERI TYLER WIENER WILHELM & WALDRON LLP                    1791

06-29-2007

CHECK AMOUNT
168,577.00

PAY
TO THE
ORDER OF
        ADVANCED MATERIALS GROUP, INC
        20211 S. SUSANA RD
        RANCHO DOMINGUEZ, CA 90221

## HP Forecasts

| PART No. | Qty,000 F Jul-07 | F Aug-07 | F Sep-07 | F Oct-07 | F Nov-07 | F Dec-07 | F Jan-08 | 29-May-07 TOTAL Jul.~Jan.2008 | Rev:25-Jun Full Year TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| **as at 15-5-07** | | **100% Forecast** | | | | | | | |
| **PELE** | | | | | | | O | | |
| 4-75 Side | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 2,113 | 1,109 |
| 5-50 Ctr | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 1,057 | 3,527 |
| 4-75 Ctr | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 3,651 | 1,793 |
| | | | | | | | | | 5,680 |
| 4-75 Short | 1,001 | 1,086 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 7,305 | |
| 5183-5666 | | | | | | | | | 11,330 |
| **CARLEX** | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 43,678 | |
| 5183-5934 | | | | | | | | | 39,196 |
| **FLAME** | 5,549 | 5,594 | 5,522 | 4,984 | 5,599 | 5,466 | 5,426 | 38,139 | 63,727 |
| 5187-5731 *Thai 20%* | *1,387* | *1,398* | *1,381* | *1,246* | *1,400* | *1,366* | *1,356* | *9,535* | *9,535* |
| **FLICKER** | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 43,002 | |
| 5188-0405 | | | | | | | O | | 41,690 |
| **WAX** | 1,141 | 1,155 | 1,055 | 644 | 839 | 875 | - | 5,710 | 13,902 |
| 5185-1099 *Thai 20%* | *285* | *289* | *264* | *161* | *210* | *219* | *0* | *1,427* | *1,427* |
| **MINLEX** *Thai 100%* | *609* | 2,448 | 2,434 | 2,575 | 2,775 | 2,647 | 2,630 | 16,118 | 16,118 |
| 5187-2317 | *Start 50%* | | | | | | | | O |
| **Total SG & Thai** | 20,019 | 26,332 | 25,034 | 24,515 | 26,217 | 24,674 | 24,944 | 171,735 | 209,037 |

| ROYALTIES (Estimated) | HP Price | Royalty per unit | 90% Forecast: 10% Cost-down Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | end 08-Jan Jan-08 | TOTAL Jul.~Jan.2008 | Rev:25-Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4-75 Side | $ 0.1360 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 5-50 Ctr | $ 0.1460 | $ (0.0027) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 4-75 Ctr | $ 0.1330 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 4-75 Short | $ 0.0810 | $ (0.0008) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 | |
| 5183-5666 | | EOL | | | | | | | | | |
| CARLEX | $ .0270 | $ 0.0025 | $7,790 | $16,853 | $15,082 | | | | | $39,725 | |
| 5183-5934 | $ .0243 | $ 0.0015 | | | | $9,064 | $9,357 | $8,097 | $8,613 | $35,131 | |
| FLAME | $ 0.0342 | $ 0.0016 | $8,989 | $9,062 | $8,946 | $8,074 | $9,071 | $8,854 | $8,789 | $61,785 | |
| 5187-5731 | $ 0.0308 | $ 0.0006 | $749 | $755 | $746 | $673 | $756 | $738 | $732 | $5,149 | |
| FLICKER | $ 0.0225 | $ 0.0004 | $1,992 | $2,130 | $2,002 | $2,218 | $2,342 | $2,241 | $2,558 | $15,480 | |
| 5188-0405 | | | | | | | | | | | |
| WAX | $ 0.0873 | $ 0.0055 | $5,647 | $5,718 | $5,223 | $3,188 | $4,154 | $4,332 | $0 | $28,262 | |
| 5185-1099 | $ 0.0786 | $ 0.0024 | $618 | $624 | $570 | $348 | $453 | $473 | $0 | $3,084 | |
| MINLEX | $ 0.0380 | $ (0.0014) | N/A | N/A | N/A | | | | | $0 | |
| 5187-2317 | $ 0.0342 | $ (0.0028) | | | | N/A | N/A | N/A | N/A | $0 | |
| **Total Forecast (100%)** | | | $25,783 | $35,142 | $32,569 | $23,562 | $26,133 | $24,735 | $20,692 | $188,616 | |

