1  Charles H. Kanter, Bar No. 071410
   ckanter@ptwww.com
2  Erica M. Sorosky, Bar No. 251314
   esorosky@ptwww.com
3  PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP
   2603 Main Street
4  East Tower - Suite 1300
   Irvine, California 92614-4281
5  Telephone: (949) 851-9400
   Facsimile: (949) 757-1225
6
   Attorneys for Defendants Foamtec (Singapore) Pte.
7  Ltd. and Foamex Asia Ltd.

8              UNITED STATES DISTRICT COURT

9        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

10

11 Advanced Materials Group, Inc., a Nevada ) Case No.  SACV08-00043 JVS (RNBx)
   Corporation,                            )
12                                         ) **TRIAL BRIEF OF DEFENDANTS**
                 Plaintiff,                ) **FOAMTEC (SINGAPORE) PTE. LTD.**
13                                         ) **AND FOAMEX ASIA LTD.**
          vs.                              )
14                                         ) Assigned for All Purposes To:
   Foamtec (Singapore) Pte. Ltd., a private ) Judge:  Hon. James Selna
15 limited company incorporated in         )
   Singapore; and Foamex Asia Ltd, a       ) Trial Date:     March 31, 2009
16 private limited company incorporated in  )
   the Kingdom of Thailand and DOES 1      )
17 through 10, inclusive,                   )
                                           )
18               Defendants.               )
                                           )
19 _____ )

20

21         Pursuant to Local Rule 16-10, defendants Foamtec (Singapore) Pte. Ltd. and

22 Foamex Asia Co. Ltd. (erroneously sued as Foamex Asia Ltd.) (collectively "Foamtec")

23 submit the following trial brief in support of its claims against plaintiff Advanced

24 Materials Group, Inc. ("AMG").

25 ///

26 ///

27 ///

28 ///

# TABLE OF CONTENTS

**Page**

1.    PRELIMINARY STATEMENT .................................................................2

2.    STATEMENT OF FACTS ........................................................................2

3.    ARGUMENT ...........................................................................................5

     A.    The Mutual Intent of the Parties Clearly Establishes That the
         Only Product Covered by the Manufacturing Agreement is the
         Special Ink Jet Foam Used to Hold and Dispense Ink in the
         Ink Jet Cartridge of the Hewlett Packard Ink Jet Printer ...........................5

         (1)    The Course of Conduct of the Parties Also Establishes
              That the Only Product Subject to the Manufacturing
              Agreement Was the Special Ink Jet Foam Used in the
              Hewlett Packard Ink Jet Printer Cartridge .........................................7

     B.    The Customers Covered by the Manufacturing Agreement Do
         Not Include The Alleged Subcontractors Identified by AMG ...................9

     C.    The Issue Regarding the Date of the Manufacturing
         Agreement (January 8 or January 30, 1998) Has Been
         Resolved ......................................................................................... 12

4.    CONCLUSION........................................................................................ 13

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Div. of Labor Stand. Enf. v. Dick Bullis, Inc.*
    (1977) 72 Cal.App.3d Supp. 52 ..................................................................10

*Hernandez v. Badger Construction Equipment Co.*
    (1994) 28 Cal.App.4th 1791 ........................................................................7

*Pierce v. Merell*
    (1900) 128 Cal. 464 ....................................................................................12

*San Joaquin v. Workers Compensation Appeal Board*
    (2004) 117 Cal.App.4th 1180 .......................................................................5

*Tillis v. Western Growers, Inc.*
    (1941) 44 Cal.App.2d 826 ..........................................................................12

*TRB Investments, Inc. v. Fireman's Fund Insurance Co.*
    (2006) 40 Cal.App.4th 19 .............................................................................5

*Universal Sales Corp. v. California Press Mfg. Co.*
    (1942) 20 Cal. 2d 751 .............................................................................7, 8

*Yoshida v. Liberty Mutual*
    (9th Cir. 1957) 240 F.2d 824 ......................................................................12

## Statutes

California Civil Code § 1636 .............................................................................5

California Civil Code § 1638 ...........................................................................12

California Civil Code § 1639 ...........................................................................12

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* ............................11

## Regulations

17 C.F.R. § 240.12b-2 .....................................................................................11

Palmieri, Tyler, Wiener
Wilhelm & Waldron LLP
Attorneys at Law

TRIAL BRIEF

1. **PRELIMINARY STATEMENT**

By Stipulation of the parties and Order of the Court, the only two issues involved in this phase of the trial are as follows:

1.     The type of foam product covered under the Manufacturing Agreement; and

2.     The type of customers and sales covered under the Manufacturing Agreement (including the definition of the term "Affiliate" as used in the Manufacturing Agreement).