Estimates pro-rated to end 08-Jan-2008,
= 5 workdays + 22 workdays =

| | | | | | | | | Ends 08-Jan | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | $4,703 | $172,627 |

| | | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Wells Fargo Rate | | | 8.25% | p.a. | 0.6875% | p.m. | | | | |
| Present Value | | | $ 25,607 | $ 34,664 | $ 31,906 | $ 22,925 | $ 25,253 | $ 23,739 | $ 4,483 | $ 168,577 |
| **NPV =** | | | $ 168,577 | | | | | | | |

| **Total Royalties (aligned)** | | | $25,783 | $35,142 | $32,569 | $23,562 | $26,133 | $24,735 | $4,703 | $172,627 |

**From:** Tan, Hui Leng [mailto:hui-leng.tan@hp.com]
**Sent:** 07 June 2007 09:16
**To:** Phoebe Ng
**Cc:** C T KOH; kenng@foamexasia.com.sg; Cheung, Marco-Mh
**Subject:** HP Confidential: June Forecast

Hi phoebe,

Below is the forecast for this month. Kindly acknowledge acceptance and ensure sufficient inventory and buffer to meet Hp requirements.

As spoken to Ken yesterday, we are depleting the inventory level for FMX Intl Wax. Pls start to keep a lean inventory.

### Foamtec

| No | Part No | Description | Quantity per pieces in Thousand ('000) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
| 1 | 5183-5666 | Short Side Foam 4.75 | 982 | 1,165 | 1,082 | 1,087 | 1,037 | 870 | 986 | 1,069 | 461 | 795 | 787 | 653 |
| 2 | 5185-0797 | Side Foam 4.75 | 360 | 220 | 294 | 338 | 329 | 295 | 236 | 254 | 259 | 266 | 204 | 216 |
| 3 | 5185-0798 | Centre Foam 5.5 | 180 | 110 | 147 | 169 | 165 | 147 | 118 | 127 | 129 | 128 | 102 | 108 |
| 4 | 5185-0799 | Centre Foam 4.75 | 491 | 583 | 541 | 544 | 518 | 435 | 492 | 535 | 230 | 397 | 394 | 327 |
| 5 | 5185-1099 | Felted Wax | 1,212 | 851 | 419 | 424 | 0 | 0 | 0 | 0 | 0 | 0 | | |
| 6 | 5187-5731 | Flame | 5,885 | 6,494 | 6,072 | 6,042 | 5,471 | 6,406 | 6,169 | 6,053 | 5,543 | 6,380 | 6,453 | 7,275 |
| 7 | 5188-0405 | Flicker | 4,972 | 6,139 | 5,895 | 4,392 | 4,840 | 4,456 | 3,768 | 3,970 | 4,146 | 4,770 | 3,394 | 5,145 |
| 8 | 5188-5934 | Carlex | 3,395 | 3,521 | 7,178 | 6,914 | 6,793 | 6,864 | 5,788 | 5,606 | 5,430 | 6,263 | 6,267 | 6,418 |
| | 5187-2317 | Unfelted Wax | 0 | 0 | 2,127 | 2,061 | 1,985 | 2,003 | 2,141 | 2,061 | 1,855 | 1,891 | 1,867 | 1,945 |

Note:

The above forecast is a current "Snapshot" of HP LIMS's best estimate of future expected demand for your product. It is being provided to be used as a business planning tool. It is not to be considered as a letter of intent for raw materials nor a commitment to purchase finished product. This forecasted information is subjected to periodic adjustment based on changing market and manufacturing demand. This data is considered to HP proprietary information and is not to be shared with other parties.

Regards,
Hui Leng

Hewlett-Packard Singapore (Private) Limited
Registration No: 197000137C

Subject FW: HP Confidential: May Forecast

From: Tan, Hui Leng [mailto:hui-leng.tan@hp.com]
Sent: 15 May 2007 10:24
To: Phoebe Ng ; ckelsey@ifoamexasia.co.th
Cc: C T KOH; Wei-Liang, Teh; kenng@ifoamexasia.com.sg
Subject: RE: HP Confidential: May Forecast

There is a change in the requirement of unfelted wax. Re-attached below is the amendment in blue. Thanks.