As to the type of products covered under the Manufacturing Agreement, the trial testimony of <u>both</u> AMG and Foamtec, submitted by way of declaration, is identical. The only product covered by the Manufacturing Agreement is the special ink jet foam used to hold and dispense ink in the ink jet cartridge reservoir in the Hewlett Packard ink jet printer.  Both Steve Scott (the President of AMG who negotiated the Manufacturing Agreement) and Steve Scibelli (the President of Foamtec who negotiated the Manufacturing Agreement) agree on this essential point.  With regard to the type of customers covered by the Manufacturing Agreement, paragraph 2.1 of the Manufacturing Agreement limits the customers to those "approved unanimously" by the parties.  The only customer "approved unanimously" by the parties is Hewlett Packard. The Addendum has language which also includes "Affiliates" of Hewlett Packard as customers.  However, the definition of the term "Affiliate" in the Manufacturing Agreement is clear and unambiguous.  It applies only to subsidiaries of Hewlett Packard and does not apply to independently owned companies that manufacture parts for Hewlett Packard.  Since the definition of "Affiliate" in the Manufacturing Agreement is clear and unambiguous, no parol evidence is admissible on this issue.

2. **STATEMENT OF FACTS**

In January of 1998, AMG's predecessor (Advanced Material Foreign Sales Corporation, Ltd.) entered into the Manufacturing Agreement ("Manufacturing Agreement") with Foamtec's predecessor (Foamtec Singapore Pte. Ltd.) whereby they

1  agreed to combine efforts to sell certain foam products to Hewlett Packard in Asia.  At
2  the time the Manufacturing Agreement was signed, AMG and Foamtec also entered into
3  companion agreements entitled Advanced Materials Foreign Sales Corporation Limited
4  Equipment Lease and Technical Information License Agreement.  In June of 2003, the
5  Manufacturing Agreement was amended by way of an agreement entitled Addendum to
6  the Manufacturing Agreement ("Addendum").  The Addendum was drafted to set forth a
7  major shift in the duties of the parties.  Due to severe financial problems at AMG,
8  Foamtec had taken over all of AMG's duties under the Manufacturing Agreement.
9  From this point in time forward, AMG was doing nothing except collecting a check for
10 its share of the profits.

11      The foam products covered by the Manufacturing Agreement are defined by
12 Article 2.1 of the Manufacturing Agreement:

> The purposes for which the Agreement is entered (the "Business") are for AMFS to acquire raw material from [Foamex USA], and to sell such raw material to Foamtec, and for Foamtec to fabricate such raw foam products at Foamtec's facility in Singapore, *utilizing machinery and technology supplied by AMFS*, for resale of *finished foam products* to AMFS, which will then sell such products to Hewlett-Packard and to certain other approved customers and products, *such products and such customers to be approved unanimously by the Parties from time to time on a case-by-case basis* (the "Products").  (Emphasis added.)

19      The Addendum, at Paragraph 16.1, contains the exact same language set forth
20 above but adds the following:

> Following the Addendum Effective Date, subject to the provisions of Section 3.2(d) of the Manufacturing Agreement, the purposes for which this Business Agreement is entered into (the "Business") shall be to manufacture and sell to Hewlett-Packard Company, a Delaware corporation, *including its Affiliates and its successors and assigns* (collectively, "Hewlett-Packard"), *finished foam products* (the "Products"), with all manufacturing, sales, delivery, billing, and collection of and for the Products to be effected by Foamex as agent for the Business.  (Emphasis added.)

27      Notwithstanding the additional language in the Addendum, both the
28 Manufacturing Agreement and the Addendum provide that the *only* products that are the

1   subject of the Manufacturing Agreement are the finished foam products that are

2   "approved unanimously by the Parties . . .".  As established by the trial testimony

3   declarations of <u>both sides</u>, the only product on which profits were to be calculated under

4   the Manufacturing Agreement was the special ink jet foam used to hold and dispense

5   ink in the Hewlett Packard ink jet printer cartridge reservoir.  This was the only product

6   on which there was "unanimous approval" as required by the language of the

7   Manufacturing Agreement.  The fact that this one product was the only product covered

8   by the Manufacturing Agreement is also established by the course of conduct of the

9   parties over the 10-year term of the Manufacturing Agreement.  Specifically, AMG

10  admits that it sold other types of foam products to Hewlett Packard for use in the

11  Hewlett Packard ink jet printers.  However, the parties discussed and agreed that these

12  other types of foam products used in the Hewlett Packard ink jet printers were <u>not</u>

13  covered by the Manufacturing Agreement.