Foamtec

| No | Part No | Description | Quantity per pieces in Thousand ('000) | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr |
| 1 | 5183-6666 | Short Side Foam 4.75 | 823 | 960 | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 475 | 938 | 849 |
| 2 | 5185-0797 | Side Foam 4.75 | 352 | 360 | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 259 | 256 | 204 |
| 3 | 5185-0798 | Centre Foam 5.5 | 176 | 180 | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 129 | 128 | 102 |
| 4 | 5185-0799 | Centre Foam 4.75 | 411 | 480 | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 238 | 469 | 425 |
| 5 | 5185-1099 | Felted Wax | 1,144 | 1,260 | 1,426 | 1,444 | 1,319 | 805 | 1,049 | 1,094 | 1,097 | 862 | 1,148 | 1,020 |
| 6 | 5187-6731 | Flame | 6,620 | 6,163 | 6,936 | 6,992 | 6,903 | 6,230 | 6,999 | 6,832 | 6,782 | 6,136 | 7,317 | 6,959 |
| 7 | 5188-0405 | Flicker | 0 | 5,758 | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 6,850 | 8,019 | 6,363 |
| 8 | 5183-5934 | Carlex | 0 | 2,970 | 3,462 | 7,490 | 6,703 | 6,714 | 5,998 | 6,931 | 6,380 | 5,462 | 6,184 | 6,118 |
| 9 | 5187-2317 | Unfelted Wax | 0 | 0 | 1,218 | 2,448 | 2,434 | 2,575 | 2,776 | 2,647 | 2,630 | 2,555 | 2,830 | 2,832 |

Regards,
Hui Leng

Hewlett-Packard Singapore (Private) Limited
Registration No: 197000137C
Tel: 65 6727 6542
Fax: 65 6274 8663

**From:** Tan, Hui Leng
**Sent:** 10 May 2007 11:00
**To:** Phoebe Ng
**Cc:** 'C T KOH'; Wei-Liang, Teh; 'kerng@foamexasia.com.sg'
**Subject:** HP Confidential: May Forecast

Hi Phoebe,
Below is May forecast. Pls ensure sufficient inventory & upside capacity to cater to HP demands. Kindly acknowledge receipt and acceptance.

| # | Part No | Description | Quantity per pieces in Thousand ('000) | | | | | | | | | | | |
|---|---------|-------------|------|------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| | | | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr |
| 1 | 5183-5866 | Short Side Foam 4.75 | 823 | 960 | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 475 | 938 | 849 |
| 2 | 5185-0797 | Side Foam 4.75 | 352 | 360 | 367 | 294 | 338 | 329 | 295 | 236 | 264 | 259 | 266 | 204 |
| 3 | 5185-0798 | Centre Foam 5.5 | 176 | 180 | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 129 | 128 | 102 |
| 4 | 5185-0799 | Centre Foam 4.75 | 411 | 480 | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 238 | 469 | 425 |
| 5 | 5185-1099 | Felted Wax | 1,144 | 1,260 | 1,426 | 1,444 | 1,319 | 805 | 1,049 | 1,094 | 1,097 | 862 | 1,148 | 1,020 |
| 6 | 5187-6731 | Flame | 6,520 | 6,163 | 6,936 | 6,992 | 6,903 | 6,230 | 6,999 | 6,832 | 6,782 | 6,136 | 7,317 | 6,959 |
| 7 | 5188-0405 | Flicker | 0 | 5,768 | 5,534 | 5,918 | 5,660 | 6,164 | 6,505 | 6,225 | 7,106 | 6,850 | 8,019 | 6,363 |
| 8 | 5183-5934 | Carlex | 0 | 2,970 | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 5,452 | 6,184 | 6,118 |
| 9 | 5187-2317 | Unfelted Wax | 0 | | 2,016 | 4,044 | 3,974 | 3,913 | 4,309 | 4,125 | 3,952 | 3,762 | 4,250 | 4,182 |

Note:

The above forecast is a current "Snapshot" of HP IJMS's best estimate of future expected demand for your product. It is being provided to be used as a business planning tool. It is not to be considered as a letter of intent for raw materials nor a commitment to purchase finished product. This forecasted information is subjected to periodic adjustment based on changing market and manufacturing demand. This data is considered to HP proprietary information and is not to be shared with other parties.