14          The type of customers covered by the Manufacturing Agreement is defined in

15  Article 2.1 of the Manufacturing Agreement.  Like the type of products, Article 2.1

16  limits the type of customers to ". . . such customers to be approved unanimously by the

17  parties from time to time on a case by case basis."  The Addendum repeats this same

18  language requiring customers to be "approved unanimously by the parties", but adds a

19  reference to "Hewlett Packard Company, a Delaware corporation, including its

20  Affiliates and its successors and assigns".  The term "Affiliate" is a defined term in the

21  Manufacturing Agreement.  The definition is clear.  It only includes companies, like

22  subsidiaries, where Hewlett Packard has "the power to direct or cause the direction of

23  the <u>management and policies</u>" of the company.  None of the alleged subcontractors of

24  Hewlett Packard, as claimed by AMG, qualify as "Affiliates" under the definition in the

25  Manufacturing Agreement.  In addition, AMG has not met and cannot meet its burden

26  of proof on this issue.  Moreover, the entire issue is irrelevant because Foamtec has

27  never sold any ink jet cartridge foam products to any of the alleged subcontractors of

28  Hewlett Packard.

1  **3.    ARGUMENT**

2      **A.      The Mutual Intent of the Parties Clearly Establishes That the Only**

3              **Product Covered by the Manufacturing Agreement is the Special Ink**

4              **Jet Foam Used to Hold and Dispense Ink in the Ink Jet Cartridge of**

5              **the Hewlett Packard Ink Jet Printer.**

6          To the extent that there is any ambiguity in the language of a contract, the Court

7  should interpret the contract according to the intent of the parties.  If the intent of the

8  parties is ascertainable, it has been held that it should be given great weight in

9  interpreting the contract.  *San Joaquin v. Workers Compensation Appeal Board* (2004)

10  117 Cal.App.4th 1180, 1184.  The California Supreme Court has held that the

11  fundamental rules of contract interpretation are based on the premise that the

12  interpretation of a contract must give effect to the "mutual intention" of the parties.  *TRB*

13  *Investments, Inc. v. Fireman's Fund Insurance Co.* (2006) 40 Cal.App.4th 19, 27.

14  California statutory law also recognizes the importance of the intent of the parties.

15  California Civil Code § 1636 states:  "A contract <u>must</u> be so interpreted as to give effect

16  to the mutual intention of the parties as it existed at the time of contracting, so far as the

17  same is ascertainable and lawful."  (Emphasis added.)

18          The direct testimony already submitted by the trial testimony declarations of

19  AMG and Foamtec conclusively establishes that it was the intent of the parties that the

20  *only* product on which profits were calculated was the special ink jet foam used in the

21  Hewlett Packard ink jet printer cartridge reservoir.  Steve Scott was the president of

22  AMG at the time the Manufacturing Agreement was executed.  He signed the

23  Manufacturing Agreement and Addendum and was the principal negotiator of the

24  Manufacturing Agreement and Addendum on behalf of AMG.  Steve Scibelli served the

25  exact same role on behalf of Foamtec.  Both Steve Scott and Steve Scibelli agree that

26  the Addendum did not and was not intended to change or expand the product under the

27  Manufacturing Agreement on which profits were to be calculated and divided between

28  Foamtec and AMG.  (Foamtec's Trial Testimony of Steve Scott, ¶¶ 5-6; AMG's Trial

1  Testimony of Steve Scott, ¶ 10; Foamtec's Trial Testimony of Steve Scibelli, ¶¶ 15-16.)
2  More importantly, Steve Scott and Steve Scibelli have both declared under oath that it
3  was the intent of the parties that the only product subject to the Manufacturing
4  Agreement was the special ink jet foam used in the Hewlett Packard ink jet printer
5  cartridge reservoir.  Specifically, Steve Scott declared: "The only product subject to the
6  Agreement was the special type of foam used in the Hewlett Packard ink jet printer
7  cartridge reservoir.  No other products or materials were subject to or covered by the
8  Agreement." (Foamtec's Trial Testimony of Steve Scott, ¶ 6.)  Even in his declaration
9  submitted by AMG, Steve Scott stated:  "I also agree with Mr. Foong's statement that
10 this agreement . . . would only cover the production of ink jet cartridge components.
11 AMG and Foamtec from time to time both sold certain unrelated products to the
12 subcontractors for parts other than ink jet foam cartridges, sometimes even the same
13 parts, and those sales were not considered covered by our agreement, and no royalties
14 were due to AMG on account of such sales." (Emphasis added.)  (AMG's Trial
15 Testimony of Steve Scott, ¶ 10.)

16      In sum, Steve Scott, the President of AMG, admits that the ink jet foam product
17 used in the ink jet cartridge reservoir was the only product covered by the
18 Manufacturing Agreement.  This understanding is confirmed by Steve Scibelli, who
19 states, in his direct testimony declaration at paragraph 16, that "The only product
20 covered by the Agreement and the Addendum was the ink jet foam used in the ink jet
21 printer cartridge in the Hewlett Packard ink jet printers."  This same understanding is
22 also supported by AMG's other trial witness, Dave Kalash, who states in paragraph 3 of
23 his declaration that the product manufactured pursuant to the agreement was the ink jet
24 printer cartridge product.  Since all parties agree, this issue has been resolved.