Regards,
Hui Leng

Hewlett-Packard Singapore (Private) Limited
Registration No: 197000137C
Tel: 65 6727 6542
Fax: 65 6274 8663

**Overnite Express**

(800) 683-7648
overniteexpress.com

**SHIPMENT NUMBER: 10119-300563-049**    1 of 1

| INTERNAL BILLING REFERENCE | | ACCOUNT NUMBER |
| --- | --- | --- |
| 34492-000 | | 10119 |

3rd PARTY BILLING ACCOUNT # (OPTIONAL)

DATE
**06/29/2007**

| FROM (YOUR NAME) | YOUR PHONE # |
| --- | --- |
| **Melisa R. Perez** | **(949) 851-9400** |

COMPANY
**Palmieri, Tyler, Wiener, Wilhelm & Waldron**

| STREET | FLOOR OR SUITE |
| --- | --- |
| **2603 Main Street** | **1300** |

| CITY | STATE | ZIPCODE (REQUIRED) |
| --- | --- | --- |
| **Irvine** | **CA** | **92614-6228** |

| DELIVER TO | PHONE # |
| --- | --- |
| **William G. Mortensen** | **(310) 537-5444** |

COMPANY
**Advanced Materials Group, Inc.**

| STREET (WE CANNOT DELIVER TO PO BOXES) | FLOOR OR SUITE |
| --- | --- |
| **20211 S. Susana Rd.** | |

| CITY | STATE | ZIPCODE |
| --- | --- | --- |
| **Rancho Dominguez** | **CA** | **90221** |

**Service Required**

Morning Oven ☑
Residence ☐
Declared Value ☐

COD AMOUNT
$

I AUTHORIZE RELEASE OF THIS SHIPMENT WITHOUT SIGNATURE OF RECIPIENT.

RELEASE SIGNATURE:





**10119-300563-049**

1.1.2.8

**SPECIAL INSTRUCTIONS:**

Please fold this form on the dotted line and place it in the pouch on your shipment. Only one copy is required by Overnite Express. **WARNING: Use only the printed label for shipping.** Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with cancellation of your Overnite Express account. Shipments with invalid account numbers will not be delivered.

EXHIBIT G, PAGE 8




:om;. Origin ID:APVA  (949)851-7212
Melisa R. Perez
PALMER; TYLER, WIENER, WILHE
2603 MAIN STREET
EAST TOWER - SUITE 1300
IRVINE, CA 92614



Ship Date: 29JUN07
ActWgt: 1 LB
System#: 3982644/INET2600
Account#: S *********

Delivery Address Bar Code

SHIP TO: (972)432-0502       BILL SENDER
**William G. Mortensen**
**Advanced Materials Group, Inc.**
**3303 Lee Parkway**
**Suite 105**
**Dallas, TX 75219**

Ref #   34492-000
Invoice #
PO #
Dept #



TRK#   7913 3356 0996
0201

MON - 02JUL        A1
PRIORITY OVERNIGHT

# XH-DALA

DFW
TX-US
75219



---

Shipping Label: Your shipment is complete

1. Use the 'Print' feature from your browser to send this page to your laser or inkjet printer.

2. Fold the printed page along the horizontal line.

3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.**

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.

Confirmation Report – Memory Send

Page       : 001
Date & Time: Jun-29-07  01:28pm
Line 1     :
Line 2     :
E-mail | : wcp795@ptwww.com
Machine ID :

| | | |
|---|---|---|
| Job number | : | 982 |
| Date | : | Jun-29 01:19pm |
| To | : ☎917145469035 | |
| Number of pages | : | 008 |
| Start time | : | Jun-29 01:25pm |
| End time | : | Jun-29 01:28pm |
| Pages sent | : | 008 |
| Status | : | OK |

Job number   : 982                    *** SEND SUCCESSFUL ***

LAW OFFICES
## PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

TELECOPIER    (949) 851-1554
              (949) 851-3844
              (949) 757-1225

2603 MAIN STREET
EAST TOWER – SUITE 1300
P.O. BOX 19712
IRVINE, CALIFORNIA 92614-4281
(949) 851-9400

WRITER'S DIRECT
DIAL NUMBER
(949) 851-7210
mperez@ptwww.com

### FACSIMILE COVER SHEET

| | | | |
|---|---|---|---|
| **Date:** | June 29, 2007 | | |
| **File Name:** | Foamex | **File No.:** | 34492-000 |

| To | Fax No. | Telephone No. |
|---|---|---|
| Ed Sybesma | (714) 546-9035 | (714) 641-3427 |
| Rutan & Tucker | | |

| From: | Melisa R. Perez |
|---|---|

**TOTAL NUMBER OF PAGES INCLUDING THIS FORM IS:  8**

*Message:*

Attached is a copy of correspondence addressed to William G. Mortensen from Melisa R. Perez
dated June 29, 2007 and its enclosures regarding Foamex Asia Co. Ltd.'s payment for purchase
of interest.