25
26
27
28

**(1)    The Course of Conduct of the Parties Also Establishes That the Only Product Subject to the Manufacturing Agreement Was the Special Ink Jet Foam Used in the Hewlett Packard Ink Jet Printer Cartridge.**

Next to direct testimony regarding the intent of the parties, *the actual conduct of the parties after execution of their contract and before any controversy has arisen as to its effect affords the most reliable evidence of the parties' intentions.* (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1814.) The California Supreme Court has so held in *Universal Sales Corp. v. California Press Mfg. Co.* (1942) 20 Cal. 2d 751. In *Universal Sales,* the parties contracted for plaintiff to purchase and operate a pellet press developed by defendant and they agreed to a cooperative effort to promote and improve upon the product. (*Id.* at p. 755.) The contract also entitled plaintiff to share in the profits of all further sales of the presses. The parties collaborated and identified several problem areas. (*Id.* at pp. 756-757.) Defendant developed and began selling a new type of press without plaintiff's knowledge and lost interest in improving the version sold to plaintiff. Plaintiff sued and demanded a share of the profits on the new type press defendant was selling. (*Id.* at pp. 757-758.) The trial court found for plaintiff and ruled that defendant had breached the contract, based in part on the fact that the conduct of the parties proved that a joint venture existed to develop, market and share profits on the sale of the presses. (*Id.* at pp. 761-765.)

On appeal, the court affirmed the trial court's construction of the contract. The court utilized the familiar rule that *when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court.* (*Id.* at p. 761.) The court explained that the reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal

1  interpretation of the terms of the contract, and a practical construction placed by the

2  parties upon the instrument is the best evidence of their intention. (*Id.* at p. 762.) The

3  court further articulated:

4       It is to be assumed that parties to a contract best know what
     was meant by its terms, and are the least liable to be mistaken

5       as to its intention; that each party is alert to his own interests,
     and to insistence on his rights, and that whatever is done by

6       the parties contemporaneously with the execution of the
     contract is done under its terms as they understood and

7       intended it should be. ***Parties are far less liable to have been
     mistaken as to the intention of their contract during the***

8       ***period while harmonious and practical construction reflects
     that intention***, than they are when subsequent differences have

9       impelled them to resort to law, and one of them then seeks a
     construction at variance with the practical construction they

10       have placed upon it. (*Ibid.*)

11       In the present case, as in *Universal Sales,* the conduct of the parties after

12  execution of the Manufacturing Agreement and before any controversy arose provides

13  reliable evidence of the parties' intentions.  The course of conduct of the parties during

14  the initial ten-year term of the Manufacturing Agreement establishes that the only

15  product subject to the Manufacturing Agreement was the finished ink jet foam product

16  used in the Hewlett Packard ink jet printer cartridge reservoir.  (Foamtec's Trial

17  Testimony of Steve Scott, ¶¶ 5-6; AMG's Trial Testimony of Steve Scott, ¶ 10;

18  Foamtec's Trial Testimony of Steve Scibelli, ¶¶ 15-16.)  It is telling that during the

19  initial ten-year term of the Manufacturing Agreement, AMG manufactured and sold to

20  Hewlett Packard foam products (other than ink jet foam) for use in the Hewlett Packard

21  ink jet printers.  (AMG Trial Testimony of Steve Scott, ¶ 10.)  One such product

22  involved a needlepoint felt foam product which was used as part of the "spittoon" in the

23  Hewlett Packard ink jet printer.  The Trial Testimony Declaration from both Steve Scott

24  and Steve Scibelli establishes that they discussed AMG's "direct sale" of this

25  needlepoint felt foam product to Hewlett Packard, and they specifically agreed that this

26  was <u>not</u> covered by the Manufacturing Agreement.  (Foamtec's Trial Testimony of Steve

27  Scott, ¶ 5; Foamtec's Trial Testimony of Steve Scibelli, ¶ 17.)  In fact, AMG had its own

28  seller, Jim Sierra, who called on Hewlett Packard and sold products (other than the ink

1 jet foam used in the ink jet printer cartridges) to Hewlett Packard at its various

2 divisions.  (Foamtec's Trial Testimony of Steve Scott, ¶ 5.)  Steve Scott even makes

3 clear in his Trial Testimony submitted by AMG that products other than the special ink

4 jet foam for the Hewlett Packard ink jet printer cartridge were not covered by the

5 Manufacturing Agreement, that both AMG and Foamtec were free to sell such other

6 products to Hewlett Packard or to Hewlett Packard subcontractors, and that such sales

7 were specifically not covered by the Manufacturing Agreement.  (AMG's Trial

8 Testimony if Steve Scott, ¶ 10.)

9      In sum, based upon the negotiations of the parties, the intent of the parties, and

10 the course of conduct of the parties during the initial ten-year term of the Agreement,

11 the only product subject to the Agreement was the finished product made of ink jet foam

12 used in the Hewlett Packard ink jet printer cartridge reservoir.