**ORIGINAL WILL:**

☐ BE SENT BY MAIL                    ☐ BE SENT BY FEDEX/OVERNIGHT COURIER
☐ BE SENT BY MESSENGER               ☒ NOT BE SENT
☐ BE SENT BY E-MAIL

If all pages are not received, please call Darlene Zenner at (949) 851-7212.

THIS COVER SHEET AND ANY DOCUMENTS ACCOMPANYING IT ARE INTENDED FOR THE INDIVIDUAL OR ENTITY SET
FORTH AS THE ADDRESSEE, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU
ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE
TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISTRIBUTION, DISTRIBUTION OR
COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN
ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE SO THAT ARRANGEMENTS CAN BE MADE FOR RETURNING
THE ORIGINAL MESSAGE TO US.  THANK YOU.

LAW OFFICES
# PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

TELECOPIER
(949) 851-1554
(949) 851-3844
(949) 757-1225

2603 MAIN STREET
EAST TOWER – SUITE 1300
P.O. BOX 19712
IRVINE, CALIFORNIA 92614-4281
(949) 851-9400

WRITER'S DIRECT
DIAL NUMBER
(949) 851-7210
mperez@ptwww.com

## FACSIMILE COVER SHEET

| | | |
|---|---|---|
| **Date:** | June 29, 2007 | |
| **File Name:** | Foamex | **File No.:** 34492-000 |

| **To** | **Fax No.** | **Telephone No.** |
|---|---|---|
| William G. Mortensen, President<br>Advanced Materials Group, Inc. | (972) 432-0595 | (972) 432-0602 |
| William G. Mortensen, President<br>Advanced Materials Group, Inc. | (310) 763-6869 | (310) 537-5444 |

**From:** Melisa R. Perez

**TOTAL NUMBER OF PAGES INCLUDING THIS FORM IS:  8**

*Message:*

Attached is a copy of correspondence addressed to William G. Mortensen from Melisa R. Perez dated June 29, 2007 and its enclosures regarding Foamex Asia Co. Ltd.'s payment for purchase of interest.

**ORIGINAL WILL:**

☐ BE SENT BY MAIL
☐ BE SENT BY MESSENGER
☐ BE SENT BY E-MAIL

☑ BE SENT BY OVERNIGHT COURIER
☐ NOT BE SENT

If all pages are not received, please call Darlene Zentner at (949) 851-7212.

THIS COVER SHEET AND ANY DOCUMENTS ACCOMPANYING IT ARE INTENDED FOR THE INDIVIDUAL OR ENTITY SET FORTH AS THE ADDRESSEE, AND MAY CONTAIN INFORMATION THAT IS PRIVILEGED AND CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE MESSAGE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE SO THAT ARRANGEMENTS CAN BE MADE FOR RETURNING THE ORIGINAL MESSAGE TO US.  THANK YOU.



## Group Send Report

Page        : 001
Date & Time: Jun-29-07  01:25pm
Line 1      :
Line 2      :
E-mail      : wcp785@ptwww.com
Machine ID  :

Job number          :   981

Date                :   Jun-29 01:18pm

Number of pages     :   006

Start time          :   Jun-29 01:18pm

End time            :   Jun-29 01:25pm

Successful nbrs.

   Fax numbers

        ☎919724320595
        ☎913107636869


Unsuccessful nbrs.                                                              Pages sent

**EXHIBIT H**

LAW OFFICES

## PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

2603 MAIN STREET

EAST TOWER - SUITE 1300

IRVINE, CALIFORNIA 92614-4281

(949) 851-9400

www.ptwww.com

P.O. BOX 19712
IRVINE, CA 92623-9712

WRITER'S DIRECT
DIAL NUMBER
(949) 851-7232
ckanter@ptwww.com

FACSIMILE (949) 851-1554
(949) 851-3844
(949) 757-1225

REFER TO FILE NO.
34492-001

ANGELO J. PALMIERI (1926-1996)
ROBERT F. WALDRON (1927-1998)