13     **B.**    <u>**The Customers Covered by the Manufacturing Agreement Do Not**</u>

14         <u>**Include The Alleged Subcontractors Identified by AMG.  They Are**</u>

15         <u>**Not "Affiliates" of Hewlett Packard, and Accordingly, Are Not Part of**</u>

16         <u>**the Customer Base on Which Profits Were To Be Calculated Under**</u>

17         <u>**the Manufacturing Agreement**</u>.

18      The Manufacturing Agreement, at Article 2.1, defines the customers covered by

19 the Manufacturing Agreement as "such customers to be approved unanimously by the

20 Parties from time to time on a case by case basis".  The parties have unanimously

21 approved and agreed that Hewlett Packard is a customer covered by the Manufacturing

22 Agreement.  However, AMG also claims that certain alleged subcontractors of Hewlett

23 Packard qualify as "Affiliates" as defined in the Manufacturing Agreement.  These

24 alleged subcontractors are Flextronics, Technicom Systems, Tech Group Asia, Jabal,

25 Cal Comp and Kinpo ("HP Subcontractors").  AMG therefore contends that all sales of

26 ink jet foam for use in Hewlett Packard ink jet printer cartridges to the HP

27

28

1   Subcontractors would be sales covered by the Agreement.[1]  It is the position of Foamtec

2   that none of these alleged HP Subcontractors qualify as "Affiliates" as that term is

3   defined in the Manufacturing Agreement.

4         If the provisions of a contract are not ambiguous, it is the duty of the court to

5   enforce the contract as written and agreed upon by the parties.  (*Div. of Labor Stand.*

6   *Enf. v. Dick Bullis, Inc.* (1977) 72 Cal.App.3d Supp. 52, 56-57.)  In the present case, the

7   definition of the term "Affiliate" under the Manufacturing Agreement is clear and

8   unambiguous.  Accordingly, the Court must enforce this provision as written and agreed

9   upon by the parties.  An "Affiliate" is defined in the Manufacturing Agreement as

10  follows:

11          An "Affiliate," when used with respect to a specified person,
        shall mean (i) any other Person directly or indirectly
12          controlling, controlled by, or under common control with such
        specified Person, (ii) any officer, director, partner (including
13          any officer or director of AMFS or Foamtec), legal
        representative (including a trustee for the benefit of such
14          specified Person) or employee of such specified Person, and
        (iii) any Person for which such specified Person acts as an
15          officer, director, partner or employee.  As used in this
        definition of "Affiliate" the term "Control" and any derivatives
16          thereof means the ***possession, directly or indirectly, of the
        power to direct or cause the direction of the management
17          and policies*** of a Person, whether through ownership of voting
        securities, ***by contract, or otherwise.***"  (Trial Exhibit, Nos. 1,
18          3.)  (Emphasis added.)

19        AMG argues that the Addendum expanded the customer base on which profits are

20  calculated under the Manufacturing Agreement to include any independent company

21  that was manufacturing parts for Hewlett Packard, including the HP Subcontractors.

22  (Trial Testimony of Ed Sybesma, ¶ 9.)  AMG argues that Hewlett Packard could direct

23  the "management and policies" of the HP Subcontractors because the HP Subcontractors

24  were required to manufacture printer parts to the specifications of Hewlett Packard.

25

26  _____

27  [1]  Regardless of how the Court decides this issue, it is, in fact, irrelevant because
    Foamtec has not sold any ink jet foam for use in Hewlett Packard ink jet cartridges to
    any of these alleged subcontractors.

28

1  Accordingly, AMG argues that such HP Subcontractors are "Affiliates" of Hewlett

2  Packard. (*Ibid.*)

3       The definitions of "affiliate" and "control" used in the Securities Exchange Act of

4  1934 ("Exchange Act") and the rules and regulations promulgated thereunder (the

5  "Exchange Act Rules") are instructive here because the definitions of these terms in the

6  Manufacturing Agreement were taken from the Exchange Act Rules. (Securities

7  Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*) The Exchange Act Rules define an

8  "affiliate" as "a person that directly, or indirectly through one or more intermediaries,

9  controls, or is controlled by, or is under common control with, the person specified." 17

10 C.F.R. § 240.12b-2. The term "control" (including the terms "controlling," controlled

11 by" and "under common control with") is defined in the Exchange Act Rules as "the

12 possession, direct or indirect, of the power to direct or cause the direction of the

13 management and policies of a person, whether through the ownership of voting

14 securities, by contract or otherwise." 17 C.F.R. § 240.12b-2.