ALAN H. WIENER*
ROBERT C. IHRKE*
JAMES E. WILHELM*
DENNIS G. TYLER*
MICHAEL J. GREENE*
DENNIS W. GHAN*
DAVID D. PARR*
CHARLES H. KANTER*
PATRICK A. HENNESSEY
DON FISHER
GREGORY N. WEILER
WARREN A. WILLIAMS
JOHN R. LISTER
CYNTHIA M. WOLCOTT
GARY C. WEISBERG
MICHAEL H. LEIFER
SCOTT R. CARPENTER
RICHARD A. SALUS
NORMAN J. RODICH
RONALD M. COLE
MICHAEL L. D'ANGELO
STEPHEN A. SCHECK

DONNA L. SNOW
RYAN M. EASTER
ELISE L. ENOMOTO
HEATHER C. WHITMORE
ELIZABETH VALADEZ
MELISA R. PEREZ
ANISH J. BANKER
MICHAEL I. KEHOE
ROBERT H. GARRETSON
RYAN M. PRAGER
JOSEPH W. HANEY III
JULIA A. GOWIN
CHADWICK C. BUNCH
ANNIE C. CHU
JERAD BELTZ
HEATHER H. WHITEHEAD
ERIN BALSARA
BRETT L. HORVATH
DEREK M. DEHANKE
F. JULIAN FREEMAN III
ERICA M. SOROSKY

*A PROFESSIONAL CORPORATION

March 17, 2009

George S. Burns, Esq.
4100 MacArthur Blvd, Suite 305
Newport Beach, CA 92660

> Re:   *Advanced Materials Group v. Foamtec, et al.*

Dear George:

As you know, Judge Selna's written ruling on my Motion for Summary Adjudication supports my position in all respects. However, he denied the Motion and reserved the issue of whether an additional buyout payment was due and owing to AMG for the period January 8 through January 30, 2008. As we stated in our Summary Adjudication papers and in our Memorandum of Contentions of Fact and Law, since this is a relatively small amount of money, my clients do not think it is worth fighting over.

Therefore, in order to resolve the dispute regarding the additional buyout payment due and owing for the period January 8 through January 30, 2008, enclosed is my client's check payable to Advanced Materials, Inc. in the amount of $15,240. It is Check No. 001544 dated March 11, 2009. The amount of $15,240 is based upon Hewlett Packard sales projections and represents the amount that AMG would have been paid in the buyout if the purchase price had been calculated through January 30, 2008. Attached

George S. Burns, Esq.
March 17, 2009
Page 2

hereto is a chart showing the basis of the calculation for this $15,240 payment. Please call me if you have questions or comments.

Very truly yours,

Charles H. Kanter

CHK:slp
Enclosures



ORIGINAL CHECK HAS A COLORED BACKGROUND PRINTED ON CHEMICAL REACTIVE PAPER - SEE BACK FOR DETAILS

**Foamtec International**

Wafer contamination control division
Cleaning critical surface
1624 Ord Way Oceanside, CA 92056

CHECK NO. 001544

CITY NATIONAL BANK
HEAD OFFICE BANKING
BEVERLY HILLS, CALIFORNIA 90212

16-1606-1220

CHECK AMOUNT
$15,240.00

FIFTEEN THOUSAND TWO HUNDRED FORTY AND 00/100 DOLLARS

VOID AFTER 180 DAYS
FOAMTEC INTERNATIONAL, LLC

PAY TO THE ORDER OF:
Advanced Materials, Inc.
20211 South Susana Road
Rancho Dominguez    CA 90221
USA

⑈001544⑈ ⑆122016066⑆ ⑉01⑈685071⑈

---

AMTEC INTERNATIONAL, LLC

VENDOR: ADV01    Advanced Materials, Inc.

CHECK NO.

001544

03/11/09

| VOUCHER NO. | INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 022477 | 00000031109 | 03/11/09 | 15,240.00 | 15,240.00 | .00 | 15,240.00 |
|  |  |  |  |  | Check Total | 15,240.00 |