15       These definitions of the terms "affiliate" and "control" are commonly used

16 throughout the Securities Exchange Act of 1934 and are commonly used by corporate

17 attorneys to define subsidiaries and related entities. In fact, a "subsidiary" is defined in

18 the Exchange Act Rules using the term "affiliate". Specifically, Rule 12b-2 of the

19 Exchange Act, 17 C.F.R. § 204.12b-2 defines a "subsidiary" as "an <u>affiliate</u> controlled

20 by such person, directly or indirectly through one or more subsidiaries." (Emphasis

21 added.) Thus, the plain language of the Manufacturing Agreement, in using the

22 definitions of "affiliate" and "control" from the Exchange Act Rules, describes a related

23 family of companies where one parent or controlling entity has the power to direct the

24 "management and policies" of the other company. Independently-owned companies

25 who simply manufacture a part or product for Hewlett Packard would not qualify as

26 "affiliates" because they are not subsidiaries of Hewlett Packard and Hewlett Packard

27 does not control the "management and policies" of these independent companies. AMG

28 has not met its burden of proof and cannot establish that Hewlett Packard controlled the

1   "management and policies" of the HP Subcontractors.  Merely providing specifications

2   for a product or part manufactured by the HP Subcontractor does not give Hewlett

3   Packard the power to direct the "management and policies" of the HP Subcontractor.

4          The definitions of "affiliate" and "control" as set forth in the Manufacturing

5   Agreement are clear and unambiguous.  They cover subsidiaries and not independent

6   third-party subcontractors.  This conclusion is supported by the use and application of

7   these definitions taken from the Exchange Act Rules.  Since the language of these

8   definitions is unambiguous, no parol evidence is admissible to contradict the plain

9   language of these definitions.  (Civil Code § 1638; *Yoshida v. Liberty Mutual* (9th Cir.

10  1957) 240 F.2d 824, 826-27; *Pierce v. Merell* (1900) 128 Cal. 464, 472; Civil Code

11  § 1639; *Tillis v. Western Growers, Inc.* (1941) 44 Cal.App.2d 826, 831.)  In sum, the

12  alleged HP Subcontractors are not covered by the Manufacturing Agreement.  Only

13  Hewlett Packard and its subsidiaries are covered by the Manufacturing Agreement.

14  **C.    The Issue Regarding the Date of the Manufacturing Agreement**
15  **(January 8 or January 30, 1998) Has Been Resolved.**

16          A minor issue reserved by the Court in the Court's ruling on Foamtec's Motion for

17  Summary Adjudication is whether the Manufacturing Agreement was entered into on

18  January 8 or January 30, 1998.  Foamtec calculated the buyout price paid to AMG using

19  the January 8, 1998 date, estimating income through January 8, 2008.  AMG argues that

20  Foamtec should have paid a buyout price based on the estimated income through

21  January 30, 2008.  However, because this is such a small issue, Foamtec has resolved

22  this issue prior to the date of trial by paying AMG the sum of $15,240 – the amount that

23  AMG would have received based on projected sales to Hewlett Packard for the period

24  of time from January 8 through January 30, 1998.  (Foamtec's Trial Testimony of Steve

25  Scibelli, ¶ 13.)  (Attached hereto as Exhibit A is a true and correct copy of the letter and

26  check mailed to George Burns on March 17, 2009.)

27

28

## 4.    **CONCLUSION**

Based on the foregoing, Foamtec respectfully requests that the Court make findings of fact as follows:

1.    The only product intended to be covered and actually covered under the Manufacturing Agreement and the Addendum is the finished product involving ink jet foam used to hold and dispense ink in the ink jet cartridge reservoir in the Hewlett Packard ink jet printers.

2.    The only customers covered by the Manufacturing Agreement and the Addendum are Hewlett Packard and subsidiaries of Hewlett Packard.  Independently-owned companies that manufactured parts for Hewlett Packard pursuant to Hewlett Packard specifications are not "Affiliates" as defined in the Manufacturing Agreement and are not covered by the Manufacturing Agreement.

3.    All disputed issues relating to whether the Manufacturing Agreement was entered into on January 8, 1998, or January 30, 1998, have been resolved by Defendants' paying Plaintiff the sum of $15,240, which represents the amount that AMG would have received based on projected sales to Hewlett Packard for the period of time from January 8 through January 30, 1998.


Dated:  April 15, 2009                    PALMIERI, TYLER, WIENER,
                                          WILHELM & WALDRON LLP


                                          By: _____
                                              Charles H. Kanter
                                              Erica M. Sorosky
                                              Attorneys for Defendants
                                              Foamtec (Singapore) Pte. Ltd. and
                                              Foamex Asia Ltd.