7 LTD    CA251866

EXHIBIT H, Page 3

| HP Forecasts as at 15-5-07 | Qty,000 | 100% Forecast | | | | | | | 29-May-07 |
|---|---|---|---|---|---|---|---|---|---|
| PART No. | | F Jul-07 | F Aug-07 | F Sep-07 | F Oct-07 | F Nov-07 | F Dec-07 | F Jan-08 O | TOTAL Jul-Jan |
| PELE | | | | | | | | | - |
| 4-75 Side | | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 2,113 |
| 5-50 Ctr | | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 1,057 |
| 4-75 Ctr | | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 3,651 |
| 4-75 Short 5183-5666 | | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 7,305 |
| CARLEX 5183-5934 | | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 43,678 |
| | | | | | | | | | - |
| FLAME 5187-5731 | | 5,549 | 5,594 | 5,522 | 4,984 | 5,599 | 5,466 | 5,426 | 38,139 |
| *Thai 20%* | | *1,387* | *1,398* | *1,381* | *1,246* | *1,400* | *1,366* | *1,356* | *9,535* |
| FLICKER 5188-0405 | | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 43,002 |
| | | | | | | | | | 0 |
| WAX 5185-1099 | | 1,141 | 1,155 | 1,055 | 644 | 839 | 875 | - | 5,710 |
| *Thai 20%* | | *285* | *289* | *264* | *161* | *210* | *219* | *0* | *1,427* |
| MINLEX 5187-2317 | *Thai 100%* Start 50% | 609 | *2,448* | *2,434* | *2,575* | *2,775* | *2,647* | *2,630* | *16,118* |
| Total SG & Thai | | 20,019 | 26,332 | 25,034 | 24,515 | 26,217 | 24,674 | 24,944 | 171,735 |
| *Ex: Thai 20%* | | *1,672* | *1,687* | *1,644* | *1,407* | *1,610* | *1,585* | *1,356* | *10,962* |

### 90% Forecast: 10% Cost-down

| ROYALTIES (Estimated) | HP Price | Royalty per unit | 90% Jul-07 | 90% Aug-07 | 90% Sep-07 | 90% Oct-07 | 90% Nov-07 | 90% Dec-07 | 90% Jan-08 | TOTAL Jul-Jan |
|---|---|---|---|---|---|---|---|---|---|---|
| 4-75 Side | $ 0.1360 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 5-50 Ctr | $ 0.1460 | $ (0.0027) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 4-75 Ctr | $ 0.1330 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 4-75 Short 5183-5666 | $ 0.0810 | $ (0.0008) EOL | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| CARLEX 5183-5934 | $ 0.0270 | $ 0.0025 | $7,790 | $16,853 | $15,082 | | | | | $39,725 |
| | $ 0.0243 | $ 0.0015 | | | | $9,064 | $9,357 | $8,097 | $8,613 | $35,131 |
| FLAME 5187-5731 | $ 0.0342 | $ 0.0018 | $8,989 | $9,062 | $8,946 | $8,074 | $9,071 | $8,854 | $8,789 | $61,785 |
| | *$ 0.0308* | *$ 0.0006* | *$749* | *$755* | *$746* | *$673* | *$756* | *$738* | *$732* | *$5,149* |
| FLICKER 5188-0405 | $ 0.0225 | $ 0.0004 | $1,992 | $2,130 | $2,002 | $2,215 | $2,342 | $2,241 | $2,558 | $15,480 |
| WAX 5185-1099 | $ 0.0873 | $ 0.0055 | $5,647 | $5,718 | $5,223 | $3,188 | $4,154 | $4,332 | $0 | $28,262 |
| | *$ 0.0786* | *$ 0.0024* | *$616* | *$624* | *$570* | *$348* | *$453* | *$473* | *$0* | *$3,084* |
| MINLEX 5187-2317 | *$ 0.0380* | *$ (0.0014)* | *N/A* | *N/A* | *N/A* | | | | | *$0* |
| | *$ 0.0342* | *$ (0.0028)* | | | | *N/A* | *N/A* | *N/A* | *N/A* | *$0* |
| Total Royalties Calculated (before taxes) | | | $25,783 | $35,142 | $32,569 | $23,562 | $26,133 | $24,735 | $20,692 | $188,616 |

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
|---|---|---|---|---|---|---|---|---|---|
| Wells Fargo Rate | | 8.25% p.a. | | 0.6875% p.m. | | | | | |
| Present Value [PV] | $ | 25,607 | $ 34,664 | $ 31,906 | $ 22,925 | $ 25,253 | $ 23,739 | $ 19,723 | $ 183,817 |
| Earlier Settlement | $ | 25,607 | $ 34,664 | $ 31,906 | $ 22,925 | $ 25,253 | $ 23,739 | $ 4,483 | $ 168,577 |
| Remainder: 9~30 Jan.2008 | $ | - | $ - | $ - | $ - | $ - | $ . - | $ 15,240 | $ 15,240 |

Friday, 16-Jan-2009, Recomputed.