LAW OFFICES

PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP

A LIMITED LIABILITY PARTNERSHIP INCLUDING PROFESSIONAL CORPORATIONS

2603 MAIN STREET

EAST TOWER - SUITE 1300

IRVINE, CALIFORNIA 92614-4281

(949) 851-9400

www.ptwww.com

March 17, 2009

ANGELO J. PALMIERI (1926-1996)
ROBERT F. WALDRON (1927-1998)

ALAN H. WIENER*
ROBERT C. IHRKE*
JAMES E. WILHELM*
DENNIS G. TYLER*
MICHAEL J. GREENE*
DENNIS W. GHAN*
DAVID D. PARR*
CHARLES H. KANTER*
PATRICK A. HENNESSEY
DON FISHER
GREGORY N. WEILER
WARREN A. WILLIAMS
JOHN R. LISTER
CYNTHIA M. WOLCOTT
GARY C. WEISBERG
MICHAEL H. LEIFER
SCOTT R. CARPENTER
RICHARD A. SALUS
NORMAN J. RODICH
RONALD M. COLE
MICHAEL L. D'ANGELO
STEPHEN A. SCHECK

DONNA L. SNOW
RYAN M. EASTER
ELISE L. ENOMOTO
HEATHER C. WHITMORE
ELIZABETH VALADEZ
MELISA R. PEREZ
ANISH J. BANKER
MICHAEL I. KEHOE
ROBERT H. GARRETSON
RYAN M. PRAGER
JOSEPH W. HANEY III
JULIA A. GOWIN
CHADWICK C. BUNCH
ANNIE C. CHU
JERAD BELTZ
HEATHER H. WHITEHEAD
ERIN BALSARA
BRETT L. HORVATH
DEREK M. DEHANKE
F. JULIAN FREEMAN III
ERICA M. SOROSKY

*A PROFESSIONAL CORPORATION

P.O. BOX 19712
IRVINE, CA 92623-9712

WRITER'S DIRECT
DIAL NUMBER
(949) 851-7232
ckanter@ptwww.com

FACSIMILE (949) 851-1554
(949) 851-3844
(949) 757-1225

REFER TO FILE NO.
34492-001

George S. Burns, Esq.
4100 MacArthur Blvd, Suite 305
Newport Beach, CA 92660

Re:  *Advanced Materials Group v. Foamtec, et al.*

Dear George:

As you know, Judge Selna's written ruling on my Motion for Summary Adjudication supports my position in all respects. However, he denied the Motion and reserved the issue of whether an additional buyout payment was due and owing to AMG for the period January 8 through January 30, 2008. As we stated in our Summary Adjudication papers and in our Memorandum of Contentions of Fact and Law, since this is a relatively small amount of money, my clients do not think it is worth fighting over.

Therefore, in order to resolve the dispute regarding the additional buyout payment due and owing for the period January 8 through January 30, 2008, enclosed is my client's check payable to Advanced Materials, Inc. in the amount of $15,240. It is Check No. 001544 dated March 11, 2009. The amount of $15,240 is based upon Hewlett Packard sales projections and represents the amount that AMG would have been paid in the buyout if the purchase price had been calculated through January 30, 2008. Attached

PALMIERI, TYLER, WIENER, WILHELM & WALDRON LLP

George S. Burns, Esq.
March 17, 2009
Page 2


hereto is a chart showing the basis of the calculation for this $15,240 payment.  Please call me if you have questions or comments.

Very truly yours,

Charles H. Kanter

CHK:slp
Enclosures



ORIGINAL CHECK HAS A COLORED BACKGROUND PRINTED ON CHEMICAL REACTIVE PAPER - SEE BACK FOR DETAILS

"001544" ⑁122016066⑁ 101"685071⑁

**AMTEC INTERNATIONAL, LLC**

| | | | | | CHECK NO. | |
| VENDOR: ADV01 | Advanced Materials, Inc. | | | 03/11/09 | | 001544 |

| VOUCHER NO. | INVOICE NO. | INVOICE DATE | INVOICE AMOUNT | AMOUNT PAID | DISCOUNT TAKEN | NET CHECK AMOUNT |
|---|---|---|---|---|---|---|
| 022477 | 00000031109 | 03/11/09 | 15,240.00 | 15,240.00 | .00 | 15,240.00 |
| | | | | | Check Total | 15,240.00 |

7 LTD    CA251866

EXHIBIT A, Page 3

HP Forecasts
as at 15-5-07 — Qty,000 — 100% Forecast — 29-May-07

| PART No. | | F Jul-07 | F Aug-07 | F Sep-07 | F Oct-07 | F Nov-07 | F Dec-07 | F Jan-08 O | TOTAL Jul~Jan |
|---|---|---|---|---|---|---|---|---|---|
| PELE | | | | | | | | | |
| 4-75 Side | | 367 | 294 | 338 | 329 | 295 | 236 | 254 | 2,113 |
| 5-50 Ctr | | 184 | 147 | 169 | 165 | 147 | 118 | 127 | 1,057 |
| 4-75 Ctr | | 500 | 533 | 536 | 514 | 505 | 508 | 555 | 3,651 |
| 4-75 Short | | 1,001 | 1,066 | 1,072 | 1,029 | 1,011 | 1,016 | 1,110 | 7,305 |
| 5183-5666 | | | | | | | | | . |
| CARLEX | | 3,462 | 7,490 | 6,703 | 6,714 | 6,931 | 5,998 | 6,380 | 43,678 |
| 5183-5934 | | | | | | | | | . |
| FLAME | | 5,549 | 5,594 | 5,522 | 4,984 | 5,599 | 5,466 | 5,426 | 38,139 |
| 5187-5731 | *Thai 20%* | *1,387* | *1,398* | *1,381* | *1,246* | *1,400* | *1,366* | *1,356* | *9,535* |
| FLICKER | | 5,534 | 5,918 | 5,560 | 6,154 | 6,505 | 6,225 | 7,106 | 43,002 |
| 5188-0405 | | | | | | | | *0* | |
| WAX | | 1,141 | 1,155 | 1,055 | 644 | 839 | 875 | - | 5,710 |
| 5185-1099 | *Thai 20%* | *285* | *289* | *264* | *161* | *210* | *219* | *0* | *1,427* |
| MINLEX | *Thai 100%* | *609* | *2,448* | *2,434* | *2,575* | *2,775* | *2,647* | *2,630* | *16,118* |
| 5187-2317 | | Start 50% | | | | | | | |
| Total SG & Thai | | 20,019 | 26,332 | 25,034 | 24,515 | 26,217 | 24,674 | 24,944 | 171,735 |
| *Ex: Thai 20%* | | *1,672* | *1,687* | *1,644* | *1,407* | *1,610* | *1,585* | *1,356* | *10,962* |

### 90% Forecast; 10% Cost-down

| ROYALTIES (Estimated) | HP Price | Royalty per unit | Jul-07 | Aug-07 | Sep-07 | Oct-07 | Nov-07 | Dec-07 | Jan-08 | TOTAL Jul~Jan |
|---|---|---|---|---|---|---|---|---|---|---|
| 4-75 Side | $ 0.1360 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 5-50 Ctr | $ 0.1460 | $ (0.0027) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 4-75 Ctr | $ 0.1330 | $ (0.0026) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 4-75 Short | $ 0.0810 | $ (0.0008) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $0 |
| 5183-5666 | | EOL | | | | | | | | |
| CARLEX | $ 0.0270 | $ 0.0025 | $7,790 | $16,853 | $15,082 | | | | | $39,725 |
| 5183-5934 | $ 0.0243 | $ 0.0015 | | | | $9,064 | $9,357 | $8,097 | $8,613 | $35,131 |
| FLAME | $ 0.0342 | $ 0.0018 | $8,989 | $9,082 | $8,946 | $8,074 | $9,071 | $8,854 | $8,789 | $61,785 |
| 5187-5731 | *$ 0.0308* | *$ 0.0006* | *$749* | *$755* | *$746* | *$673* | *$756* | *$738* | *$732* | *$5,149* |
| FLICKER | $ 0.0225 | $ 0.0004 | $1,992 | $2,130 | $2,002 | $2,215 | $2,342 | $2,241 | $2,558 | $15,480 |
| 5188-0405 | | | | | | | | | | |
| WAX | $ 0.0873 | $ 0.0055 | $5,647 | $5,718 | $5,223 | $3,188 | $4,154 | $4,332 | $0 | $28,262 |
| 5185-1099 | *$ 0.0786* | *$ 0.0024* | *$616* | *$624* | *$570* | *$348* | *$453* | *$473* | *$0* | *$3,084* |
| MINLEX | *$ 0.0380* | *$ (0.0014)* | N/A | N/A | N/A | | | | | $0 |
| 5187-2317 | *$ 0.0342* | *$ (0.0028)* | | | | N/A | N/A | N/A | N/A | $0 |
| Total Royalties Calculated (before taxes) | | | $25,783 | $35,142 | $32,569 | $23,562 | $26,133 | $24,735 | $20,692 | $188,616 |

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
|---|---|---|---|---|---|---|---|---|
| Wells Fargo Rate | 8.25% p.a. | | 0.6875% p.m. | | | | | |
| Present Value [PV] | $ 25,607 | $ 34,664 | $ 31,906 | $ 22,925 | $ 25,253 | $ 23,739 | $ 19,723 | $ 183,817 |
| Earlier Settlement | $ 25,607 | $ 34,664 | $ 31,906 | $ 22,925 | $ 25,253 | $ 23,739 | $ 4,483 | $ 168,577 |
| Remainder: 9~30 Jan.2008 | $ - | $ - | $ - | $ - | $ - | $ - | $ 15,240 | $ 15,240 |

Friday, 16-Jan-2009, Recomputed.

EXHIBIT A, Page 4